**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HERMAN BREWER, and FAYETTE REID,** *individually and on behalf of a class of all persons similarly situated*, <br><br> **and JAMES BROOKS,** *individually*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **ERIC H. HOLDER,** **United States Attorney General,** <br><br> **Defendant.** | **Civil Action No. 08-1747 (BJR)** <br><br> **MEMORANDUM OPINION** |

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiffs Herman Brewer and Fayette Reid, individually and on behalf of a class of similarly situated individuals, bring suit against their employer, the United States Marshals Service ("USMS" or "Defendant").  Plaintiffs allege that Defendant engaged in a pattern or practice of racial discrimination against them and other African American Deputy United States Marshals in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq* ("Title VII").  Plaintiff, James Brooks, brings individual claims of racial discrimination, hostile

work environment and retaliation under Title VII.[1]  Defendant moves for partial summary judgment.  For the following reasons, the Court grants in part and denies in part Defendant's motion.

## II.    BACKGROUND

Plaintiffs allege that USMS has failed to "revise[] its policies and practices" to "end the continuing pattern and practice of racial discrimination and remedy the effects of that discrimination," as "manifested by discriminatory employment practices with respect to promotions, transfers, assignments, training, awards, and the use of investigations."  Am. Compl. ¶¶ 29, 34.  Plaintiffs specifically challenge USMS's Merit Promotion System, alleging that the System's features impede the promotion of African American Deputy U.S. Marshals and favors the promotion of white Marshals over African American Marshals.  Furthermore, Plaintiffs allege that "[t]he high degree of subjectivity in the assignment and lateral transfer process has a disparate impact on African American [Deputy U.S. Marshals]," affecting their ability "to secure promotions or career enhancing opportunities and experiences.  *Id.* ¶¶ 55-56.

Plaintiffs also claim that they receive fewer career-enhancing training opportunities than their white counterparts because of "the high degree of subjectivity in how [Deputy U.S. Marshals] receive training."  *Id.* ¶ 65.   Similarly, Plaintiffs claim they have been discriminated against with respect to the distribution of awards.  *Id.* ¶ 71.  Finally, Plaintiffs allege that African American Deputy U.S. Marshals are "targeted by their white co-workers and supervisors for

---

[1]      Plaintiffs recently moved to add Brooks as a putative class representative, but that motion remains pending.

investigation by [the Office of Internal Investigation] based on frivolous allegations or for conduct that would not result in an investigation if committed by a white deputy." *Id.* ¶ 79.

Defendant has moved for summary judgment as to class claims that it discriminated against African-American Deputy Marshals in distributing awards, assignments, training, and promotions, and in conducting internal investigations. Def.'s Mot. at 1. Defendant also moves for summary judgment as to the individual claims asserted by Brooks for disparate treatment, hostile work environment, and retaliation. The Court first considers the parties' arguments and legal standards as to the class claims and will then turn to consider Brooks' individual claims. Further relevant facts are provided below as necessary.

## III.    ANALYSIS OF CLASS CLAIMS

### A.    Applicable Legal Standards

#### 1.  Summary Judgment

A motion for summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict" for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" if it could reasonably affect the outcome of the case. *Id.*

Where the movant does not bear the ultimate burden at trial, it need only satisfy the initial burden of demonstrating the absence of evidence to support the nonmovant's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant bears the ultimate burden of

persuasion, the movant must show the absence of a genuine issue of material fact by demonstrating each element of its claim or defense by sufficient, competent evidence. *Id.* at 331 (Brennan, J., dissenting). Once the motion has been properly supported, the burden shifts to the nonmovant to show that "the evidence is such that a reasonable jury could return a verdict" in its favor. *Anderson*, 477 U.S. at 248.

The nonmoving party must go beyond the allegations in his pleading and provide "specific facts showing there is a genuine issue for trial." *Celotex,* 477 U.S. at 324. To satisfy the burden of providing specific facts, the nonmoving party must tender affidavits or other competent evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The factual record and inferences therefrom are generally viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, to be entitled to preferential review, the nonmoving party must respond with competent evidence and cannot support its arguments on the basis of conclusory, speculative, or inadmissible statements.[2] *Celotex*, 477 U.S. at 322 n.3. Further, the nonmoving party's evidence must be more than "mere reargument of its case or a denial of an opponent's allegation"

---

[2] Furthermore, the court need only consider material clearly identified by the party asserting its relevance. Fed. R. Civ. P. 56(c)(3); *see generally Thomas v. Wichita Coca‒Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992) ("[The court] will not search the record in an effort to determine whether there exists . . . evidence which might require submission of the case to a jury."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure §

2738 at 356 (3d ed.1998).

Finally, not every disputed factual issue is material in light of the substantive law that

governs the case. "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at

248-50 (noting that if the evidence is "merely colorable" or "not significantly probative,"

summary judgment may be granted).

## 2. *Teamsters* framework

Disparate treatment claims may involve "an isolated incident of discrimination against a

single individual, or . . . allegations of a 'pattern or practice' of discrimination affecting an entire

class of individuals." *Aliotta v. Bair*, 614 F.3d 556, 562 (D.C. Cir. 2010). Plaintiffs here allege a

pattern or practice of discrimination. In *International Brotherhood of Teamsters v. United*

*States*, 431 U.S. 324 (1977), the Supreme Court set forth a specific framework for pattern or

practice cases. The D.C. Circuit succinctly described the "liability" phase of the *Teamsters*

framework as follows:

> In the initial, or 'liability,' phase of a pattern or practice lawsuit, the analysis
> focuses on whether the unlawful discrimination has been the employer's regular
> or 'systemwide' pattern or practice. In order to make out a prima facie case, the
> plaintiffs must . . . establish by a preponderance of the evidence that
> discrimination was the company's standard operating procedure—the regular
> rather than the unusual practice. In this phase, the plaintiffs need not show each
> individual member of the class was a victim of the employer's discriminatory
> policy, since proof of the pattern or practice supports an inference that any
> particular employment decision, during the period in which the discriminatory
> policy was in force, was made in pursuit of that policy.

*Aliotta v. Bair*, 614 F.3d at 562-63.

"Once a prima facie case is established, the burden shifts to the employer to rebut the inference of discrimination by showing the employees' proof is either inaccurate or insignificant." *Id.* at 563. "[T]he employer's defense must counter the [plaintiffs'] showing of a discriminatory pattern rather than simply point out that the employer did not discriminate against certain individuals, for the question is whether a pattern or practice exists, not whether specific employees were subject to discrimination." *EEOC v. Intn'l Profit Assocs.*, No. 01-C-4427, 2007 U.S. Dist. LEXIS 19070, at *24 (N.D. Ill. March 16, 2007); *see also Teamsters*, 431 U.S. at 360 n.46 ("The employer's defense must, of course, be designed to meet the prima facie case of the [plaintiffs] . . . The point is that at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.").

If an employer fails to rebut the inference that arises from the plaintiffs' prima facie case, the district court may conclude that discrimination occurred. "[A] court's finding of a pattern or practice justifies an award of prospective relief," such as an injunction or court monitoring. *Teamsters*, 431 U.S. at 361 (internal quotations omitted).

If plaintiffs seek individual relief for the victims of discriminatory practice, the litigation proceeds to the "remedial stage where each class member must show individual harm." *Aliotta v. Bair*, 614 F.3d at 563. During this stage, "a district court must usually conduct additional proceedings . . . to determine the scope of the individual relief." *Teamsters*, 431 U.S. at 361. By this point in a pattern-or-practice case, the plaintiff

would have already proved that the employer followed an employment policy of unlawful discrimination. *Id.* Therefore, the plaintiff need only show that he or she was "a potential victim of the proved discrimination," and the burden then shifts to the defendant "to demonstrate that the individual [class member] was denied an employment opportunity for lawful reasons" and "not based on its policy of discrimination." *Id.* at 363. "Any nondiscriminatory justification offered by the company will be subject to further evidence by the [plaintiffs] that the purported reason for the [adverse employment action] was in fact a pretext for unlawful discrimination." *Id.* at 362 n.50.

### 2. Class Certification – Adequate Representation Requirement

"[A] Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Falcon*, 457 U.S. at 161. Under Rule 23, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quoting *East Tex. Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). The Rule 23 requirement that a class representative be an "adequate" representative often overlaps with the Court's inquiry into a party's standing since a putative class member who did not suffer the same injury as the putative class lacks standing to bring the class claim. *Arnold v. Postmaster General*, 667 F. Supp. 6, 20 (D.C. Cir. 1987).

In employment discrimination class actions, "the mere fact that a complaint alleges racial . . . discrimination does not in itself ensure that the party who has brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination."

7

*Rodriguez*, 431 U.S. at 405. "Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160.

"A party seeking class certification must affirmatively demonstrate his compliance with [] Rule [23]," by presenting the court with facts that he meets the Rule's requirements. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. at 2552. Therefore, a preliminary inquiry into the merits of a pattern-or-practice suit is sometimes necessary to determine whether Rule 23 requirements are satisfied. *Id*. Indeed, the Advisory Committee recognized that the district court may need to allow for "discovery in aid of the certification decision," even though such discovery might overlap with the "merits discovery." *See* Rule 23, Notes of Advisory Committee on 2003 amendments; *see also Rodriguez*, 431 U.S. at 405 n.12 (stating that "the decision whether the named plaintiffs should represent a class is appropriately made on the full record").

If a specific plaintiff has not suffered the injury as a result of the alleged discriminatory practice, then he or she is "simply not eligible to represent a class of persons who did allegedly suffer injury." *Rodriguez*, 431 U.S. at 405. This is because "[o]ne whose own claim is a loser from the start knows that he has nothing to gain from the victory of the class, and so he has little incentive to assist or cooperate in the litigation; the case is then a pure class action lawyer's suit." *Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999). "The point is not that a plaintiff is disqualified as class representative if he *may* fail to prove his case or if the defendant may have a good defense. . . . But if [a plaintiff's] claim is a *clear* loser at the time he

asks to be made class representative, then approving him as a class representative can only hurt the class." *Id.* at 1158.

### 3. Defendant's Argument Regarding the Adequacy of Brewer and Reid to Serve as Class Representatives is Not Premature

Defendant moves for partial summary judgment as to claims that it discriminated against the putative class members through its policies regarding awards, assignments, training, and investigations. Def.'s Mot. at 1. Additionally, Defendant moves for summary judgment as to some of the putative class claims alleging discriminatory promotions practices. Def.'s Mot. at 29.

In its motion, Defendant does not attempt to refute the allegation that there has been a pattern or practice of discrimination. *See generally id.* Instead, Defendant argues that the "undisputed material facts demonstrate that the individual Plaintiffs have not suffered the injuries that they allege, and therefore cannot prevail on those claims on their own behalf nor bring them on behalf of similarly-situated members of a putative class." *Id.* In other words, Defendant contends that for claims related to awards, training, assignments, investigations, and promotions Brewer and Reid (the only remaining putative class representatives) are inadequate class representatives under Rule 23. Therefore, Defendants conclude, such claims should be dismissed.

Plaintiffs argue that Defendant's motion for summary judgment is premature and focuses on the wrong legal standards. Specifically, Plaintiffs contend that once a pattern or practice of discrimination is demonstrated, Defendant must rebut a presumption of discrimination by using "class-wide evidence." Plaintiffs further argue that Defendant's approach "inappropriately

focuses only on the merits of each individual claim," the wrong legal standards for a pattern or practice case. Pls.' Opp'n at 5. Plaintiffs insist that that Defendant's summary judgment motion should have solely focused "on whether there is sufficient evidence demonstrating that [D]efendant[] had in place a pattern or practice of discrimination during the relevant limitations period." *Id.* at 4.

The parties' disagreement as to the appropriate legal standard to apply to Defendant's motion for summary judgment stems from fact that the Court must apply the *Teamsters* framework to the merits of Plaintiffs' pattern-or-practice class claims, but prior to reaching the merits must conduct a "rigorous" class certification analysis to ensure compliance with Rule 23 requirements, Although Plaintiffs are correct that the *Teamsters* framework applies to the merits of a pattern-or-practice case, the Court need not wait until the merits of the class claims are fully ripe to address whether Brewer and Reid are adequate class representatives. Indeed, in *East Texas Motor Freight System v. Rodriguez*, an opinion delivered on the same day as *Teamsters*, the Supreme Court held that class claims could not go forward where the record showed that the putative class representatives had "suffered no injury as a result of the alleged discriminatory practices," and therefore "were not members of the class of discriminatees they purported to represent." 341 U.S. at 404-405. Indeed, Rule 23's requirement that a putative class representative be an adequate representative would make no sense if the trial court were not allowed to determine in advance of a consideration of the merits whether the putative class representatives have suffered the same injury as the putative class. Accordingly, the Court will

first determine whether a reasonable juror could conclude that Brewer and Reid suffered the injuries alleged by the putative class.

In making these determinations, the Court applies the *Teamsters* framework.[3] Because discovery is still ongoing with respect to the class-wide evidence and no briefing has yet occurred with respect to the liability stage, the Court assumes, without deciding, that Defendant had discriminatory policies in place with respect to awards, training, assignments, investigations, and promotions from 2007 to the present (the liability period). The parties have, however, exchanged a substantive amount of discovery with respect to the alleged injuries of the individual class representatives. Thus, the Court is well-equipped to determine the issues that would arise at the remedial stage of the *Teamsters* framework. Accordingly, the Court will assume that a discriminatory policy was in place and, while working under such an assumption, asks if a reasonable juror could find that Brewer and Reid were denied an employment opportunity for unlawful reasons. *Teamsters*, at 363. Any nondiscriminatory justification advanced by Defendant will be considered in light of Brewer and Reid's evidence that such a justification is pretextual.[4] *Id.* at 362 n.50.

---

[3] Brewer and Reid have not asserted individual claims relating to awards, training, assignments, and investigations, but rather have alleged only class claims. Accordingly, applying the burden-shifting framework for individual claims, commonly referred to as the *McDonnell Douglas* framework, would be inappropriate.

[4] In addition to any evidence of pretext that Plaintiffs may put forth, the Court also considers any request by Plaintiffs for additional discovery and whether such discovery might uncover evidence of pretext.

### B.    Awards

Both Brewer and Reid allege that they were denied a Quality Step Increase ("QSI"), an award that increases pay and provides "faster than normal progression through the steps of the General Pay Schedule." Am. Compl. ¶ 72. Brewer claims that during assignments in Louisiana and North Carolina, he did not receive any QSI awards "while his white counterparts received them." *Id.* ¶ 126. Similarly, Reid alleges that she did not receive QSI awards while "similarly situated white DUSMs were given QSI awards by their supervisors." *Id.* ¶ 131.

Defendant argues that Brewer's claims are time-barred because his claims arose prior to 2005 and because he never exhausted his administrative remedies for such claims. Defendant concludes that because Brewer has no timely claims for denial of a QSI, his award claim must be dismissed. Def.'s Mot. at 12-13. Similarly, Defendant contends that Reid's award claim should be dismissed because her lack of a QSI award can be explained by the universal moratorium that was placed on QSIs from 2004 through 2010. *Id.* at 13. According to Defendant, once that moratorium was lifted on February 27, 2011, Reid received a QSI. *Id.*

While Plaintiffs assert several arguments in response, none directly address Defendant's arguments. Pls.' Opp'n at 35-36. Instead, Plaintiffs bring up new allegations that Brewer and Reid were denied awards throughout their careers other than QSI awards, namely Director's awards, Attorney General's awards, and cash awards. *Id.* at 35. These types of award are not mentioned as part of the class representatives' allegations in the Amended Complaint, and to the extent that Plaintiffs now seek to amend their complaint to add such allegations, that request is untimely and denied. *Elkins v. District of Columbia*, 690 F.3d 554, 565 (D.C. Cir. 2012)

12

("Undue delay is a valid reason to reject a party's attempt to add a new theory of liability to a complaint.").

Next, Plaintiffs' argue that Defendant's motion is premature because Brewer and Reid need time to conduct discovery as to their awards claims. *Id.* at 36. "To obtain Rule 56(d) relief, [Plaintiffs] must submit an affidavit which states with sufficient particularity why additional discovery is necessary." *Cannon v. District of Columbia*, 717 F.3d 200, 208 (D.C. Cir. 2013). Among other things, this affidavit "must outline the particular facts [Plaintiffs] intend[] to discover and describe why those facts are necessary to the litigation." *Id.* Plaintiffs' attorney submitted an affidavit indicating that discovery is required to determine the factors considered by decision-makers when giving out awards and the rates that those awards were given to white and African American DUSMS. Pls.' Opp'n, Ex. E ("Henderson Decl.") ¶ 20. Plaintiffs' attorney also claims that more awards data must be discovered in order "to determine how the data might be analyzed." *Id.* ¶ 21.

It is unclear to the Court how the additional discovery that Plaintiffs seek could undermine Defendants' arguments for summary judgment. Plaintiffs do not dispute that Brewer's QSI award claims arose prior to 2005. As such, Brewer's QSI award claims arose prior to the liability period and are not part of this lawsuit. *See generally* Mem. Op. (Aug. 23, 2013) (limiting claims in this case to those arising in 2007 to the present). As for Reid, Defendants offer evidence that QSI awards were suspended for all employees from 2004 until 2010, and reinstituted in 2011, at which point Reid received the QSI award. Def.'s Mot., Exs. 32 and 33. Reid does not contest this evidence or request additional time to procure discovery that would

13

contest this evidence. Reid does not, for instance, seek the opportunity to conduct further discovery to refute that this universal moratorium was in effect or that this was the reason she was deprived of a QSI. Nor does Reid suggest that the universal moratorium was put in effect for discriminatory purposes. Thus, Reid stands nothing to gain from additional evidence showing the rates of QSI awards for African-American differed from those for white Deputy Marshals or the factors involved in issuing those awards. Because Plaintiffs do not point to particular facts that they intend to discover which are relevant to addressing Defendants' arguments, the Court declines Rule 56(d) relief with respect to the awards claim.

Finally, Plaintiffs argue that the Court should reject Defendant's arguments because under *Teamsters*, Defendant are required to provide evidence refuting Plaintiffs' allegations that USMS has maintained a discriminatory awards policy. Pls.' Opp'n at 36. As discussed above, the Court assumes without deciding that Plaintiffs would have been successful in demonstrating a pattern-or-practice as to USMS awards policies, and therefore presumes that Defendants' QSI award policy was discriminatory. But even assuming that the Defendant's had a discriminatory policy with respect to QSI awards, Defendant has demonstrated, for the reasons discussed above, that neither Brewer nor Reid were victims of such a discriminatory policy during the relevant time period.

In sum, because Brewer has not alleged that he suffered a QSI award injury during the relevant time period, he is not an adequate representative of a class of individuals who purport to have suffered such an injury. Reid is also an inadequate representative under Rule 23 because, even assuming that Reid did not receive a QSI award from 2004 to 2010, a reasonable juror

could not find that she was injured because of a discriminatory awards policy given the universal moratorium that was in effect as to QSIs. As such, the Court dismisses without prejudice the class claims regarding awards.

### C. Training

Plaintiff Reid alleges that she was denied training opportunities that were afforded to white Deputy Marshals while she worked in job series 082, in late 2003 and early 2004, and while she worked in job series 1811, in 2008 and 2009. Am. Compl. ¶¶ 129,130. Defendant argues that Reid's allegations regarding denied training opportunities actually arose prior to the liability period of 2007 to the present. Def.'s Mot. at 18. Defendant further contends that during the liability period, "it is undisputed that Reid attended more than nine weeks—365 hours—of training during a two year period." *Id.*

Plaintiffs contend that Defendant neglects to address Reid's timely training claim arising in 2008-2009. Pls.' Opp'n at 7. Plaintiffs argue that under the "continuing violations" doctrine, this timely training claim allows her to raise training claims that arose prior to the liability period. *Id.* In response, Defendant argues that Reid's timely training claim is a "bare-bones allegation," that fails to meet the pleading requirements of Rule 8. Def.'s Reply at 11.

As a threshold matter, Reid's claims arising prior to the liability period have already been dismissed. The Court has previously rejected the application of the continuing violations doctrine to this case. *See* Mem. Order (Aug. 23, 2013), Dkt. #159. Therefore, Reid's 2003-2004 training claim is not actionable.

With regard to Reid's 2008-2009 training claim, Reid merely states that she was denied "training opportunities that were afforded to [her white counterparts]," and gives no factual allegations that would support such a claim.  The Supreme Court has explained that, even at the pleading stage, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Stated otherwise, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id*. at 679.  However, Reid's declaration simply states that "upon information and belief," she "was denied critical training opportunities which were afforded disproportionately to white DUSMs."  Reid Decl. ¶ 6.  Reid does not identify any specific training opportunity that was denied to her, even though that information would be readily available to her through her own memory and experience.  Indeed, Reid had no trouble identifying the specific training opportunities that were allegedly denied to her in 2003-2004 in job series 082, yet she fails to do the same for the 2008-2009 training claim.  Furthermore, Plaintiffs do not identify further discovery regarding any specific training opportunity which was denied to Reid.  *See White v. Hon Co.*, 2013 U.S. App. LEXIS 6948, at *5-6 (3d Cir. April 5, 2013) ("'Fishing expeditions' to seek out the facts needed to bring a legally sufficient complaint are barred by the pleading clarifications in *Iqbal* and *Twombly*.").  In sum, Reid's 2008-2009 training claim is not supported by any factual allegations and is therefore not actionable.[5]

---

[5]      Plaintiffs again argue that the Court should reject Defendant's arguments because under *Teamsters*, Defendant is required to provide evidence refuting Plaintiffs' allegations that USMS has maintained a discriminatory awards policy.  Pls.' Opp'n at 38.  However, even assuming that

Because Reid's training claims, both those arising prior to and during the liability period, are not viable as a matter of law, she is not an adequate representative of a class of individuals who purport to have suffered such an injury. Moreover, Brewer, the only other class representative, does not advance any training claims. Accordingly, the Court dismisses without prejudice the class claims regarding denial of training opportunities. *See Rodriguez*, 431 U.S. at 403.

### D. Assignments

#### 1. Brewer's Assignment Claims

Brewer alleges that he "has never been given the opportunity from anyone in headquarters to lead a mission or special task force," the type of assignment that Plaintiffs claims is an "important experience to have when applying for promotions within the Marshals Service." Am. Compl. ¶ 123. Furthermore, Brewer claims that "[i]n September 2007, he was removed as the commanding officer of the HIDTA Fugitive Task Force in Puerto Rico and replaced by a white Deputy United States Marshal from outside the [Puerto Rico] District." *Id.* ¶ 124. Brewer also alleges that while he was in Louisiana between 1993 and 2001, he was only assigned to the warrant squad once, whereas "[w]hite deputies in [the Louisiana District] were routinely rotated onto [the] warrant squad ever[y] one to two years." *Id.* ¶ 125.

Defendant argues that Brewer's assignment claims accruing between 1993 and 2001, during Brewer's assignment to Louisiana, are untimely. Def.'s Mot. at 19-20. Defendant further challenges Brewer's claim that he was removed as the commanding officer of the Puerto Rico

the Defendant maintained a discriminatory policy with respect to training, Reid's claims would not survive because they do not meet pleading and timeliness requirements.

Fugitive Task force.  According to Defendant, Brewer was not removed from the Task Force, but rather his responsibilities were expanded to include both the Task Force (which falls within the ambit of "Enforcement" duties) and Court Operations.  Defendant contends that this change does not constitute an actionable assignment claim because Brewer retained his title as Assistant Chief Deputy and his "supervisor authority grew from five USMS employees to at least a dozen," and, therefore, no adverse employment action occurred.[6]  *Id.* at 20-21.

Plaintiffs argue that Brewer's 1993 to 2001 claims are covered by the continuing violations doctrine and thus actionable.  Pls.' Opp'n at 26.  Plaintiffs also assert that Brewer's removal from the Fugitive Task Force in Puerto Rico constituted an adverse employment action because he was "stripped of all enforcement duties, including the more desirable responsibilities of handling warrants in the Enforcement Division," and was "denied the opportunity for supervisory responsibilities in the reorganization."  *Id.*  Plaintiffs argue that such "a reassignment to a different task with lessened responsibilities . . . is actionable."  *Id.*

The Court agrees with Defendant that Brewer's 1993 to 2001 claims are not actionable because, as previously explained, they are untimely and the continuing violations doctrine does not apply.  However, Brewer's other assignment claims require closer consideration.  As previously explained, for purposes of this decision, the Court assumes that the USMS had in place a discriminatory policy regarding assignments.  Working under that assumption, the Court

---

[6]    Defendant also challenges Brewer's claim that he "has never been given the opportunity from anyone in headquarters to lead a mission or special task force."  However, the Court need not reach this issue because, as discussed below, the Court concludes that a genuine dispute of fact exists as to whether Brewer's removal from the Fugitive Task Force is an adverse action.  Because Brewer's Fugitive Task Force claim is viable, he remains an adequate representative for the broader class claims regarding assignments.

18

must inquire whether a reasonable juror could conclude that Brewer suffered an objectively tangible harm when Brewer was removed from the Fugitive Task Force in Puerto Rico.  If the answer is in the affirmative, then summary judgment is not appropriate and Brewer may continue to serve as an adequate class representative as to the class assignment claim.

"Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question."  *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007). A reassignment constitutes an objectively tangible harm (and therefore an adverse employment action) if the reassignment leads to "materially adverse consequences affecting the terms, conditions, or privileges of [an employee's] employment opportunities or [his] future employment opportunities."  *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003).  A reassignment or denial of assignment that does not affect an employee's pay and benefits may still constitute an adverse employment action if the reassignment or denial negatively affects future advancement opportunities.  *Id.*  Furthermore, a reassignment that results in "significantly different and diminished" supervisory and programmatic responsibilities may constitute an adverse employment action.  *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007).

The parties disagree as to whether Brewer's removal as the commanding officer of the HIDTA Fugitive Task Force in Puerto Rico resulted in a reassignment that broadened his supervisory duties to include both the Court Operations and Enforcement or whether it limited his supervisory duties to only the Court Operations.  Pls.' Opp'n at 25.  As Brewer recalls it, his instructions upon reassignment were "not to oversee the Enforcement Section of the Task Force," and, instead, to "handl[e] court support in Operations."  Def.'s Mot., Ex. G ("Brewer

19

Decl.") ¶ 6.  Defendant, on the other hand, maintains that while Brewer "no longer served on the day-today-management of the Task Force," he retained an "oversight role."  Def.'s Mot. at 21 (quoting Earp Decl. ¶ 12).  Because diminished supervisory duties constitutes an adverse employment action, and because there is a genuine dispute of fact as to whether Brewer's supervisory duties decreased as a result of his reassignment in Puerto Rico, Brewer's assignment claims are viable and survive summary judgment.  Accordingly, Defendant has not demonstrated why Brewer would be an inadequate representative to raise the class claims regarding assignments.  Therefore, the Court denies Defendant's motion for summary judgment as to the class assignment claims.

### 2.  Reid's Assignment Claims

Reid alleges that in 2008 she was denied an assignment as lead investigator in a high-profile security case regarding an Assistant United States Attorney, and was instead assigned as the lead investigator to less significant cases.  Am. Compl. ¶ 130.  In 2009, Reid claims that she was denied an assignment involving the Presidential Inauguration.[7]  *Id.*

Defendant argues that the denial of these assignments do not constitute an adverse employment action because they were not accompanied by salary changes or work hour changes.  Def.'s Mot. at 13.  Defendant contends that Reid cannot show any injury from the denial of either assignment denial since she was promoted to a GS-12 in 2008 and a GS-13 in 2009, as soon as she was eligible.  *Id.*

---

[7]  Reid also alleges that in 2003 and 2004, she was discriminated against when she was denied assignment to a "COOP Team."  Am. Compl. ¶ 129.  However, these claims fall outside of the liability period (2007 to the present) and need not detain the Court further.  *See generally* Mem. Order (Aug. 23, 2013).

Plaintiffs responds that the denial of the AUSA investigation assignment and the Presidential Inauguration assignment amount to the deprivation of "career-enhancing assignments that would have afforded her valuable experience." Pls.' Opp'n at 27. Instead, Plaintiffs allege that Reid was assigned to "several insignificant assignments," which, in turn, "retards the advancement" of her career.

As discussed above, an assignment or denial of assignment may constitute an adverse employment action even if it has no effect on the employee's pay and benefits. An adverse action exists if the assignment decision led to "significantly different and diminished" supervisory and programmatic responsibilities that affected future employment opportunities. *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007); *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003).

Plaintiffs allege that Reid was affected by the denial of the AUSA investigation assignment and the Presidential Inauguration assignment, as well as by her assignment to insignificant tasks. However, Plaintiffs fail to show or even allege *how* these assignments adversely affected Reid's ability to advance within USMS hierarchy. Plaintiffs do not allege facts, which if proven true, would support that these employment decisions adversely affected Reid's current or future career track. *Iqbal*, 556 U.S. at 678-79. Instead, Plaintiffs appear to concede that Reid was promoted to the next GS level as soon as possible. Moreover, Plaintiffs do not indicate that further discovery is required to determine whether these assignment decisions constitute adverse employment actions. Because Reid fails to allege facts that would convert the denial of the AUSA investigation assignment and Presidential Inauguration

assignment into adverse employment actions, the Court finds that these claims are not actionable. For these reasons, Reid's assignment claims are not viable and she is not an adequate representative for the class assignment claims. Insofar as Defendant's motion argues the inadequacy of Reid to serve as class representative for assignment claims, its motion is granted. However, as noted above, the class assignment claims remain viable with Brewer as a putative class representative.

### 3. Defendant's Subcategories for Assignment Claim

Defendant argues that Plaintiff has erroneously lumped together various claims under the label of "assignment." Def.'s Mot. at 22-23. Specifically, Defendant divides assignments into four categories: "(1) duties within an employee's official position, (2) temporary duties outside an employee's official position, (3) collateral duties, and (4) promotions or transfers to 'career-enhancing' positions." *Id.* at 23. Defendant contends that the "different sorts of assignments involve distinct policies and practical differences," and therefore "cannot constitute one class claim." *Id.*

Plaintiffs argue that Defendant has "improperly analyzed the claims in isolation and fails to address Plaintiffs' claims and evidence of a systemic pattern of discrimination." Pls.' Opp'n at 27. Plaintiffs further contend that assignments are controlled by the same USMS policy that leaves assignments up to the discretion of managers. *Id.*

A class representative's claims must be typical of other claims asserted by the other members of the class, meaning that both the class representative's assignment claims and the class member's claims must present common questions of law or fact. *Falcon,* 457 U.S. at 158-

59.  At this juncture, however, the Court will not consider Defendant's argument that Brewer's assignment claims are not typical of other class members.  First, the Court finds flaws in Defendant's suggestion that assignment claims should be divided into these specific four subcategories.  More specifically, any given assignment may fall into more than one of Defendant's artificial subcategories.  For instance, Brewer's claim that he was improperly removed from the Fugitive Task Force in Puerto Rico involves both issues of his day-to-day official duties and, by Defendant's own admission, temporary duties outside of his position.  Def.'s Mot. at 25 (acknowledging that Brewer's allegation "about not being given the opportunity to lead a task force or mission could fit within [subcategory 2]").  Second, Defendant fails to cite any examples of courts that have rejected a class claim as non-typical, where the class claim involved the same type of adverse employment action (*i.e.*, promotion, termination, non-hiring, or assignments).  Third, while Defendant asserts that the subcategories of assignments are controlled by different policies and practices, it fails to support this assertion with any evidence.  For these reasons, the Court concludes that the typicality issues surrounding assignments are best determined after Plaintiffs move for class certification.  Defendant's arguments regarding subcategories of the class assignment claim are therefore denied without prejudice.

### E.  Investigations

Plaintiffs assert that the USMS has discriminated against the putative class by its "use of allegations of misconduct and investigations."  Am. Compl. ¶ 75.  Reid and Brewer do not raise any claims regarding allegations of misconduct or investigations.  Instead, in their Amended

Complaint, Plaintiffs raised an investigation class claim through former plaintiff and putative class representative, David Grogan. Grogan voluntarily dismissed his individual and class claims in May 2013, two months after Defendant had filed its motion for summary judgment. Defendant's arguments regarding Grogan's investigation claim are, therefore, moot.

Perhaps preempting the voluntary dismissal by Grogan, Plaintiffs' response makes no mention of Grogan and instead seeks to advance class investigation claims brought on behalf of Plaintiff Brooks. Since the commencement of this litigation, Brooks has only asserted individual claims. *See generally* Compl.; Am. Compl. In July 2013, however, Plaintiffs moved to amend their complaint to add Brooks as a class representative. That motion is pending, and needs to be resolved before the Court can rule on whether there is adequate class representation to bring an investigation class claim. Accordingly, the Court defers ruling as to the investigation class claims until Plaintiffs' motion for leave to amend has been ruled upon.

### F.  Promotions

Defendant argues that neither Brewer nor Reid can show that he or she has been injured by four particular aspects of the promotions system, and therefore moves to dismiss Plaintiffs' promotion claims insofar as Plaintiffs are challenging those aspects. Def.'s Mot. at 31. Plaintiffs respond that Brooks and/or Brewer have indeed been injured by these aspects of the promotions system. Pls.' Opp'n at 21-24. According to Plaintiffs, "[i]t is axiomatic in this Circuit that class claims of non-promotion include the various components of the system." *Id.* at 23. Moreover, Plaintiffs argue that Defendant's argument is really directed as to the typicality of the class claims and is best addressed when ruling on Plaintiffs' upcoming motion for class certification.

24

*Id.* at 23.  Plaintiffs insist that their claims should be allowed as long as they are challenging "a general discriminatory promotion process that injures class members in the same manner and fashion, but under different factual circumstances."  *Id.* at 24.

As with the class assignment claims, the Court believes that Defendant's attempts to parse out the promotion claim is best treated after Plaintiffs have moved for class certification. The Court agrees with Plaintiffs that this is primarily an issue of typicality, as the Court must determine whether common issues of fact or law weave through the four aspects of the promotion system subcategorized by Defendant.  Accordingly, the Court denies without prejudice Defendant's arguments regarding subcategories of the class promotion claim.

## IV.     ANALYSIS OF BROOKS' INDIVIDUAL CLAIMS

James Brooks was hired by the USMS in 1990 as a DUSM.  He rose up the ranks, and in June 2007, assumed the position of Chief Deputy Marshal at the District of Columbia Superior Court, a position he currently holds.  Am. Compl. ¶ 150.  Brooks commenced suit against the USMS in 2008, asserting individual claims of disparate treatment, hostile work environment and retaliation.  Am. Compl. ¶¶ 150-166.   Discovery has been conducted as to Brooks' individual claims, and Defendant now moves for summary judgment.  Plaintiffs recently moved to amend their complaint to allow Brooks to be a class representative.  The Court will rule on that motion separately, but believes it is nonetheless proper to rule on Brooks' ripe individual claims since such a ruling can impact whether amendment would be proper.  *See Rodriguez*, 431 U.S. at 395

(holding that a plaintiff whose individual claims had failed was not an adequate representative of class claims).

### A.     Brooks' Disparate Treatment Claims

Brooks claims that "since assuming the Chief Deputy position he has been denied promotions and special assignments on the basis of his race." Am. Compl. ¶ 151. Each of these allegedly denied positions will be discussed in turn below.[8]

### 1.  Recruiting Officer

Brooks claims that in May 2007 he was denied a promotion to be the Recruiting Officer/Program Manager for Recruiting, a GS-15 position that was located in the Headquarters for the USMS and that "would have provided a career-enhancing opportunity [for him] to advance to the Senior Executive level." Am. Compl. ¶ 153. Brooks alleges that "[u]pon information and belief," he was not selected because of his race and, instead, "a white male employee with minimal supervisory experience was selected for the position." *Id.*

Defendant argues that Brooks has not asserted an adverse employment action because on the same day that he was denied the Recruiting Officer position, he was promoted to be the Chief DUSM of D.C. Superior Court, also a GS-15 position. Def.'s Mot. at 24. Defendant claims that "the Recruiting Officer position does not involve greater responsibility than the [Chief DUSM]." According to Defendant, the Recruiting Officer position supervises only "a handful of

---

[8]     Defendant does not move for summary judgment as to Brooks' claim that he was denied an opportunity to become an interim Marshal for D.C. Superior Court on May 26, 2010, or that, on July 1, 2010, he "was denied promotional opportunities with respect to MPA#10-076 (Criminal Investigator, IOD-Office of the AD, ARC) and MPA #10-077 (Supervisory Criminal Investigator, IOD-Office of the AD, ARC)." Am. Compl. ¶ 158. Accordingly, the Court does not address these claims.

employees, whereas, as the Chief DUSM in the D.C. Superior Court, Brooks is in charge of more than a hundred employees." *Id.* Defendant contends that Plaintiffs "have identified no evidence that [the Recruiting Officer] position was meaningfully superior to [the Chief DUSM position]." *Id.*

A plaintiff claiming discrimination must show that he suffered an adverse employment action. "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013). For instance, "public humiliation or loss of reputation . . . have [been] consistently classified as falling below the requirements for an adverse employment action." *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011). To qualify as materially adverse, the employer's action must "be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Id.* at 1248-49 (internal quotation and citation omitted). "An employee must experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Id.*

Brooks states in his deposition and affidavit that the Recruiting Officer position, unlike the Chief DUSM position, would have provided him with advancement to the Senior Executive level. More specifically, Brooks claims that the experience he would have gained in the Recruiting Officer position was "very valuable in applying for future promotions and in completing the Executive Core Qualifications required for Senior Executive Service positions." Brooks further notes that the person who was ultimately selected as the Recruiting Officer later

became the U.S. Marshal for D.C. Superior Court and directly supervises Brooks. Brooks Decl. ¶ 4. Such evidence could lead a reasonable juror to conclude that Brooks experienced "materially adverse consequences" from being promoted to Chief DUSM instead of Recruiting Officer because the difference in the two positions affected "future employment opportunities." Although Defendant disagrees with Brooks, and insists that the supervisory responsibilities of the Chief DUSM position were greater than those of the Recruiting Officer position, such a disagreement is not one that this Court can resolve at the summary judgment stage. *Celotex,* 477 U.S. at 324. In sum, because Brooks' sworn statements, when viewed in his favor, are sufficient evidence to show that "there is a genuine issue for trial," the Court denies Defendant's motion for summary judgment as to Brooks' Recruiting Officer claim.

### 2. Chief of Staff

Brooks further alleges that in July 2008, he was denied a lateral transfer to the position of Chief of Staff, in favor of a lesser qualified white employee, Sean Fahey. Am. Compl. ¶ 154. According to Brooks, Fahey was a GS-14 and his only supervisory experience was supervising less than ten people for under a year. In contrast, Brooks alleges he was a GS-15 who had "more than [five] years [of] experience managing USMS employees." *Id.*

Defendant submitted declarations from Molly Lowry, the Chief of the Office of Merit Promotion at the USMS, and John Clark, the then-USMS John Clark, Def.'s Mot., Ex. 14 ("Decl. Lowry"); *id.*, Ex. 4, ("Decl. Clark"), to show that USMS "hand-picked" Fahey to be his Chief of Staff based on his "strong writing and crisis management skills." Def.'s Mot. at 35. Defendant argues that Brooks has not provided any evidence to suggest that this reason was pretext for

28

discrimination. *Id.* Moreover, Defendant argues that "Brooks presents no evidence that he was more qualified for the position than [Fahey]." *Id.* According to Defendant, supervisory skills were not part of the job description, and, instead, the Chief of Staff would be required to give "advice and assistance to the USMS Director and analyze and assess policy issues." *Id.* Finally, Defendant argues that Brooks has not shown that the Chief of Staff position was "sufficiently superior" to his position as Chief DUSMS, so as to constitute an adverse action. *Id.*

In response, Brooks argues that Defendant's "purported reason" for his non-selection, *i.e.* that Fahey was selected for his strong writing and crisis management skills, refers to qualifications that were never part of the actual job posting. Pls.' Opp'n at 16. Brooks contends that Defendant "minimizes the importance of the qualifications listed in the vacancy, and emphasizes the Director's prerogative to choose whomever he wished." *Id.* at 16 n.9. Brooks argues that further discovery is required so that he may have the opportunity to depose the then-USMS Director, John Clark. *Id.* Finally, Brooks argues that there is a genuine dispute as to whether the denial of the Chief of Staff position constitutes an adverse employment action. Specifically, Brooks points to the "evidence of the positive effect that a selection to Headquarters can have on the trajectory of one's career at the Marshals Service." *Id.* at 16.

As an initial matter, the Court is persuaded that a reasonable juror may conclude that the denial of the Chief of Staff position was an adverse employment action. As with the Recruiting Officer position, Brooks points to his own statements to support the notion that a Chief of Staff position enhances the likelihood that one will be chosen for a Senior Executive level position. A reasonable juror may credit such statements and conclude that Brooks experienced "materially

adverse consequences" when he was denied a lateral transfer as a Chief of Staff because a transfer to that position could affect "future employment opportunities."

The Court is less inclined to agree with Brooks' argument that Clark's deviation from the strict language of the job description is evidence from which a reasonable juror could infer pretext. "[T]he fact that an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment." *Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007) ("[W]e are aware of no previous case from this or any other circuit suggesting that an employee gets past summary judgment simply by showing that a factor in the hiring decision was not expressly listed in the job description when the factor was encompassed by the job description.). "[J]ob descriptions are often phrased in general terms, and employers then make the ultimate hiring decision in light of more specific factors -- such as their strategic priorities and goals at the time, the strengths and weaknesses of the applicant pool, and the overall skills of and gaps in their existing workforce, among many other factors." *Id.* at 708. In sum, the Court does not believe that Brooks has shown sufficient evidence of pretext.

However, given Brooks' request to depose Defendant Clark, the Court finds that any ruling on this issue would be premature. Defendant relies on Clark's declaration to propound a legitimate, nondiscriminatory reason for denying Brooks the Chief of Staff position, *i.e.* that he did not have the same strong writing and crisis management skills as Fahey. Def.'s Mot. at 35 (citing Clark Decl. ¶ 12). Brooks should be given an opportunity to depose Clark before he is forced to argue that Clark's stated-reason is pretext for discrimination. Accordingly, the Court

30

denies without prejudice Defendant's motion insofar as it seeks summary judgment as to Brooks' Chief of Staff claim.

### 3. Acting U.S. Marshal for D.C. Superior Court

Brooks alleges that in August 2008, he was denied a promotion as Acting U.S. Marshal for the D.C. Superior Court, upon the resignation of the U.S. Marshal for D.C. Superior Court. Am. Compl. ¶ 156. Brooks claims that it was USMS practice, upon the departure of the U.S. Marshal in a given district, to appoint the Chief Deputy U.S. Marshal of that same district. *Id.* Despite this alleged USMS practice, however, the Chief Deputy for Minnesota was appointed as Acting U.S. Marshal for D.C. Superior Court.

Among other things, Defendant argues that, as a matter of law, "not being placed in an acting role is not an adverse employment action." Def.'s Mot. at 36. Plaintiff retorts that the Acting U.S. Marshal position would have "provided him with valuable experience for future promotions into Senior Executive Service [] positions." Pls.' Opp'n at 17. Because Defendant is correct, the Court must grant Defendant's motion as to Brooks' Acting U.S. Marshal claim.

The D.C. Circuit has explained that "denial of a temporary designation is not one of the terms, conditions, or privileges of employment contemplated by Title VII." *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002) (citing *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997)). "Therefore, 'denial of an acting position - without showing some further harm - does not by itself qualify as an adverse employment action.'" *Bruder v. Chu*, 2013 U.S. Dist. LEXIS 99948, 15-16 (D.D.C. 2013) (quoting *Glenn v. Williams*, 2006 U.S. Dist. LEXIS 8687 (D.D.C. Feb. 21, 2006)). Because the Acting U.S. Marshal position is a temporary designation and

31

because Circuit precedent precludes such a claim under Title VII, the Court grants Defendant's motion for summary judgment as to Brooks' claim that he was denied the Acting U.S. Marshal position.

### 4. Senior Executive Service

Brooks alleges that in August 2008, he was denied a promotion as Assistant Director, Senior Executive Service. Brooks claims that he "was equally or more qualified for the [Senior Executive Service] position" than the four white employees who were ultimately selected. Am. Compl. ¶ 155.

Defendant argues that Brooks was not qualified to hold a Senior Executive Service post at the time that he applied in 2008. Def.'s Mot. at 38. Defendant notes that a Senior Executive must "possess certain executive qualifications," and a candidate "may not be appointed until a Qualifications Review Board convened by the Office of Personnel Management certifies that the candidate meets the requisite qualifications." *Id.* Brooks does not dispute that he did not have the "executive core qualifications," but argues that the only reason he could not meet these requirements was because Defendant had deprived him of the opportunity to gain the requisite experience in the first place, opting to give such opportunities to white employees instead. Pls.' Opp'n at 19.

A plaintiff pursuing a Title VII claim must establish, by a preponderance of the evidence that he "was qualified for a job for which the employer was seeking applicants." *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1149-50 (D.C. Cir. 2004). However, the plaintiff need only show that he was "substantively" qualified and does not need to satisfy "technical"

qualifications imposed by the employer. In *Cones v. Shalala*, 199 F.3d 512, 517-518 (D.C. Cir. 2000), the employer had refused to consider the plaintiff for a promotion despite his "substantive qualifications," because he was not a GS-15 and therefore not "technically qualified" for the position. The D.C. Circuit rejected the employer's argument that the plaintiff was not "technically qualified," explaining that such a "theory of 'qualification' would open a potential loophole in Title VII" because "[a]gencies seeking to prevent minority employees from advancing to higher level positions" could simply bar minority employees from attaining the technical prerequisites. *Id.* Thus, it is sufficient for a plaintiff seeking to make out a Title VII prima facie case to "establish that he was substantively qualified and that [the employer] selected a white person." *Id.*; *see also Lathram v. Snow*, 336 F.3d 1085, 1090 (D.C. Cir. 2003) (noting that the *Cones* opinion "casts an additional shadow on [the employer's] argument that [the plaintiff] could not make out a prima facie case, even though she was substantively qualified, because her lack of time as a GS-14 rendered her technically unqualified for the GS-15 position").

Defendant does not argue that Brooks lacked the substantive qualifications for the Senior Executive Service position. Instead, Defendant argues that Brooks did not meet the "executive core qualifications" necessary for the job. Def.'s Mot. at 38. However, Defendant does not elaborate as to what these "executive core qualifications" are or how they relate to the substantive qualifications that are necessary for the job. Without more information, the Court cannot determine whether the "executive core qualifications" were mere technical hurdles or whether they are part and parcel of the substantive job qualifications. Because, at this juncture,

the Court cannot determine whether Brooks was substantively qualified to do the job (as he claims he was), the Court rejects Defendant's argument that Brooks "cannot make out a prima facie case as to [the Senior Executive Service] claim." As such, Defendant's motion for summary judgment as to this claim is denied without prejudice.

### 5. Chief of Sex Offender Investigations Branch

Next, Brooks alleges that Defendant denied him the opportunity to apply for the newly created position of Chief for the Sex Offender Investigations Branch. More specifically, Brooks claims that Defendant failed to properly advertise through the Merit Promotions System and, instead, appointed a white employee, David Harlow. Am. Compl. ¶ 157.

Defendant argues, among other things, that Brooks has not alleged an adverse employment action because the Chief of Sex Offender Investigations Branch position would have just been a lateral transfer for Brooks and the "denial of a lateral transfer, without more, is not an adverse employment action." Def.'s Mot. at 39. Brooks replies by asserting that a lateral transfer can constitute an adverse employment action if it results in a significant change in responsibilities and/or benefits. Pl.'s Opp'n at 20.

Brooks is correct that a lateral transfer may constitute an adverse employment action if it significantly affects the employee's responsibilities and/or benefits. *Czekalski v. Peters*, 475 F.3d at 364. However, Brooks does not allege, much less demonstrate, how the position of Chief of Sex Offender Investigations Branch would have significantly affected his responsibilities or benefits. Instead he merely states the law. Accordingly, Brooks has not met his burden to show

by a preponderance of the evidence that he incurred an adverse employment action.  As such, the Court must grant Defendant's motion for summary judgment as to this claim.

### 6.  Structured Interview Panel Placement

Brooks alleges that he was "discriminatorily denied appointment to the Merit Promotion Structured Interview Panel, a position in which he would conduct interviews of applicants for GS 14 and GS 15 positions."  Am. Compl. ¶ 159.  Defendant argues that, as a matter of law, Brooks' non-selection to the Structured Interview Panel is not an adverse employment action.  Def.'s Mot. at 39.  Brooks does not respond to this argument.  Accordingly, the Court deems it conceded and grants Defendant's motion with respect to this claim.

### B.  Brooks' Hostile Work Environment Claim

Brooks alleges that, in May 2007, three white employees – Assistant Chiefs Gregory Petchel and Stirling Murray and former Supervisor Robert Brandt – "initiated a campaign to portray Mr. Brooks as an ineffective leader" for discriminatory motives.  Am. Compl. ¶ 160.  In June 2007, Murray, Petchel, and Brandt allegedly created and disseminated a pamphlet stating that Brooks' "diminutive presence was felt everywhere," portraying him as a coarse and ineffective leader, and describing him as a "short, bald man."  *Id.*  Brooks alleges that despite his complaints regarding the actions of Murray, Petchel, and Brandt and his claims that they acted with discriminatory motives, Internal Affairs declined to investigate the alleged creation and dissemination of the pamphlet. Am. Compl. ¶ 162.

Brooks further claims that Petchel, Murray, and Brandt "began a campaign to suggest that Mr. Brooks had harassed a female employee, Sno Rush, in order to portray him as guilty of

35

misconduct and generate an Internal Affairs investigation against him." *Id.* ¶ 161.  USMS'

Internal Affairs investigated Brooks for the alleged sexual harassment of Sno Rush.

Additionally, Brooks was investigated for allegations that he had made racist comments against

whites at a conference.  *Id.* ¶ 164.  Brooks believes that "these investigations were prompted by

false allegations" by Murray, Petchel, and Brandt.  *Id.*

Brooks argues that he was the victim of a hostile work environment because racist

hostility was "overlooked by [his] superiors and the division responsible for investigating

complaints, while anti-harassment policies were disingenuously enforced against [Brooks] and to

protect and insulate white DUSMS."  Pls.' Opp'n at 42.   Defendant argues *inter alia* that Brooks

has not shown any evidence that the Office of Internal Investigations was motivated by Brooks'

race in pursuing investigations or deciding not to pursue an investigation.  Def.'s Mot. at 40.

"To prevail on [a hostile work environment] claim, a plaintiff must show that his

employer subjected him to '*discriminatory* intimidation, ridicule, and insult' that is 'sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment.'"  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (emphasis added).  "To determine whether a

hostile work environment exists, the court looks to the totality of the circumstances, including

the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it

interferes with an employee's work performance."  *Id.*  Additionally, "[c]ourts in this District

have routinely held that 'hostile behavior, no matter how unjustified or egregious, cannot support

a claim of hostile work environment unless there exists some linkage between the hostile

behavior and the plaintiff's membership in a protected class.'" *Nguyen v. Mabus*, 895 F. Supp. 2d 158, 188-189 (D.D.C. 2012) (quoting *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009)).

Brooks' hostile work environment claims is premised on Internal Affairs' (1) allegedly faulty investigation into claims that Brooks made racist remarks at a conference, (2) decision to investigate allegations that Brooks had sexually harassed Rush, and (3) the failure to investigate Brooks' claim regarding the negative pamphlet about him. Brooks asserts, without any evidentiary support, that the motives underlying such actions were discriminatory. However, Brooks' unsupported accusation that Internal Affairs acted with discriminatory motive in pursuing some investigations and not others is not enough to defeat summary judgment. *Mentzer v. Lanier,* 408 Fed. Appx. 379, 381 (D.C. Cir. 2010) (holding that hostile work environment claim failed in part "because [the Appellants'] allegations are conclusory"). Because Brooks simply does not provide any evidence from which a reasonable juror could infer that the decisions to investigate or not investigate where prompted by his race, the Court grants Defendant's motion for summary judgment as to Brooks' hostile work environment claim. *Penchion v. Fed. Express Corp.*, 2012 U.S. App. LEXIS 19821 (D.C. Cir. 2012) (affirming summary judgment because *inter alia* "appellant failed to establish that the alleged behavior was motivated by race"); *Beshir v. Jewell*, 2013 U.S. Dist. LEXIS 116202, 37-38 (D.D.C. 2013) ("What is more, [plaintiff] has failed to link any of the allegedly hostile workplace experiences to her race or sex and, therefore, has failed to demonstrate the kind of 'discriminatory intimidation, ridicule, and insult' that is necessary to sustain her claim.); *Lin v. Salazar*, 891 F. Supp. 2d 49, 60

(D.D.C. 2012) ("For a Title VII hostile work environment claim to succeed, the objectively offensive conduct must be connected to [discrimination based on a protected status].").

### C. Brooks' Retaliation Claim

Brooks alleges that he has been denied promotions and assignments and subjected to harassment and investigations in retaliation for his efforts to "create a more equal and fair workplace for racial minorities." Am. Compl. ¶ 166. Specifically, Brooks notes that as Chief of the D.C. Superior Court, he "instituted a shift away from the discretionary policies governing assignments, training, and awards that had resulted in a pattern of discrimination against African American deputies; specifically, he created (1) a system to ensure that assignments were available to all deputies on a rotating – rather than discretionary – basis; and (2) a training roster to equalize the availability of training to deputies." *Id.*

Defendant argues that Brooks' retaliation claim fails because he did not engage in protected activity and instead "[s]imply follow[ed] the law and USMS policy on not discriminating." Def.'s Mot. at 43. Further, Defendant contends that there is no support that Defendant retaliated against Brooks for his efforts to improve conditions for racial minorities, but rather Brooks' supervisors supported such efforts. *Id.*

"To prove unlawful retaliation, a plaintiff must show: (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012).

The parties contest whether Brooks "opposed a practice made unlawful by Title VII." Defendant argues that the use of discretion by supervisors, i.e. the policy that Brooks "opposed," is not necessarily a violation of Title VII. Def.'s Reply at 24. While this is may be true, it is also the case that "giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory since an employer's undisciplined system of subjective decisionmaking can have precisely the same effects as a system pervaded by impermissible intentional discrimination." *Wal-mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011) (internal quotations and citations omitted). Plaintiffs have not yet had an opportunity to fully present their case regarding the alleged disparate-impact that the discretion of lower-level supervisors created in the training and assignment opportunities for African-American Deputy Marshals. Accordingly, it is too early to determine whether Brooks "opposed a practice made unlawful by Title VII" when he insisted on giving out assignments and training in a more standardized format.

However, even assuming that Brooks opposed the discriminatory practice of USMS in providing training and assignments, his retaliation claim must still fail. Brooks has provided no evidence to support that USMS acted adversely against him *because of* his opposition to the discriminatory practices in providing training and assignment practices. *See McGrath v. Clinton*, 666 F.3d at 1380 (explaining that one of the prima facie elements for a retaliation claim is that the employer took the action "because the employee opposed the [discriminatory] practice"). Brooks claims he was subjected to an internal investigation and denied promotions and special assignments, but provides no evidence from which a reasonable juror could infer that USMS

took these actions *because of* the changes that Brooks had implemented in providing training and assignments to his subordinates. Accordingly, the Court grants Defendant's motion for summary judgment with respect to Brooks' retaliation claim.

## V. CONCLUSION

For the foregoing reasons, the Defendant's motion for partial summary judgment is **DENIED in part** and **GRANTED in part**.

**SO ORDERED.**

September 27, 2013

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE