**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **HERMAN BREWER,** | ) | |
| | ) | |
| **individually and on behalf of a class of** | ) | |
| **all other persons similarly situated,** | ) | |
| | ) | |
| **and JAMES BROOKS, individually,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **NO. 1:08-cv-01747-BJR** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ERIC H. HOLDER,** | ) | |
| **U.S. Attorney General,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>PLAINTIFFS' MOTION AND BRIEF IN SUPPORT OF MOTION FOR CLASS
CERTIFICATION</u>**

# I.    INTRODUCTION

This action is brought on behalf of approximately 272 current and former African American Deputy U.S. Marshals ("DUSMs") of the U.S. Marshals Service ("USMS" or "Agency"). The USMS has a history of racial discrimination within its ranks that demonstrably continues today. It is undisputed that the USMS has common policies and processes for selecting DUSMs for GS-13 through -15 positions; that those policies have a statistically significant adverse effect on the promotions and positions available to African Americans; and that the USMS has not validated those same policies and processes.   Accordingly, this case is a straightforward challenge to uniform policies affecting the entire class that presents common questions that can be decided on evidence common to the class and which predominate over individual issues. The Court therefore should certify the action as a class action under Federal Rule of Civil Procedure 23 to ensure that the promise of equal justice for all is afforded to those African American DUSMs who protect and serve the judicial system but whose careers have been and are being damaged by racial discrimination.

# II.    STATEMENT OF RELEVANT FACTS

## 1)  The History of USMS Discrimination Against African Americans.

The history of USMS discrimination against African Americans is documented, including in reports by the Department of Justice ("DOJ") and USMS.  For example, a 1974 lawsuit prompted a 1977 report by a panel chaired by then-Assistant Attorney General Taft detailing numerous findings of racial discrimination in promotions, assignments, training and other opportunities, Dkt. 123-6 (App. Ex. 1) at 5, 6, 9, 15, and 39, and making recommendations for revised selection methods for supervisory DUSM positions and assignments.  *Id.* at 12 and 25.

No evaluation of whether those proposed changes were implemented was made until 1991, when, in response to another lawsuit, the USMS convened an Ad Hoc Committee to

address renewed claims of discrimination. Dkt. 123-6 (App. Ex. 2).   The 1992 Ad Hoc Committee's Report:

> confirmed the existence of a rather widely held perception by members of the Service of favoritism and discrimination in the areas of hiring, promotions, and assignments, and the belief on the part of a significant segment of the Service in the existence of 'a good old boy network' or 'buddy system,' which operates to the disadvantage of women, minority members, and other persons believed to be excluded from the power structure.

Dkt. 123-6 (App. Ex. 2) at 19.   The report also found that at least seven Taft Report recommendations had not been adopted, including changes in promotions, Dkt. 123-6 (App. Ex. 2) at 3, endorsed "strict adherence to OPM mandated … promotion, and assignment procedures," and made additional recommendations.   *Id.*

In 1994 then-DUSM Matthew Fogg filed a class complaint of racial discrimination against the USMS with the Equal Employment Opportunity Commission ("EEOC"), referencing the 1992 Ad Hoc Committee Report.   Dkt. 123-6 (App. Ex. 3), (App. Ex. 6) at 2-3.   After EEOC procedural missteps and delays, in July 2012, the EEOC certified that class of African American USMS employees, finding the record "sufficient to establish that the practices at issue affect the whole class" and "offer[ing] preliminary proof of what appears to be a common Agency practice."   Dkt. 123-6 (App. Ex. 5) at 1, 7.   A USMS motion to reconsider is pending. Dkt. 123-6 (App. Exs. 7, 8).

In 1996, another USMS Task Force found that 19 of the 1992 Ad Hoc Committee recommendations had not been fully adopted, including recommendations relating to assignments, and that "unpunished acts of alleged bigotry" had not been investigated.   Dkt. 123-7 (App. Ex. 9).

DUSM Fogg filed an individual case and obtained a verdict in his favor in 1999. Dkt. 123-6 (App. Ex. 4).   In sustaining the verdict, this Court held that the evidence:

described a U.S. Marshal's Service . . . that has labored in substantial racial turmoil for at least a decade, and in which racial identities are keenly felt. The perception is pervasive on the part of African American members of the Marshal Service that they are less highly regarded and more is expected of them than of their white peers."

*Fogg v. Reno,* C.A. 94-2814, Mem. Op. at 5 & n. 5 (D.D.C. July 1, 1999) (Ex. 1).  The Court also found that "[t]he USMS concedes that Fogg presented evidence that the USMS in general has had a race problem," and noted that "[t]hree senior African-American managers in the USMS … testified that African Americans are not treated fairly compared to their white counterparts." *Id.*

This class action was filed in 2008 after a class EEO charge filed by then-DUSM David Grogan.  The action alleges ongoing racial discrimination in promotions, reassignments, and duty assignments.  Accordingly, Plaintiffs ask the Court to certify a class consisting of all current and former African American DUSMs, from April 22, 2007 forward, in job series 1811, Criminal Investigators, 1) Grades 12 through 15 regarding promotions and selections for positions, and 2) a subclass in Grades 13-15 regarding Headquarters duty assignments.

**2) Common Policies and Procedures Apply to the Entire Class and Vest Authority to Make <u>Promotions and Directed Reassignments in the Director.</u>**

    A. The Director of the USMS Has Authority To Make Promotions and Directed <u>Reassignments for the Entire Class.</u>

All class members are subject to common policies and practices regarding 1) promotions from the Best Qualified List ("BQL") through the Merit Promotion Plan ("MPP") and cancellations of such selections; 2) the distribution of positions in Headquarters ("HQ") divisions through promotions, reassignments and transfers; 3) selections for duty assignments made by HQ; and 4) other aspects of USMS operations bearing on promotions.  By statute and regulations, the Director is vested with the authority to make *all* personnel decisions within the

USMS.  28 U.S.C. § 561; 28 CFR § 0.111; 28 CFR § 0.138(a).[1]  Pursuant to USMS Policy, the Director makes all competitive promotion and lateral transfer decisions under the Merit Promotion Process ("MPP") ("Competitive Promotions").  Hylton Dep. Ex. 1 (Ex. 4) & 17 (Ex. 5).  The Director has, in limited circumstances, delegated to the Deputy Director and Associate Directors of Operations ("ADO") and Administration ("ADA") the authority to direct the reassignment of employees ("Directed Reassignments").  Hylton Dep. Ex. 1 (Ex. 4) at 2-3; Hylton Dep. Ex. 17 (Ex. 5).[2]   No African Americans have had this authority during the liability period; that is, there have been no African American Directors, Deputy Directors, or Associate Directors during that time.  Brooks Dep. (Ex. 6) 22:19-23:3.[3]

B.  Competitive Promotions For the Entire Class Are Made By the Director Through the MPP.

Competitive Promotions for GS-13 through -15 positions are made by the Director through the Merit Promotion Process.  Lowry Dep. (Ex. 7) 43:8-10.  The current version of the MPP has been used throughout the liability period, Dkt. 117-14 (Lowry Decl.) at ¶11; Fagan Dep. (Ex. 8) 14:12-13; Dkt. 124 at 8-9, and has been used in some form since the 1980s.  Dkt. 123-1 at ¶11.  As described more fully below, the MPP has two parts: (1) the scoring of Open Season applications and, for applicants to GS-14 and -15 positions, the scoring of structured

---

[1] ("[T]he Director of the United States Marshals Service … [is] authorized to exercise the power and authority …to take final action in matters pertaining to the employment, direction, and general administration (including appointment, assignment, training, promotion, demotion, compensation, leave, awards, classification, and separation) of personnel in General Schedule grades GS–1 through GS–15").  28 CFR § 0.138(a).

[2] The ADO and ADA can reassign a DUSM within the Headquarters divisions they supervise if there is no geographic change in positions.  Finan Dep. (Ex. 2) 60:20, 61:8-14; Snelson Dep. (Ex. 3) 135:3-20.  If a geographic change is involved, then the Deputy Director's approval is required.  Finan Dep.  68:23-24. The ADO and ADA also can reassign DUSMs between operational and administrative divisions with the same geographic limitation.  Finan Dep.  (Ex. 2) 61:24-25, 62:1-12.  Headquarters Division Assistant Directors can reassign DUSMs only within that division if there is no geographic change in positions. Finan Dep. (Ex. 2) 55:7-19, 178:8-18. Finally, the Deputy Director and Director are involved if a DUSM is to be reassigned between a district and a Headquarters division.  Finan Dep. (Ex. 2) 65:17-22, 66:19-20.

[3]  There have never been African American Assistant Directors of the Investigative Operations or Tactical Operations Headquarters Divisions and there have been only two African American Headquarters Division Assistant Directors.  Brooks Dep. (Ex. 6) 22:19-23:3; Brewer Decl. (Ex. 26) ¶ 6.

interviews, and (2) the ranking and selection process that follows the final certificate of eligible candidates (cert list).

> i)      The Substantive Process Of Evaluating and Scoring Open Season
> Applications and Structured Interviews

In order to apply for a Competitive Promotion all DUSMs must first have served one year in an operational position at the grade below, taken the USMS merit promotion exam, and submitted an annual "Open Season" application package containing pertinent job-related information.[4]  Dkt. 117-14 at ¶12.  The applicants' experience statements are scored by trained staff using written guidelines and job-specific criteria.[5]

Throughout the year, available GS-13 through -15 positions are advertised in Merit Promotion Vacancy Announcements ("MPA"). Dkt. 117-14 at ¶36-37.  Most DUSMs at or a grade below the vacant position meet its qualifications.  Lowry Dep. 98:2-6 (GS-13 through -15 positions consist mainly of "jobs [that] can be done by other 1811's" and do not require "specific, unique experience or duty [that] could not be learned or through training . . . in a couple months.").[6] The applicants' scores for experience, education, training, awards and the Merit Promotion Exam are weighted and totaled into a Merit Promotion Score by the HRMP Staff, which then creates the Best Qualified List ("BQL") for the position by determining a

---

[4] The Open Season application, Form USM-280, is a multiple-page document that asks applicants for detailed information about 30 job-related items, and for one-page narratives on what they have learned from their job experience on each of 17 job-related qualifications and skills, all based on a job analysis, as well as detailed information about their education, training and awards. Lowry Dep. Ex. 4 (Ex. 9); 175:1-18; Murphy Dep. (Ex. 10) 140:4-22, 143:20-146:2.

[5]  Scoring is done by DUMSs trained in how to evaluate and score experience, Lowry Dep. (Ex. 9) 189:17-22, using written scoring guides providing specific criteria.  Murphy Dep. Ex. 3 (Ex. 70); Murphy Dep. (Ex. 10) 155:4-157:7. GS-13 applicants are scored by GS-13 and GS-14 subject matter experts, while GS-14 and GS-15 positions are scored by GS-15 subject matter experts. Lowry Dep. (Ex. 9) 189:17-190:2. The scoring of candidates' education, training and awards is conducted by USMS Human Resources Merit Promotion (HRMP) staff trained in how to evaluate applicants' credentials. Lowry Dep. (Ex. 9) 188:19-189:15.

[6]  Rarely, an MPA will include a quality ranking factor (QRF) or selective placement factor (SPF).  A QRF is optional criteria which may increase a candidate's rank on the BQL, while an SPF is part of the minimum eligibility requirement focusing on a unique requirement for a position.  Dkt. 117-14 at ¶40; Lowry Dep. (Ex. 9) 93:18- 94:8.

"cutoff score."  Dkt. 117-14 at ¶43. All applicants eligible for a lateral transfer into the position

are also included on the BQL.  Dkt. 117-14 at ¶42.

Promotional candidates who make the BQL for GS-14 and -15 positions must participate

in a Structured Interview.[7]  Lowry Dep. 202:4-13. The Structured Interviews[8] are conducted by a

panel of three GS-14 or -15 DUSMs trained in the structured interview process.[9]  *See, e.g.,*

Murphy Dep. Ex. 4 (Ex. 11) at 2.[10]  After the BQL is created, and for a GS-14 or -15 position,

the Structured Interviews are completed and scored, the "cert list" is prepared. The "cert list"

contains only limited information regarding applicants: their duty station, city, GS level, current

position, date they joined the USMS, date of last promotion, and for GS-14 and GS-15

candidates, structured interview score.  Dkt. 117-14 at ¶42; Murphy Dep. Ex. 7 (Ex. 13).

> ii)     *The Unguided Ranking and Selection Process.*

Unlike the structured processes used to assess applicants to determine the final cert list

outlined above, for which the USMS has undertaken substantial validation efforts, the USMS has

undertaken no effort to study or validate the Ranking and Selection process of the MPP.

Lundquist Rept. (Ex. 15) at 2, 16, 19; Murphy Rept. (Ex. 12) at 12; Murphy Dep. (Ex. 10) 49:15-

21, 125:14-19, 169:5-15.  In contrast to the substantial job-related information and criteria that

are used to select candidates for the final cert list, the Ranking and Selection process is based

---

[7]  Reassignment-eligible candidates do not need to be interviewed.  Lowry Dep. (Ex. 7) 202:4-13.
[8] The interviews consist of predetermined performance-based questions that relate to a number of specific skill areas and questions which require responses to hypothetical situations.  Murphy Dep. Ex. 4 (Ex. 11), p. 2.
[9] The Structured Interview panelists are provided with written materials to conduct the interviews, including a script, a number of benchmarks to measure responses to each of the questions, and a five-point rating gauged to qualitatively different sample responses.  Murphy Dep. Ex. 4 (Ex. 11) (USMS013_002227 to end); Murphy Dep. (Ex. 10) 159:8-169:15; Murphy Rept. (Ex. 12) at 12-13.  The notes and scores are made by the three interview panelists independently, after which they attempt to reach a consensus score.  Murphy Dep. Ex. 4 (Ex. 11) (USMS013_002231).
[10]  The process includes briefing, preparation time, an extensive interview, and debriefing over the course of approximately three hours.  *Id.* At the end of the interview process, candidates are scored from very strong to very weak in each of the designated categories.  Dkt. 117-14 at ¶45.

only on the very limited information contained in the final certificate and applicant resumes. Murphy Dep. Ex. 11 (Ex. 14) at 2-3.

The "Recommending Official" ("RO") is the "appropriate U.S. Marshal, division or staff office chief, etc., for positions over which the Director has final approval (generally GS-13 and above)." Hylton Dep. Ex. 17 (Ex. 5) at 3; Dkt. 117-14 at ¶48. The RO receives the final cert list and applicant resumes and completes a USM-577 Recommendation Worksheet and returns it to HR "with the candidates ranked in selection order." Murphy Dep. Ex. 11 (Ex. 14) at 2-3. ROs are permitted to obtain and consider information and opinions of any type from any source, to conduct their own unstructured applicant interviews, Dkt. 117-4 49; Lowry Dep. (Ex. 7) 221:9-19; Lundquist Rept. (Ex. 15) at 16-17, and no USMS policies or procedures define, limit or explain the extent to which information may be used or considered. Lowry Dep. (Ex. 7) 215:1-221:19; Lundquist Rept. (Ex. 15) at 16-17. Nor is there any requirement that the RO record the information considered for the rankings. Lundquist Dep. (Ex. 38) 114:20-115:5. Some ROs would provide no explanation for their rankings or would note only that an applicant was ready and willing to be promoted. Fagan Dep. (Ex. 8) 65:11-20. In the end, the RO often provides "little to no information  . . . to support their promotion ranking recommendation." Lundquist Rept. (Ex. 15) at 21; Fagan Dep. (Ex. 8) at 64:25-65:20; *see also* Murphy Dep. Ex. 9 (Ex. 16).

After the RO ranks the candidates, the Career Board (CB) reviews those rankings, makes its own ranking and recommends to the Director a single top candidate for each open position. Fagan Dep. (Ex. 8) 77:12-16, 61:8-62:25, 91:25-92:8. The CB is composed of "senior career USMS employees" appointed by the Director which meets four times a year and "makes recommendations to the Director … who determines which positions will be filled…." Hylton Dep. Ex. 17 (Ex. 5) p. 1, 3.

As with the RO, the CB also is provided only the information contained in the final certificate and the applicants' resumes, along with the RO rankings.[11]  The RO rankings provide the CB with little if any information or explanation for why a candidate was recommended. Fagan Dep. (Ex. 8) 65:3-20.  Like the RO, CB members can – and do – obtain information of any type from any source.  Snelson Dep. (Ex. 3) 86:18-87:11.

When the CB meets, the Chair assigns each Board member a certain number of vacant positions for which they individually review applicants.  Fagan Dep. (Ex. 8) 61:8-15.  After reviewing the candidates and RO rankings, that member proposes a ranking then leads the CB discussion regarding his assigned vacancies and the CB reaches a consensus on who to recommend for the position.  *Id.* at 62:6-25.  In ranking applicants, the CB is required to indicate whether it agrees with the RO on the highest-ranked applicant, and to explain any reasons for departure.  *See* Murphy Dep. Ex. 12 (Ex. 17); Fagan Dep. (Ex. 8) 67:3-68:9; Lowry Dep. (Ex. 7) 226:13-228:2; Lowry Dep. Ex. 2 (Ex. 18).  The CB identifies only one ranked applicant for each vacancy in its recommendations to the Director.  Fagan Dep. (Ex. 8) 91:24-92:8; Lundquist Rept. (Ex. 15) 13-14.  As a result, applicants who are recommended as the first choice for one position are necessarily ranked lower for other positions to which they have applied.  *See* Clark Dep. Ex. 56 (Ex. 19), 57 (Ex. 55); Brewer Dep. (Ex. 20) 167:1-19; Clark Dep. (Ex. 21) 226:7-228:21; Fagan Dep. (Ex. 8) 91:24-92:8.

As a former CB Chair testified, its ranking of applicants is "a subjective process" that lacks any standardized job-related criteria or guidelines. Fagan Dep. (Ex. 8) 62:22-25, 63:10-13, 64:6-65:20; *see also* Lowry Dep. (Ex. 7) 229:4-21; Lundquist Rept. (Ex. 15) at 20-21.  As noted

---

[11] For example, the CB does not see the complete Open Season package that includes the multipage experience section, and is given only the resume that does not include detailed information about a candidate's experiences. Fagan Dep. (Ex. 8) 110:18-113:25.  The CB also does not receive the Open Season scores of the applicants or their scores on the merit promotion exam.  *Id.* at 16:9-13. It also receives only position titles for the vacancies to be filled and no job descriptions or requirements.  *Id.* 61:1-15

by one former CB Chair, it was a challenge "to try to be fair and equitable" with "such limited information." Fagan Dep. (Ex. 8) 63:21-65:20.  Accordingly, the CB is free to decide whether and which criteria to apply, according to its own potentially non-job-related views or information.  *Id*. at 63:10-13.  After ranking and recommending candidates for each position, the CB meets with the Director and Deputy Director to share its recommendations.  *Id*. at 80:25-81:14.  There, the CB Chair makes presentations on certain vacancy announcements -- generally only those where the CB's recommendation differed from the RO's.  Fahey Dep. (Ex. 22) 81:1-82:23.  The Director receives only the final certificates, RO rankings, Merit Promotion resumes, and CB rankings.  Clark Dep. (Ex. 21) 116:4-16; Clark Dep. Ex. 5 (Ex. 23); Lowry Dep. (Ex. 7) 125:12-16, 251:1-18, 313:1-5.  The Director, along with the Chair of the Career Board, is informed if a candidate is the subject of an internal affairs investigation.[12]  Class members have testified that African Americans with open investigations typically are prevented from receiving promotions.  Brooks Dep. (Ex. 6) 235:6-11; *see also* Bradshaw Decl. (Ex. 25) ¶ 20-21.

While the RO and CB make *recommendations* of candidates on the final certificate for selection, the *actual selection decision* is always made by the Director.  Lowry Dep. (Ex. 7) 244:17-245:3, 250:1-10; Hylton Dep. (Ex. 24) 264:1-265:6.  The Director, in making his or her decision, can seek any additional information about candidates, whether that information is job related or not.  Lowry Dep. (Ex. 7) 248:16-249:8, 251:10-12; Clark Dep. (Ex. 21) 116:4-118:18; Hylton Dep. (Ex. 24) 343:5-344:9, 349:7-17.  The Director can also decide to cancel a position instead of selecting a recommended candidate, request additional candidates or select someone who is not on the BQL. Hylton Dep. Ex. 17 (Ex. 5); Lowry Dep. (Ex. 7) 244:21-245:3; 253:20-

---

[12]  Prior to 2011, USMS policy prevented a DUSM under investigation from being selected for a promotion. Lowry Dep. (Ex. 7) 238:15-240:18.  As of 2011, a candidate's open investigation is now reviewed to determine if it is serious enough to prevent that candidate's selection. Lowry Dep. (Ex. 7) 246:6-247:19; Hylton Dep. (Ex. 24) 315:9-317:5.

254:15.  As with the RO and CB, there is no process, and are no benchmarks, guidelines or criteria to be followed by the Director in making selections.  Lowry Dep. (Ex. 7) 244:17-245:3. The Director need not and does not record the basis on which candidates are selected or positions cancelled.  Indeed, Director Clark did not record, and is unable to state the basis on which he made, any selection or cancellation decisions that denied Class Representative Brewer or Plaintiff Brooks positions for which they applied during the Liability Period.  Clark Dep. (Ex. 21) 173:1-261:18.

C. Reassignments Are Made By the Director and Top USMS Executives Through Policies That Apply To the Entire Class.

In addition to competitive promotions made through the MPP, the Director (and in some cases the Deputy and Associate Directors) make "Directed Reassignments," that is, the promotion or transfer of a DUSM through "non-competitive placement into a position regardless of the vacancy announcement status or whether a list of eligible exists."[13] Hylton Dep. Ex. 17 (Ex. 5) at 6.  Although there are certain basic eligibility requirements, "[f]or noncompetitive placement, no formal evaluation procedures are required."  *Id.* at 6, 8.  Thus, the Director has the authority to, and does, select any employee for a Directed Reassignment without announcing a position or going through a competitive process.  Hylton Dep. (Ex. 24) 297:5-12; Clark Dep. (Ex. 21) 235:8-243:18, 164:16-168:12.

There is no written policy or process for Directed Reassignments.  Nor is there a formalized process for a DUSM to apply for Directed Reassignments, though a DUSM may ask for one.  Finan Dep. (Ex. 2) 58:12-18, 60:14-15.  Nor is there any validated, structured process or criteria used to determine who should receive a Directed Reassignment.  *See* Murphy Rept. (Ex.

---

[13] The term "Directed Reassignment" will be used throughout to refer to movements from one position to another within or between grades outside the MPP.

12) at 36-37.   Their only basis is the Director's belief that it is "in the best interest of the agency."  Lowry Dep. (Ex. 7) 54:5-13.

Directed Reassignments are all made or approved by the Director or, in limited circumstances, by authority delegated to only the three other highest-ranking officials.  *See supra* Section 2(A) .  The policies and practices regarding Directed Reassignments therefore apply to all members of the Class, just as the MPP does.  As discussed more fully in Sections 4 and 5 below, Directed Reassignments are used to place DUSMs into preferred positions without having to compete with others through the MPP and play an important role in DUSMs' careers.

D.  Headquarters Duty Assignment Policies Apply To the Entire Class.

USMS policies provide for HQ selections for Duty Assignments that apply to the class as a whole.  *See, e.g.,* Hylton Dep. Ex. 17 (Ex. 5) at 8.  HQ Duty Assignments provide DUSMs with experience in leadership, and national or regional roles that enhance a DUSM's prospects for promotion and advancement.  *See, e.g.,* Lowry Dep. Ex. 4 (Ex. 9) at 13, 19, 25-26.  Examples of HQ Duty Assignments include: Operation FALCON[14]; the Incident Management Team (IMT)[15];

---

[14] Operation FALCON was a national USMS operation that coordinated with state and local law enforcement authorities to apprehend fugitives from 2005 to 2010. Operation FALCON was organized by HQ's Investigative Operations Division (IOD), and led by a GS-14 or GS-15 Commander, assisted by a GS-14 Deputy Commander. Finan Dep. (Ex. 2) 100:5-9; Brewer Decl. (Ex. 26) ¶ 19. The Commander and Deputy Commander of Operation FALCON were selected by the Assistant Director of IOD, pursuant to authority delegated by the Director.  Finan Dep.  (Ex. 2) 95:6-7. There was no formal application process for such positions; rather IOD made the selection based on their views of which Chief Deputies had significant investigation and management experience.  *Id.* at 95:8-9, 96:23-97:5, 97:21-23.

[15] The Incident Management Team (IMT) consists of a variety of personnel who are deployed to assist with the management of emergency situations. Harlow 30(b)(6) Dep. (Ex. 27) 100:18-101:7, 101:22-102:8; Snelson Dep. (Ex. 3) 73:19-74:3.  Selection for an IMT requires the submission of an application to HQ's Tactical Operations Division (TOD), which then selects those who will attend IMT training.  Harlow 30(b)(6) Dep. (Ex. 27) 102:14-103:4; Snelson Dep. (Ex. 3) 75:11-16, 107:1-7. Upon completion of the training, the DUSM becomes a member of an IMT and can be deployed in emergency situations.  Snelson Dep. (Ex. 3) 73:20-74:3.  IMT selections are made by TOD. Harlow 30(b)(6) Dep. (Ex. 27) 100:18-101:7, 101:22-102:8, 102:14-20; Snelson Dep. (Ex. 3) 73:19-74:3.

and the Special Operations Group (SOG).[16]   These Duty Assignments all are made pursuant to the Director's delegated authority by select high-ranking officials.

### 3. USMS Promotion and Assignment Policies and Practices Have An Adverse Impact on African American DUSMS.

Data from the USMS demonstrate that the decisions made under the policies and practices discussed above adversely affect African American DUSMs.

#### a. Promotion Selections From the Best Qualified List.

##### i. *Both parties' statistical experts agree that there are statistically significant disparities in promotions.*

It is undisputed that African American DUSMs are statistically significantly less likely to be promoted from the BQL to GS-13 through -15 positions than their white counterparts.  Dr. Vekker, Plaintiffs' labor economist, found that African Americans would have been expected to receive an additional 37 (or 29.4%) promotions to GS-13 through -15 positions from 2007 to 2012, a statistically significant disparity at 3.53 standard deviations, with a probability of occurring by chance of 0.0004 (or odds of 4 in 10,000).[17]  Vekker Rept. (Ex. 28) at 5-6. Similarly, Dr. White, Defendant's expert, found that African Americans would have been expected to receive an additional 20 (or 11.9%) such promotions from 2007 to 2013, a statistically significant disparity at 2.04 standard deviations, or a less than a 0.05 (or odds of less than 5 in 100) probability of occurring by chance. White Rept. (Ex. 29) at 10-11, 18 & Ex. C at

---

[16] The Special Operations Group (SOG) is another Collateral Duty Assignment made by the TOD. Harlow 30(b)(6) Dep. 87:4-5; *see* Hylton Dep. Ex. 1 at 5.  SOG, like IMT, is a specially trained group of DUSM's who are deployed to various locations like a national tactical team.  Hylton Dep. 57:18-22, 58: 9-20; Snelson Dep. 54:3-10. To become a member of SOG, DUSMs apply to and are selected by TOD to attend the SOG basic training. Snelson Dep. 57:2-10, 58:14-22.  Those who successfully complete training become a member of SOG and can be deployed.  *Id.*

[17] While there is no "minimum statistical threshold" required for a prima facie case for employment discrimination, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 n.3 (1988), disparities of 1.96 standard deviations typically are sufficient to support an inference of discrimination. *See, e.g.*, *Taylor* ., 241 F.R.D. at 44(quoting *Anderson*, 180 F.3d at 340 (alteration in original).  Where the data set is smaller, making disparities harder to discern, lesser deviations may serve as potent proof of discrimination, *see, e.g.*, *McReynolds v. Sodexho Marriott Servs.*, 349 F. Supp. 2d 1 (D.D.C. 2004); *Segar*, 738 F.2dat 1283, particularly when supported by expert opinion or anecdotal evidence. *Valentino v. United States Postal Serv.*, 674 F.2d 56, 73 (D.C. Cir. 1982); *Segar*, 738 F.2d at 1278.

3; White Dep. Ex. 8 (Ex. 34); Gielow Decl. (Ex. 81) ¶6-7. Thus, the parties' experts *agree* that among best qualified candidates, African American DUSMs are statistically significantly less likely to be selected through the MPP than their white counterparts.

The parties' experts reached similar conclusions when they compared the same time periods.[18] For the period 2007 through 2011 -- omitting the years after the parties' experts first submitted reports identifying racial disparities in promotions[19] -- Dr. Vekker found the same disparity of 37 fewer African American promotions but at 3.82 standard deviations (a probability of 0.0001 that the disparity occurred by chance). Vekker Rept. (Ex. 28) at 6-7.   Dr. White found 23 fewer African American promotions than expected (an increase of 3 from the 2007-13 and 2007-12 analyses), a disparity at 2.56 standard deviations (an increase of .52 in standard deviations from his 2007-13 and 2007-12 analyses). White Rept. (Ex. 29) at Ex. C, p. 3; White Dep. (Ex. 30) 185:22-188:9; White Dep. Ex. 8 (Ex. 34); Gielow Decl. (Ex. 81) ¶6-7.

### ii. *Defendant's expert's statistical manipulations*

---

[18] The experts' respective data sources covered different periods. Dr. Vekker used the USMS EEOC Form 715 data, which covered the 2007–2012 fiscal years, Vekker Rept. (Ex. 28) at 4 n.4, finding the USMS promotions databases unreliable, *id*. at 7-10.  Dr. White used the USMS promotions databases spanning January 2007 to January 2013, *see, e.g.*, White Rept. (Ex. 29) at 18, corrected and supplemented by paper records unavailable to Dr. Vekker. White Rept. (Ex. 29) at 5-6; White Dep. (Ex. 30)  21:14-23:13; White Dep. Exs. 2-4 (Exs. 31, 32, 33). Both experts used the multiple pools exact test. Vekker Rept. (Ex. 28) at 5 n.6; White Rept. (Ex. 29) at 10-11.  Because the EEOC Form 715 Reports contain data for all applications by year, they did not allow Dr. Vekker to perform the analyses Dr. White criticizes him for not including.  *See* White Rept. (Ex. 29) at 25-27.  In addition, notwithstanding Dr. White's concerns whether the Form 715 data is accurate, *id*. at 27, Dr. Vekker was justified in relying on them as the USMS is required to submit those data to the EEOC under 42 U.S.C. § 2000e-16.

[19] It is appropriate to analyze the Defendant's pattern of decision-making prior to it being on notice of evidence that its policies were discriminatory.  *See* Dr. White's (Ex. 29) reports of August 19, 2010 and December 9, 2011 (Dkt. 50-1 and Dkt. 90-3, and Dr. Vekker's reports of November 16, 2011 and December 22, 2011 (Dkt. 83-6 and Dkt. 92-1].  It is well-established that evidence of changes in employment practices subsequent to such notice is of little weight and irrelevant to liability.  *EEOC v. Ford Motor Co*., 645 F.2d 183, 197 (4th Cir. 1981), rev'd in part on other gds, 458 U.S. 219 (1982) (changes in employment practices that occur after the defendant learns of the charges "are entitled to little weight"); *Gonzales v. Police Dep't. City of San Jose*, 901 F.2d 758, 762  (9th Cir. 1990) (lower court erred in considering statistics showing "subsequent hiring or promotion practices"; "[c]urative measures simply do not tend to prove that a prior violation did not occur."); *Parham v. Southwestern Bell Tel. Co*., 433 F.2d 421, 426 (8th Cir. 1970) (employer's more recent employment practices "do not affect the determination of whether the employer previously violated Title VII."); *Jenkins v. United Gas Corp*., 400 F.2d 28 (5th Cir. 1968) (same). Accordingly, the Court should disregard that portion of Dr. White's analysis that relies on statistical analyses including 2012 and 2013 data.

While both experts reported their analyses aggregated over the years discussed above, Dr. White also disaggregated the data by grade and by year within each grade. *See, e.g.* White Rept. at Ex. D at 2-end.  Dr. White repeatedly acknowledges that "the analyses at the grade/year level have lower statistical power" than aggregated analyses, *see, e.g.*, *id.* at 18, and explains that "[t]he power of a statistical test is the probability of finding a significant result when, in actuality, there is a significant difference."   White Dep. (Ex. 30) 117:11-13.   Dr. White nevertheless discusses these disaggregated data to point out differences in the disparities.[20] On this basis, Dr. White later states that "*all* of the analyses for GS-13 resulted in more African Americans selected than expected," White Rept. (Ex. 29) at 20 (emphasis added), despite the contradictory results of his own analysis.  For example, Dr. White's disaggregated analyses show that GS-13 selections in 2011 alone resulted in 8 fewer African American promotions than expected, a statistically significant disparity at 2.03 standard deviations.   White Rept. (Ex. 29) at Ex. C p. 3; *id.* 139:4-10; White Dep. Ex. 8 (Ex. 34). Further, over the period 2007-11, there were fewer African American GS-13 promotions than expected in three of five years, with an overall shortfall of 6 promotions. White Rept. at Ex. C (Ex. 29) p. 3; White Dep. (Ex. 30) 176:16-177:8; White Dep. Ex. 8 (Ex. 34). The net plus of 1 African American promotion at Grade 13 on which Dr. White premises his conclusory statement results only when he includes January 2013 selections in an analysis. White Dep. (Ex. 30) 57:9-12; White Rept. at Ex. C (Ex. 29) at 3.[21]

The results discussed above and reported by Dr. White (Tables 4 and 5, Exs. C and D to White Rept.) aggregate the results of each selection and, thus, consider every application by a

---

[20] For example, for 2007-13, despite an overall disparity in promotions at 2.04 standard deviations and a disparity of 21 fewer than expected African American Grades 14/15 promotions, Dr. White reports that there was 1 more African American Grade 13 promotion than expected. White Rept. (Ex. 29) at 18.

[21] Similarly, in these same years, there were statistically significantly fewer African American promotions to GS-14/15 positions in 2011 alone, and fewer African American promotions to GS-14/15 positions in each of the five years with overall shortfalls of 16.75 from 2007-11 and 19 from 2007-12.   White Rept. (Ex. 29) at 17-18; White Dep. (Ex. 30) at 124:21-125:16, 136:14-137:16, 174:21-180:17; White Dep. Ex. 8 (Ex. 34).

DUSM, White Rept. at 6, as did Dr. Vekker's analyses using the Form 715 data. Vekker Dep. (Ex. 35) 26:22-27:8, 54:13-17; White Rept. (Ex. 29) at 27. However, Dr. White also ran a different set of analyses that aggregated promotions by selection periods, but which *did not count each application made by a DUSM.*[22]  *Id.* at 8 (Tables 2 and 3, Exs. A and B).  Dr. White admitted that this approach is not proper in that it understates the number of rejections by excluding situations where an applicant applies for but is not selected for more than one position, or is rejected for one position but selected for a different one. White Rept. (Ex. 29) at 9; White Dep. (Ex. 30) 280:8-281:15.  Further, Dr. White admitted that his analytical model that *counted each application* would most closely reflect the selection process if in fact each candidate were actually considered for a position as is the case.[23]  *Id.* at 128:11-131:9.  Despite the shortcomings of the analyses that do not count every application, Dr. White still found statistically significant disparities in the selection of African American DUSMs throughout the liability period.

Thus, even after disaggregating the data to levels with admittedly lower statistical power and arbitrarily excluding actual applications from analyses, Dr. White still cannot eliminate statistically significant disparities in African American promotions.

### b.  Directors' Cancellations of Selections From the Best Qualified List.

Dr. White also analyzed GS 13-15 positions that were cancelled by the Director.  His analysis confirmed that African American candidates were indeed disproportionately ranked as the number one candidate among cancelled positions--they were number-one-ranked in 16.2% of

---

[22] Instead, Dr. White treated each DUSM as having applied only once regardless of the actual number of applications.  As set forth in Section 5 below, it is not uncommon for Class Members to apply for multiple promotions on multiple occasions. *See* pp. 23-29, *infra.*

[23] This is so because, as Dr. White's Report recognizes, (1) "[a]ll applicants on the best qualified list are ranked by the Recommending Official," White Rept. (Ex. 29) at 4; (2) the Career Board first divides announcements among individual members to rank all candidates from the BQL for a particular announcement before coming together to reach consensus on final recommendations for selection, Fagan Dep. (Ex. 8) 61:8-62:11 and (3) the Director receives the names of all applicants on the BQL and can select any candidate on the list. Lowry Dep. (Ex. 7) 244:17-245:3, 250:1-10.

the positions cancelled, while comprising only 11.2% of all applicants, a disparity in cancellation of presumed selections of African American number-one-ranked candidates at a rate of 1.4 times their representation. White Dep. (Ex. 30) 193:11-196:12, 285:3-287:12. This disparity in *cancelled* positions is in addition to, and apart from, the statistically significant disparity in *selections* of discussed above, from which cancellations were excluded, and adds to the overall shortfall in African American promotions.

### c. The Results of Promotions and Reassignments On Headquarters Positions.

It is also undisputed that there are statistically significant racial disparities in the distribution of African American and white GS-13 through -15 DUSMs across Headquarters divisions at USMS.   Dr. Vekker found that African American DUSMs were statistically significantly less likely, at 3.95 standard deviations, to hold positions in the Investigative Operations Division ("IOD") and the Tactical Operations Division ("TOD"). Vekker Rept. Table 3 (Ex. 28) at 11-12.  Not only does Dr. White not contest this finding, White Dep. (Ex. 30) 200:4-201:11, but his own Report shows a stark and consistent racial disparity across both years and grades.  *See* White Rept. (Ex. 29), Table 7 at 30.   Indeed, Dr. White finds that African Americans hold DUSM positions in IOD/TOD at roughly 1/5th to 2/5ths the rate they hold other HQ positions.[24]

Dr. Vekker's HQ data,[25] also used by Dr. White,[26] demonstrates that the racial disparity in IOD/TOD positions has had a segregative effect on the HQ workforce. Indeed, more than one-

---

[24] For example, in 2007, Grade 13 - IOD/TOD 5.6%, other HQ 16.8%; Grade 14 - IOD/TOD 3.3%, other HQ 19.4%; Grade 15 - IOD/TOD 0.0%, other HQ 7.7%. White Rept. at 30. Table 7 also reveals that there were no African Americans at Grade 15 in IOD/TOD in any year until 2012, *id,* following Dr. Vekker's November 16, 2011 report first showing these HQ disparities (Dkt. 83-6).

[25] Vekker Dep. Ex. 11 (Ex. 36).

[26] White Rept. (ex. 29) at 30.

half of all white HQ DUSMs hold positions in these *95% white* divisions.[27] *Id.* Thus, in addition to being selected for fewer positions, African American DUSMs are also statistically significantly less likely to be placed in IOD or TOD, where the majority of all white HQ DUSMs work.[28]

### d.  HQ Duty Assignments.

Selections for HQ Duty Assignments also have a disparate effect on African American DUSMs. As noted above, these include such prestigious, career-enhancing leadership assignments to Operation FALCON. Finan Dep. (Ex. 2) 100:5-9; Dkt. 123-3 ¶5. Indeed, *none* of the nine FALCON Commanders and Deputy Commanders selected over its 2005-2010 life were African American. *Id.* 96:18-21, 98:22-25, 99:8-11, 99:18-100:4; Brewer Decl. (Ex. 26) ¶ 19.

Assignments to the Incident Management Team are similarly discriminatory. Of the 35 DUSM's in Grades GS-13 through -15 within the Liability Period,[29] only two have been African American, Gielow Decl. (Ex. 81) ¶11, representing only 5.7% of IMT's in the USMS. The same holds true for assignments to the Special Operations Group.[30] Of 78 DUSM's in Grades 13

---

[27] For example, the racial composition of IOD/TOD DUSMs is 4.81% African American and 95.19% white, and a majority (53.88%) of all white HQ DUSMs work in IOD/TOD, while less than a quarter of African American HQ DUSMs work in IOD/TOD. Gielow Decl. (Ex. 81) ¶9 & Gielow Decl. (Ex. 81) Attachment A.

[28] The HQ data also demonstrates that Dr. White's critiques of Dr. Vekker's analysis are unfounded. For example, Dr. White criticizes Dr. Vekker for combining IOD and TOD for analysis, White Rept. (Ex. 29) at 32, and purportedly for not accounting for the fact that about one-half of the 2012 IOD/TOD DUSMs were there in 2007, *id.* at 31. Yet, the HQ data show that IOD and TOD have approximately the same racial composition (IOD - 5% AA, 95% W; TOD - 4% AA, 96% W) although TOD is roughly only a third the size of IOD, and that the racial composition of IOD/TOD in 2012 (4.81% AA, 95.19% W) essentially mirrors that in 2007 (4.97% AA, 95.03% W). Otherwise, Dr. White was unable to identify any differences in qualification, selection methods, geography, or other factors that would explain the racial disparity in IOD/TOD positions. White Dep. (Ex. 30) 203:9-215:7. Further, while Dr. White properly observed that Dr. Vekker's analysis did not measure any particular employment decision-making process, he also acknowledged that the racial composition of the HQ divisions was the result of promotion, reassignment, transfer and related decisions made by the Director and USMS, except for any effect of voluntary terminations, *id.* 211:9-14, and the fact that the racial composition of IOD/TOD remained constant from 2007 to 2012 while one-half of the DUSM positions were filled suggests that the racial pattern of the decisions between 2007 and 2012 was the same as that which created the racial disparities in 2007. *Id.* 291:1-294:21.

[29] Only 35 such assignments can be reliably identified as participants in IMT. Gielow Decl. (Ex. 81) ¶11.

[30] The selections have been delegated by the Director to TOD. Harlow 30(b)(6) Dep. (Ex. 27) 87:4-5.

through 15 since 2007 associated with the SOG, only 3.8% are African American, compared to their representation at 8.3% of DUSMs in grades 13-15. Gielow Decl. (Ex. 81) ¶10; *see also* White Rept. (Ex. 29) at 12 (Table 1, 2010 count).

### e.  Other Evidence of Systemic Discrimination.

The USMS's own analyses also reveal stark racial disparities in investigation and disciplinary procedures, relevant to the promotion analysis because DUSMs who receive a discipline greater than a letter of reprimand are disqualified from promotional opportunities for from one-to-two years.  Hylton Dep. Ex. 17 (Ex. 5) at 12.

In November 2012, the USMS Offices of Inspection (OI) and Discipline Management conducted an internal analysis in response to an EEO complaint alleging, *inter alia*, that the OI disproportionately charges African American male employees in internal investigations with "Lack of Candor" charges.[31]  Their initial report ("IO Report") found that, from January 2007 to September 2012, 22.8% of lack of candor and similar charges were against African American males, compared to their 6.11% representation in the USMS workforce.  Gielow Decl. (Ex. 81) ¶ 12 (Attachment B (*compare*  IO Report at 4 with 10)).[32]  Contrary to analyses repeatedly finding this disparity, the formal memo to the Assistant Director concludes "it cannot be argued that any one group is being treated disparately or more harshly than any other."  Gielow Decl. (Ex. 81) ¶ 12 (Attachment B at p. 4 (USMS011-374015 – 18)).

---

[31]  Specifically, the allegation claimed that DUSMs who are not forthright during investigations were disproportionately charged with "Lack of Candor," as compared to white DUSMs. Gielow Decl. (Ex. 81) ¶ 12 (Attachment B (Office of Inspection Case Study 15 Nov. 2012, p. 3 (USMS010-403660 - 669))).

[32]  The reaction of the Assistant Director of IO to the initial report included the following:  "How do we make a no disparate impact statement when the workforce is 6% AAM, but falsification charges against AAM appear to be over 25%?  Emphasis: I don't think there is a disparate impact, but the stats need to support the statement that there is none, if there is none…" Gielow Decl. (Ex. 81) ¶ 12 (Attachment B at p. 1 (USMS010_408956 - 7)).  In response further analyses of subsets of charges involving providing false information, but the analysts concluded that "[w]hen it was necked down to just Lack of Candor/False Statement during an investigation, there were 39 total subjects, 9/39 is 23%.  With percentages ranging from 19 to 23% -- regardless of how we change the query -- the numbers still represent a far greater percentage of Lack of Candor Cases than the percentage of AAM in the USMS workforce." *Id*. ¶ 12 (Attachment B pp. 1-2 (USMS011_374007 - 8)).

The IO Report is compelling evidence that African-Americans are disproportionately charged with more severe offenses and thus disproportionately disqualified from seeking promotion, a further systematic denial of equal promotion opportunities.   In addition, this evidence demonstrates that USMS leadership denies the existence of racial disparities in the face of clear data and its own analyses to the contrary.

### 4. The MPP Ranking and Selection Process and Directed Reassignment Process Are Not Reliable, Valid Selection Processes.

The Uniform Guidelines on Employee Selection Procedures ("Uniform Guidelines") were jointly adopted by DOJ, the EEOC, and other agencies to provide "a uniform set of principles on the question of the use of tests and other selection procedures" and "apply the same principles to the Federal Government as are applied to other employers."  29 CFR § 1607.1.  The Uniform Guidelines plainly state:

> The use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group *will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated* in accordance with these guidelines….

29 CFR § 1607.3 (emphasis added).

The statistical analyses of both parties' experts, along with the other evidence, demonstrate that USMS policies regarding promotions, directed reassignments and duty assignments discussed above have a disparate impact on African American DUSMs. Accordingly, under the Uniform Guidelines these procedures are considered discriminatory *unless* they have been appropriately validated.

It is undisputed that the USMS has not validated the Ranking and Selection process of the MPP. Murphy Dep. (Ex. 10) 125:14-19; Lowry Dep. (Ex. 7) 221:9-19. Similarly, there is no evidence that the USMS has undertaken any efforts to validate the unspecified means by which

selections for Directed Reassignments are made, and for which "no formal evaluation procedures are required." Hylton Dep. Ex. 17 (Ex. 5) at 6. Nor is there any evidence regarding validation of the undefined process for selecting HQ Duty Assignments.

### a. Plaintiffs' expert's analysis of reliability and validity.

Dr. Kathleen Lundquist, an Industrial/Organizational Psychologist, found that the Ranking and Selection Process of the MPP lacks sufficient reliability and validity under professional and legal standards. Lundquist Rept. (Ex. 15) at 2, 6. A "valid" selection process is one that is job-related, in that it measures the knowledge, skills, abilities, and other personal characteristics critical to the job, to identify which candidates will be successful. *Id.* at 6. "Validation," then, is an empirical process for determining whether a selection procedure, in fact, provides meaningful information with regard to some important aspect of job performance to predict potential employees' success in the job. *Id.* at 7.

Because validation is an empirical process, before a procedure can be found valid, it must first be reliable. *Id.* In evaluating reliability, the question is whether a selection procedure measures something consistently, *id.*, that is "in the application of a measurement procedure," "the degree to which scores [or the characteristic being measured] are consistent over one or more potential sources of error (e.g., time, raters, items, conditions of measurement, etc.)." Murphy Dep. Ex. 15 (Ex. 37) at 70. Reliability is established when there is standardization in the execution of the selection process so that it reduces measurement error, including error such as racial bias. Lundquist Rept. (Ex. 15) at 1-2, 7, 16, 17, 19, 21-23. Without reliability, factors other than a candidate's job-related skills may be introduced and undermine a selection device's predictions about the candidate's actual potential for success on the new job. *Id.* at 16. Thus, a

low level of reliability calls into question the validity of the selection procedure. Lundquist Dep. (Ex. 38) 125:14-18.

The lack of structure, guidelines, and standardized criteria in the MPP Ranking and Selection Process, undermine its reliability by allowing non-job-related factors, including "both unintentional and intentional biases" to enter into the decision making process. Lundquist Rept. (Ex. 15) at 22-23; Lundquist Dep. (Ex. 38) 123:19-124:1. These deficiencies exist in all aspects of the Ranking and Selection Process, from the RO's assessment and recommendation of applicants through the Director's final selection of a candidate.[33]

### b. Defendant's expert's validity conclusions are deeply flawed.

Conceding as he must that the Ranking and Selection Process has not been validated by the USMS, Defendant's expert, Dr. Kevin Murphy, also an Industrial/Organizational Psychologist,[34] purports to establish its validity in his report. Murphy Rept. (Ex. 12) at 3. Much of Dr. Murphy's report is devoted to demonstrating the validity of the MPP processes up to the creation of the BQL and scoring of the Structured Interview. *Id*. at 8-13, 18-21 – a proposition that Plaintiffs do not challenge. Thus, that portion of his report is relevant only as it supports

---

[33] Specifically, the absence of validated interview questions and formal guidance provided to ROs in conducting discretionary interviews and obtaining other information and opinions; the lack of criteria governing what information is to be used, how it is to be considered, and the basis on which candidates were to be ranked; and the absence of articulated rationales, all undermine the reliability and validity of the RO's role in the process. Lundquist Rept. (Ex. 15) at 17-19. Similarly, the fact that the CB is provided "no standardized criteria to ensure that the basis for [candidates'] rankings and selection recommendation is job-related and consistently applied across candidates;" the lack of consistent, job-related information about candidates and vacancies, and the lack of guidance on what information "should be considered and how much weight to apply, including to the RO's recommendation," undermines the reliability of the Board's role in the process. *Id*. at 19-21. Further, the lack of criteria or guidelines for the Director to use in making his final selection, the lack of consistent information and sources of information that can be used by the Director and the fact that the selection need not even be made from the BQL, all undermine the reliability and validity of the selection process. *Id*. at 21-22. The process also lacks quality controls such as training, documentation, and monitoring "to ensure that HR policies and procedures are implemented correctly and consistently." *Id*. at 23.

[34] Plaintiffs challenge the admissibility of Dr. Murphy's report and testimony in a separate motion, which more fully discusses the flaws in his analysis, and his disqualification as unreliable in two other federal cases. *See, e.g.*, *EEOC v. Kaplan Higher Educ. Corp.*, No. 13-3408, 2014 U.S. App. LEXIS 6490, at *8-13 (6th Cir. Apr. 9, 2014); *EEOC v. Freeman*, 961 F. Supp. 2d 783, 792-97 (D. Md. 2013).

Plaintiffs' position that there are less discriminatory alternatives to the Ranking and Selection Process, including the validated collection and scoring of job-related knowledge and Structured Interviews, which are used earlier in the MPP process, but then kept from and thus not considered by the RO, the CB or the Director.[35]

That portion of Dr. Murphy's report that does relate to whether the Ranking and Selection is valid is fraught with analytical errors. First, Dr. Murphy did not collect or analyze any data from the USMS about the Ranking and Selection Process. Nor did he perform any independent validation analysis of the information actually obtained and factors actually considered in that Process, or whether the post-selection job performance of the chosen candidates demonstrated that the factors actually considered were, in fact, predictive of successful job performance.[36] Rather, Dr. Murphy based his opinion on academic research regarding *different selection processes* that bear no resemblance to the Ranking and Selection Process which, instead, is a type of Training and Experience (T&E) assessment that has been found to have low levels of validity and in a way found to produce "poor results," Murphy Dep. Ex. 16 (Ex. 39) at 23.[37]

---

[35] In further contending that Dr. Lundquist should have identified less discriminatory alternatives, Dr. Murphy improperly attempts to shift to Plaintiffs-- a burden that does not arise unless and until the Defendant carries its burden to demonstrate that the process is job-related and consistent with business necessity. *See, e.g., Anderson v. Zubieta*, 180 F.3d at 338-39 (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i)).

[36] Dr. Murphy concedes that he had the opportunity to request data from the Department of Justice and the USMS but did not do so. Murphy Dep. (Ex. 10) at 29:14.

[37] Although Dr. Murphy purports to validate that process through comparing it to research literature, Murphy Rept. at 16, he acknowledges that *none* of the research studies he relied on concerned "the validity of the ranking process by the recommending officials, or by the Career Board." Murphy Dep. (Ex. 10) 125:14-19. He also admits that there are "substantial differences" between the processes reviewed in the research he cites and the Ranking and Selection process. *Id.* 262:15-17; *see also id.* 261:19-262:11; 264:14-265:3. Dr. Murphy agrees that the evaluation of the Merit Promotion Resumes in the Ranking and Selection process properly could be characterized as a T&E assessment that a recent U.S. Merit Systems Promotion Board report identifies as problematic. *Id.* 280:17-21; Murphy Dep. Ex. 16 (Ex. 39) at 23. That Report explains that resumes not only have low levels of predictive validity, but that any such validity is further eroded when used in the manner the USMS does. Murphy Dep. Ex. 16 (Ex. 39) at 23 ("In an unstructured evaluation, such as reviewing a resume without guidelines, people adopt informal strategies that produce poor results."). The Report thus advises that agencies "[s]hould be cautious about any assessment which has not been subjected to a validation procedure to determine how well it predicts job performance; that [t]oo often measures of training and experience may appear rational and valid, but they have not

Second, Dr. Murphy's analysis fails to acknowledge that the RO, CB and Director do not engage in an independent review of candidates that might suggest some evidence of reliability.[38]

Dr. Murphy also rests his validity opinion (and attempts to criticize Dr. Lundquist's analysis) on a characterization of the CB members -- peers of the candidates -- as selection "experts," but does so only "by virtue of [their] experience on the job," Murphy Dep. (Ex. 10) 241:17, admitting that he performed no analysis of their "education, training, experience or any other characteristics" *id.* 244:8-20. Similarly, Dr. Murphy claims that "monitoring of Career Board meetings by senior HR and EEO representatives," Murphy Rept. (Ex. 12) at 26; *see also id.* at 28, 31, and the CB's "demographic diversity" somehow "reduces the possibility that the recommendations that systematically favor White over African American candidates on the basis of information that is not job related will be made," *id.* at 23; *see also id.* at 26, but cannot cite any authority for these assertions beyond his personal experience in "hiring promotion procedures," and serving on "comparable promotion bodies."  Murphy Dep. (Ex. 10) 71:15-72:7; 252:18-253:12; 253:13-254:5.

## 5) Plaintiffs' and Class Members' Experiences Illustrate the Pattern and Practice of Discrimination in Promotions and Assignments.

The systemic discrimination against African Americans in promotions, reassignments and other selections is reflected in the personal experiences of Representative Brewer, Plaintiff

---

been put to the test;" and that "[t]he best approach is *to avoid the use of any such measures* until their validity is established. Murphy Dep. Ex. 16 (Ex. 39) at 24 (emphasis added). It further cautions that, "[w]hether or not they are eventually shown to produce valid results, their use can be difficult to defend in the face of a legal challenge without validity evidence in hand." *Id.*

[38] Pursuant to USMS policy,  the CB is not only well aware of the RO ranking, and the Director aware of both the RO and CB rankings, but the CB is required to indicate whether its ranking agrees with the RO ranking and, if not, explain why.  Murphy Rept. (Ex. 12) at 14 -15; Murphy Dep. (Ex. 10) 115:8-15, 246:1-7, 246:17-22. The Ranking and Selection Process not only requires consideration of a previous ranking, but discourages independent disagreement with RO rankings and maximizes similarity.  Lundquist Dep. (Ex. 38) 134:20-135:7.  This is exactly contrary to separate and independent *de novo* rankings that might provide some evidence of reliability, Lundquist Rept. (Ex. 15) at 23-24, Lundquist Dep. (Ex. 38) at 134:9-135:7.

Brooks and other class members.[39]  Representative Brewer, who has been with the USMS for 25 years, was denied over 22 competitive promotions and reassignments since 2007, 18 of which were given to non-African Americans, as well as  numerous HQ assignments.  Brewer Dep. (Ex. 20) 328: 6-10; Brewer Decl. (Ex. 26) ¶ 8-17.[40]  On numerous occasions, the position was inexplicably cancelled after Brewer applied, and a non-African American candidate was subsequently assigned or promoted to it. Id. ¶ 10-13, 15.

In September 2007, Brewer applied for and was denied a GS-15 Chief position in Boston. He had applied for and been denied this position on two prior occasions -- both times because the position was cancelled and on Mr. Brewer's third attempt a non-African American received the position.[41] Brewer Dep. (Ex. 20) 212:14-213:18.  In January 2008, Brewer was again denied a promotion that was cancelled after he submitted his application; this was a promotion to a position within the Office of Witness Security ("OWS"). Brewer Decl. (Ex. 26) ¶12.  This time, both the RO and CB had recommended Brewer for the position.[42]  However, the Director cancelled it as management's preferred white candidate was no longer eligible for the promotion and filled it with a white male, Randy Becker, who ranked lower than Mr. Brewer on the BQL.[43]

---

[39] See declarations from class members Bradshaw (Ex. 25), R_Ho_ (Ex. 47), Downs (Ex. 52), Harrington (Ex. 62), G_Cr_ (Ex. 69), Gause (Ex. 71), Epps (Ex. 71), Smith (Ex. 73), Robinson (Ex. 74), Holland (Ex. 75), Rodgers (Ex. 76), Thompson (Ex. 77), Foster (Ex. 78), Hedgepeth (Ex. 79).

[40] Representative Brewer finally, in September 2008 received a promotion to GS-15 and became Chief Inspector of the Office of Inspection in Sept. 2008. Brewer Decl. (Ex. 26) ¶18.

[41] Representative Brewer was denied four other positions at this same time. These included: a GS-15 Chief DUSM position in the Eastern District of Virginia ("EDVA") that went to a white employee; a GS-15 position within HQ's Asset Forfeiture Office that went to an Hispanic employee; and a GS-15 position as Chief DUSM in DC. Clark Dep. (Ex. 21) 192: 2-204:12; Clark Dep. Ex. 40 (Ex. 40), 41 (Ex. 41), 43 (Ex.42), 44 (Ex. 43); and a position in TOD (formerly OSD) that went to a white employee. Snelson Dep. (Ex. 3) 42: 1-3; Clark Dep. Ex. 40 (Ex. 40).

[42] Because the CB had already recommended Representative Brewer for the OWS position, it did not recommend him for any other positions at that time.  Brewer Dep. (Ex. 20) 167:1-19.  As a result, Brewer was denied four more promotions, all of which went to non-African Americans, three to applicants with less managerial experience. Id. 172:5-19, 175:15-178:20; Clark Dep. (Ex. 21) 205:1- 214:15; Clark Dep. Ex. 45 (Ex. 44), 46 (Ex. 48), 47 (Ex. 49), 48 (Ex. 50), 49 (Ex. 51).

[43] Becker subsequently received another directed reassignment a few months later and became the Deputy Assistant Director of the Prisoner Operations Division (POD) in 2008.  In 2011, Becker became the Acting Assistant Director of the division.  Brewer Decl. (Ex. 25) ¶ 13.

Clark Dep. (Ex. 21) 214:16- 220:5; Clark. Dep. Exs. 45 (Ex. 44), 50 (Ex. 45), 51 (Ex. 46);

Brewer Dep. (Ex. 20) 347:13-22; Jones Decl. (Ex. 80) ¶6.[44]  In July 2008, again after the CB

recommended him for the position, the Director cancelled another position that Brewer applied

for.  Clark Dep. (Ex. 21) 229:3-233; Clark. Dep. Exs. 54 (Ex. 53), 58 (Ex. 56). When it was re-

announced several months later, Mr. Brewer re-applied. Brewer Dep. (Ex. 20) 202:9-10, 342:12-

343:12. The Director gave the position to a white employee instead.[45] Clark Dep. (Ex. 21)

243:17-249:16; Clark Dep. Exs. 59 (Ex. 57), 61 (Ex. 58), 62 (Ex. 59).

Class members R_ Ho_ and Reginald Bradshaw have similarly been denied promotions

that were cancelled after they applied and later given to a non-African American applicant. *See*

R_ Ho__ Decl. (Ex. 47) ¶6-15; Bradshaw Decl. (Ex. 25) ¶14. The cancellation of the position

R_Ho_ applied for was orchestrated so that management's preferred non-African American

candidate would receive the position. Jones Decl. (Ex. 80) ¶ 9.

The USMS also denied Mr. Brewer numerous reassignments that would have assisted his

promotion chances; Mr. Brewer has never received a permanent directed reassignment and, until

recently, knew no African Americans who had. Brewer Dep. (Ex. 20) 348:1-21; *see also* Downs

Decl. (Ex. 52) ¶ 32 ("Phillips' directed reassignment  . . . exemplifies a common practice at the

USMS, whereby members of the "Good Ol' Boys" club of white deputies are granted

advantageous non-competitive directed reassignments, often "over the heads" of better qualified

African American deputies who rarely, if ever, receive such consideration.").

---

[44]Class member Reginald Bradshaw applied for the same position as Representative Brewer in OWS.  He was similarly denied the position in favor of Becker, a white employee. Bradshaw Decl. (Ex. 25) ¶11, 14.

[45] Because the CB had already recommended Brewer for the Nebraska position, it did not recommend him for any other position he applied for in July 2008.  Clark Dep. (Ex. 21) 226:7-228:21; Clark Dep. Ex. 55 (Ex. 54), 56 (Ex. 19), 57 (Ex. 55).  As a result, Representative Brewer was denied two more promotions in favor of white applicants. Brewer Decl. (Ex. 26) ¶17.

In sharp contrast to the experiences of these class members, numerous white males have received directed reassignments to coveted positions that built their careers.  Indeed, this is a common theme in the careers of white DUSMs.   For instance, when Robert Finan became the Assistant Director of the Judicial Security Division (JSD), several whites were reassigned into the division. Fagan Dep. (Ex. 8) 34:10-35:25, 36:1-37:8, 122:22-123:21; Jones Decl. (Ex. 80) ¶10.  Robert Fagan later received a directed reassignment to Deputy Assistant Director of JSD and in 2010, was directly reassigned to Chief of a Regional Fugitive Task Force in New York.  Fagan Dep. (Ex. 8) 45:6-47:6, 48:10- 52:7, 51:24-52:7, Brewer Dep. (Ex. 20) 283:3-19. William Snelson received a directed reassignment in 2006 to the Office of Inspection and is currently Assistant Director of IOD and former Assistant Director of TOD. Snelson Dep.  (Ex. 3) 28:18-30:14. Both Director Clark and Director Hylton also received directed reassignments as has current Deputy Director Harlow.  Clark Dep.  (ex. 21) 22: 21-23:4, 24:19-25:6, Hylton Dep.  (Ex.24)  68:16-69:9, 77:6-81:12;Harlow Dep. Ex. 1 (Ex. 60) , Harlow Dep. (Ex. 61) at 39:15-43:20, 48:13-51:22.  These reassignments are one way in which the "Good Ol' Boys" network of white USMS employees in influential positions advance the careers of white DUSMs. Hedgepeth Decl. (Ex. 79) ¶¶13-19, 20-22.

The USMS has also discriminated against Representative Brewer with respect to Headquarters assignments.  Indeed, despite his wealth of experience, Headquarters has never selected or assigned him to lead a national mission or special task force.[46]  Dkt. 123-3 ¶5. To the

---

[46] Representative Brewer was never afforded an opportunity to lead Operation FALCON. Brewer Dep. (Ex. 20) 275:14-276:6.  Indeed, none of the nine Commanders and Deputy Commanders of FALCON selected since 2005 have been African American. Finan Dep. (Ex. 2) 96:18-21, 98:22-25, 99:8-11, 99:18-100:4, Brewer Decl. (Ex. 26) ¶ 19. In contrast with Brewer, many of those selected were later given significant promotions and/or placed in positions of influence. For instance, David Harlow subsequently received a directed reassignment to become the GS-15 Chief of the Sex Offender Investigations Branch, the Acting Deputy Assistant Director of IOD and the Assistant Director of IOD; he then was further promoted to ADO and to Deputy Director of the Agency.  Harlow Dep. Ex. 1 (Ex. 60), Harlow Dep. (Ex. 61) at 39:15-43:20, 48:13-51:22. William Fallon later became the Acting Deputy

contrary, the USMS has taken steps to impede Brewer's chances at HQ assignments. For instance, in September 2007, when Mr. Brewer was one of the few African Americans leading a task force and after he had made substantial improvements over his predecessors, the USMS removed Brewer from this assignment and replaced with two less experienced white deputies. Brewer Dep. (Ex. 20) 223:6-224:2, 227:2-7, 250:3-19, 257:3-21, 331:20-333:17.

Mr. Brewer's experience at the USMS is mirrored by that of Plaintiff Brooks and other African American DUSMs. Class member Keith Harrington has repeatedly been the victim of discrimination in promotions and reassignments at the USMS, to the extent that he believes his career "has been irreparably damaged." Harrington Decl. (Ex. 62) ¶43. Since 2008, Harrington has been denied more than 15 promotions. *Id.* ¶6. Even when he applied for positions at his own GS level, Harrington was denied them in favor of individuals at lower grade levels with less experience. *Id.* ¶16-21; *see also*, *e.g.*, Downs Decl. (Ex. 52) ¶27 ("each of the five individuals ranked above me were white males with lower GS levels."). Mr. Harrington has also been discriminatorily denied numerous reassignments, and, on one occasion, was involuntarily reassigned out of Headquarters position in IOD.[47] *Id.* ¶6 *see also*, *e.g.*, Downs Decl. (Ex. 52) ¶6-32 (repeated denials of requests for directed reassignments).[48] As a result, Harrington's career remained stagnant, while those of the white males who received directed reassignments rose. *See id.* ¶11-33.

---

Assistant Director of the Human Resources Division and then the Assistant Director of the Training Division in Headquarters. *See* Gielow Decl. (Ex. 81) ¶13 (Attachment C).

[47] Although the USMS indicated the need to make cuts at this Branch, he was the only one of six investigators who was sent back to the district. Harrington Decl. (Ex. 62) ¶10. Three were allowed to remain in their respective cities, while the other two were given positions at Headquarters. *Id.* All five of those other individuals are white. *Id.*

[48] In one instance after Ms. Downs contacted HQ seeking a directed reassignment to an unannounced vacancy, Chief of Staff Fahey stated in an email that it had already been decided that a white male, Dan Phillips, would receive the position. Downs Decl. (Ex. 52) ¶31.

After being removed from IOD, Harrington was advised that he needed to obtain supervisory experience in order to be promoted, yet was repeatedly denied positions that would provide him with such experience. *Id.* ¶15-33. On the one occasion that he was placed in a supervisory role, USMS took it away from him three weeks later, claiming that his current position prevented him from playing a supervisory role. *Id.* ¶35. When Harrington inquired to the HQ Chief about this, he was told that his current position should have no such effect. *Id.* ¶25.

Class member Bradshaw has applied for and been denied over 25 competitive promotions since 2007; he was included on the BQL for at least 12 of those position. Bradshaw Decl. (Ex. 25) ¶ 6. On three occasions, the RO ranked Bradshaw last among all candidates despite his superior qualifications. *Id.* ¶8-10. On both occasions, all other candidates were white. *Id.* ¶8-9. On both occasions, a white male was selected for the position. *Id.* The one time the RO recommended him for a promotion the Director ignored the recommendation and placed a white male in the position. *Id.* ¶13.

Plaintiff Brooks has also been discriminatory denied promotions and supervisory positions. In May 2007, Mr. Brooks applied for a supervisory position at a HQ position. Brooks Dep. (Ex. 6) 17:5-18:14, Clark Dep. (Ex. 21) 186:21-191:18, Clark Dep. Ex. 39 (Ex. 63). Mr. Brooks was denied that position in favor of a less qualified, similarly situated white male who did not have the experience Brooks had. Brooks Dep. (Ex. 6) 28:5-16; 30:13-31:22.[49] In 2010, the white male who had previously been selected for the supervisory HQ position was again selected over Mr. Brooks for an SES position as an Assistant Director and later became Mr.

---

[49]Although Brooks did receive a GS-15 Chief position in D.C. Superior Court, the Recruiting Officer position was preferable as it would have made him more competitive for an SES position. Brooks Dep. (Ex. 6) 26:21-7. Mr. Brooks applied to the D.C. Superior Court position as a failsafe as it is considered an undesirable assignment generally given to African Americans. Brooks Dep. (Ex. 6) 17:5-18:14, 27:19-28:16.

Brooks' direct supervisor. Dkt. 123-4 ¶4, Brooks Dep. (Ex. 6) 137:5-22,211:14-213:13,219:16-222:1.

Mr. Brooks has also been denied lateral transfers. In 2008, Brooks applied for a transfer to a GS-15 Chief of Staff position.  Dkt. 123-4 ¶ 7, Brooks Dep. (Ex. 6) 210: 1-211:10. While initially  soliciting applications through a MPA, the Director then interviewed only Mr. Fahey, a white male, Clark Dep. (Ex. 21) 235:8-239:14, Clark Dep. Ex. 60 (Ex. 64), and then directly reassigned him into the position over Brewer, Brooks and Class member Downs, all of whom were GS-15's. Clark Dep. (Ex. 21) 241:4-243; Clark Dep. Exs. 59 (Ex. 57), 60 (Ex. 64); Downs Decl. (Ex. 52) ¶ 23-24.

Like many other African Americans at the USMS, Brooks was unable to move into positions in IOD via lateral reassignment. Brooks Dep. (Ex. 6) 20:4-18.  In 2008, he applied for three IOD GS-15 positions.  Brooks Decl. (Ex. 65) ¶ 5.  Mr. Brooks was not selected and all three positions went to white male DUSM's.  Clark Dep. Ex. 59 (Ex. 57); Brooks Decl. (Ex. 65) ¶ 5. In 2010, Mr. Brooks again applied for two positions at IOD and was denied both. Clark Dep. (Ex. 21) 257:2-261:18; Clark Dep. Exs.64 (Ex. 66), 65 (Ex. 67), 66 (Ex. 68).

It is "common knowledge" that the USMS initiates or accepts charges that place African American DUSMs under investigation for "frivolous or unsubstantiated allegations in order to make them ineligible for promotions." Bradshaw Decl. (Ex. 25) at ¶ 20.  The Agency has made Mr. Brooks the subject of various internal affairs investigations for the past several years that have resulted in the denial of promotions. Brooks Decl. (Ex. 65) ¶ 9. Other class members, including G_ Cr_ (Cr_ Decl. (Ex. 69) ¶9-13), Mr. Harrington (Harr. Decl. (Ex. 62) at ¶41-42), Mr. Bradshaw (Bradshaw Decl. (Ex. 25) at ¶19-21) and Mr. Gause (Gause Decl. (Ex. 71) at ¶4-

29

6), also have been subject to internal investigations that have impeded their chances for promotion.

## II.    ARGUMENT

The totality of the evidence regarding the common policies, including the statistics, anecdotal and expert evidence, clearly establishes that class certification is appropriate in this action.

### A.    CLASS CERTIFICATION UNDER RULE 23.

Plaintiffs seeking class certification under Rule 23 must first show that the class meets the prerequisites set forth in Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy of representation").  Fed.R. Civ. P. 23(a).  They must then demonstrate that the class falls into one of two categories described in Rule 23(b): subsection (b)(2), when the Defendant has "acted or refused to act on grounds that apply generally to the class" making injunctive relief appropriate; and subsection (b)(3), when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and  . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The question at this stage "is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974) (internal citation omitted).  It is true that the Court's Rule 23 analysis may involve "some overlap with the merits of the plaintiff's

underlying claim," *Wal-mart v. Dukes*, 131 S. Ct. 2541, 2551 (2011).   However, this is not

tantamount to "a license to engage in free-ranging merits inquiries at the certification stage.

Merits questions may be considered to the extent--but only to the extent--that they are relevant to

determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v.*

*Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).

## B.   PLAINTIFFS EASILY SATISFY THE REQUIREMENTS FOR CERTIFICATION UNDER RULE 23(a).

### 1.   <u>The Class is So Numerous That Joinder Would Be Impracticable.</u>

USMS data show that there are 272 African American DUSMs in grades 12-15 who are

or have been subject to the challenged policies during the liability period.   Gielow Decl. (Ex. 81)

¶3.   "There is no specific threshold that must be surpassed in order to satisfy the numerosity

requirement[.]" *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007); *see also*

*Gen. Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 330 (1980) (numerosity "imposes no

absolute limitations").   Rather, the court must examine "the specific facts of each case," *Gen.*

*Tel. Co. of the NW.*, 446 U.S. at 330; *Cohen v. Warner Chilcott Pub. Ltd. Co.*, 522 F. Supp. 2d

105, 114 (D.D.C. 2007).   As courts within this Circuit have noted, however, where a proposed

class consists of more than 40 members, joinder is generally considered impracticable such that

numerosity is satisfied.   *See, e.g., Taylor*, 241 F.R.D. at 37 (noting that the D.C. Circuit has

upheld the certification of forty-member classes); *see also* Newberg on Class Actions § 3:5, at

247 (4th ed. 2002).

### 2.   Class-wide Proceedings Will Answers Questions of Fact and Law That Are Common to the Class.

In order to satisfy commonality, Plaintiffs must demonstrate the existence of at least one

question of law or fact that is common to the class. *Dukes*, 131 S. Ct. at 2556; *Garcia v. Johanns*,

444 F.3d 625, 631 (D.C. Cir. 2006). "[F]actual variations among the class members will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members." *Encinas v. J.J. Drywall Corp.*, 265 F.R.D. 3, 8 (D.D.C. 2010) (internal citation omitted). The key to commonality is whether the class representatives assert a common question that will generate a common answer for all members of the class. *Dukes*, 131 S.Ct. at 2551; *Thorpe v. District of Columbia*, No. 10-2250, 2014 U.S. Dist. LEXIS 42605, at * 82 (D.D.C. Mar. 29, 2014) (same).

Here, Plaintiffs assert both disparate impact and disparate treatment claims regarding USMS selection policies. Both types of claims "attack[]. . . the systemic results of employment practices." *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C. Cir. 1984). Pattern or practice disparate treatment claims include an element of discriminatory intent, while disparate impact claims focus on whether facially neutral policies or practices have an adverse impact on a protected class. *Id.*; *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971).

"Proof of discriminatory motive … is not required under a disparate-impact theory." *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 336 n.15 (1977). To make a *prima facie* case of disparate impact, Plaintiffs must only demonstrate the existence of a policy or practice that "'is neutral on [its] face and in intent but [ ] nonetheless discriminate[s] in effect against a particular group.'" *Anderson v. Zubieta*, 180 F.3d 329, 339 (D.C. Cir. 1999) (citing *Teamsters,* 431 U.S. at 349). Once they make this showing, the employer must establish that the employment practice is justified by "business necessity." *Id.* (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Griggs*, 401 U.S. at 431). The plaintiffs may nonetheless prevail if they can suggest an alternative that would meet the employer's legitimate needs without producing a discriminatory effect. *Id.* (citing 42 U.S.C. § 2000e-2(k)(1)(A)(ii); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)).

A pattern or practice disparate treatment case includes the element of discriminatory intent or motive. *See, e.g.*, *Teamsters*, 431 U.S. at 335. In order to make out a prima facie case, the plaintiffs must show, by a preponderance of the evidence, that "discrimination was the company's standard operating procedure."  Sept. 27, 2013 Order, Dkt 162 at 5 (citing *Aliotta v. Bair*, 614 F.3d 556, 562-63 (D.C. Cir. 2010) (citing *Teamsters*, 431 U.S. at 336)).  The burden then shifts to the defendant to rebut the inference of discrimination by showing that plaintiffs' proof "is either inaccurate or insignificant." *Id*. at 563. "The point is that at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking." *Aliotta*, 614 F.3d at 563.

> **a.** **Plaintiffs' Disparate Impact and Disparate Treatment Claims Present Common Questions That Will Be Answered For the Entire Class.**

Commonality is easily satisfied for both Plaintiffs' disparate impact and disparate treatment claims. Those claims generate common questions including: (1) whether uniform policies of the USMS that apply to the Class as a whole discriminate against African American DUSMs; (2) whether the application of those policies have a disparate impact on the Class; (3) whether those policies have been validated as job-related selection processes; (4) whether the policies are justified by business necessity; (5) if so, whether there are less-discriminatory alternatives to the policies; (6) whether the USMS operated under a general policy of racial discrimination; and (7) whether and what injunctive relief should be afforded to the class as a whole.

> **(1)** **Plaintiffs' Challenges To Uniform Policies That Apply To the Class Present Common Questions.**

In the context of employment discrimination claims, a plaintiff satisfies commonality by demonstrating the existence of "a uniform employment practice," *Dukes,* 131 S.Ct. at 2554, such

as, "a companywide discriminatory pay and promotion policy" that "touch[es] and concern[s] all members of the class." *Id*. at 2556-57 & n. 10. *See also Taylo*r, 241 F.R.D. at 37-38 (commonality established through "a 'common policy' that affected the members of the putative class") (quoting *Falcon*, 457 U.S. at 158). It is undisputed that the USMS employs consistent, company-wide policies for competitive promotions to Grade GS-13-15 positions and directed reassignments, and that selections under these policies are made by the Director and, in some limited circumstances, the Deputy and Associate Directors. *See supra* at 4-5; 9-11. Similar centralized selections are made for duty assignments. *Id.* at 11.

Challenges to centralized, agency-wide policies administered by discrete individuals in the upper-echelon of the agency unquestionably present questions common to the class. *See, e.g., DL v. District of Columbia*, No. 05-14372013, U.S. Dist. LEXIS 160018, at * 28 (D.D.C. Nov. 8, 2013) (commonality found where practices were "highly centralized and within the purview of a single decision-maker"); *Moore v. Napolitano*, 269 F.R.D. 21, 29-30 (D.D.C. 2010) (commonality found where centralized policy, under which "the determination of which criteria to use is left entirely to the individual decision-maker") (brackets and internal quotations omitted). This remains true even where more than one decision-maker is involved. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489 (7th Cir.), cert. denied, 133 S. Ct. 338 (2012) (commonality found where two teams exercised discretion that was "influenced by the two company-wide policies at issue"); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 530 (N.D. Cal. 2012) ("These policies and practices, set and enforced by upper management, provide the "glue" the Supreme Court sought—but did not find—in *Dukes*, sufficient to 'say that examination of all the class members' claims for relief will produce a

common answer to the crucial question *why was I disfavored.*'")(quoting *Dukes,* 131 S.Ct. at 2552.)

> **(2)     Whether the Challenged Policies Have A Disparate Impact On the Class Presents Common Questions.**

Commonality can be established with statistical evidence, or in combination with anecdotal evidence. *Taylor*, 241 F.R.D. at 40-44; *McReynolds v. Sodexho Marriott Services, Inc*., 208 F.R.D. 428, 441 (D.D.C. 2002); *see also Dukes,* 131 S. Ct. at 2555-56. A "battle of statistical experts, while central to the ultimate issue of liability, is not relevant to the issue of class certification." *Moore*, 269 F.R.D. at 30 n.3 (internal quotations and citation omitted). Rather, once the Court determines that a plaintiffs' statistics are relevant and probative, the question of which expert is right is a common question on which the fact-finder will resolve the Class claims.

It is undisputed that there are statistically significant racial disparities in competitive promotions under the MPP, and that African Americans are statistically significantly less likely to hold positions in the IOD and TOD Headquarters positions. *See supra at* 16-17. Racial disparities also appear in selections for duty assignments. *See supra* at 17. Accordingly, there is ample statistical evidence to support a finding of commonality.

On the disparate impact claim, statistical evidence provides common proof on which the fact finder will decide the common question whether "'members of the class experienced discrimination as a result of the disparate effect of a facially neutral policy.'" *Taylor*, 241 F.R.D. at 38 (quoting *Garcia*, 444 F.3d  632); *See also Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 987 (1988) (evidence in disparate impact cases "usually focuses on statistical disparities, rather than specific incidents. . . ."); *Arnold v. United States* 863 F.2d 994, 996 (D.C. Cir. 1988) (In a disparate impact case, "[t]he plaintiff must simply establish, generally through the use of

statistical evidence, that the challenged practice has a disparate impact on the protected class.")
(citing *Griggs*, 401 U.S. 424)).

The same statistical evidence will be used in answering the common question whether the
USMS "good old boys" network represents a pattern or practice of intentional discrimination.
*Segar*, 738 F.2d at 1265-1266 (discriminatory intent "especially in cases alleging class-wide
discrimination, may be inferred from a sufficient showing of disparity  between members of the
plaintiff class and comparably qualified members of the majority group.") (citing *Teamsters*, 441
U.S. at 336 n.15); *Palmer v. Shultz*, 815 F.2d 84, 90 (D.C. Cir. 1987) (evidence of discriminatory
intent can be "entirely statistical in nature."); *Taylor v. D.C. Water & Sewer Auth.*, 205 F.R.D.
43, 46, (D.D.C. 2002) (noting that proving a pattern or practice of discrimination is "usually
done with a combination of statistical evidence  . . . and anecdotal testimony from individual
class members . . . .").

> **(3)  Whether the Challenged Policies Are Reliable and Valid
> Selection Procedures, Are Justified By Business Necessity, and
> Can Be Replaced By Less Discriminatory Alternatives Are
> Common Questions.**

It is also undisputed that the USMS has not validated the Ranking and Selection Process
of the MPP or the means by which directed reassignments are made. *See* 19-23.  An employer's
use of a biased testing procedure to evaluate applicants for employment is sufficient to
demonstrate the existence of questions of fact and law common to the claims of the members of
the class alleging they were harmed by the discrimination. *U.S. v. City of New York*, 276 F.R.D.
22, 43-44 (E.D.N.Y. 2011) (certifying class) (citing *Wal–Mart v Dukes,* 131 S.Ct. at 2552–
548 (quoting *Falcon,* 457 U.S. at 159 n.15).[50]  The features of USMS's selection policies and

_____

[50] *See id*. at 43-44 (plaintiffs' "disparate impact and pattern-or-practice disparate treatment claims raised the same
common questions: whether Defendants' uses of [exams] had a disparate impact upon black applicants for the
position of entry-level firefighter; whether Defendants' uses of those examinations were job related to the position in

expert evidence that they are unreliable and thus not valid are common evidence on questions common to the class. *See Gulino v. Board of Educ. of City School Dist. of City of New York*, 907 F.Supp.2d 492, 514-23 515 (S.D.N.Y. 2012) (denying in part motion to decertify class; identifying and discussing application of standards in making findings on questions of validity); *N.A.A.C.P. v. North Hudson Regional Fire & Rescue*, 255 F.R.D. 374, 386 (D.N.J. 2009).

### (4)   Whether The USMS Has Engaged In A Pattern Or Practice Amounting To Intentional Discrimination Is A Common Question.

The question whether the USMS "engaged in a pattern or practice amounting to intentional discrimination," also "raise[s] the same common questions."  *U.S. v. City of New York*, 276 F.R.D. at 44.  Commonality is met with respect to a disparate treatment class claim where the plaintiffs provide "significant proof that an employer operated under a general policy of discrimination . . . if the discrimination manifested itself in . . . promotion practices in the same general fashion[.]"  *Dukes*, 131 S. Ct. at 2553 (quoting *Falcon*, 457 U.S. at 159 n.15); *see also Love v. Johanns*, 439 F.3d 723, 728 (D.C. Cir. 2006) (same). Additional common evidence on the question of a pattern or practice of discrimination is Plaintiffs' anecdotal evidence which brings "the cold numbers" of Dr. Vekker's statistical evidence "convincingly to life." *Teamsters*, 431 U.S. at 339; *see also Moore*, 269 F.R.D. at 32 ("Given the plaintiffs' extensive anecdotal accounts of  discrimination within the Secret Service and their statistical showing that raises an inference of a causal discriminatory policy, the plaintiffs have carried their burden of establishing Rule 23(a)'s commonality requirement.").

### b.   The Supreme Court's Instruction in *Dukes* Further Supports a Finding of Commonality.

---

question and consistent with business necessity; whether alternative practices that satisfy the asserted business necessity without disparate effect are available; and whether Defendants engaged in a pattern or practice amounting to intentional discrimination.")

The Supreme Court's reasoning in *Dukes* confirms that Plaintiffs satisfy Rule 23's commonality prong.  There, plaintiffs sought certification of a class of *1.5 million* women in a challenge to Wal-mart's practice of leaving pay and promotions decisions to "local managers' broad discretion" based on "their own subjective criteria." 131 S. Ct. at 2547.  Other than "the bare existence of delegated discretion" by thousands of individual managers, however, the plaintiffs "identified no 'specific employment practice' -- much less one that tie[d] all their 1.5 million claims together." *Id.*  Accordingly, they could not demonstrate the existence of a common question that could be answered for all class members. *Id*. at 2554-55.

Here, Plaintiffs do not challenge an unwritten practice of allowing for discretionary decision-making at the lower levels of management.  Rather, they challenge specific *written, agency-wide policies*, under which decisions are made by *a single high-ranking official.  See, e.g.*, *McReynolds*, 672 F.3d at 489 (two company-wide policies applied by local managers "exercising discretion granted them by top management"); *Scott v. Family Dollar Stores*, 773 F.3d 105, 117 (4th Cir. 2013) (companywide policies applied "by high-level corporate decision-makers with authority over a broad segment of [] employees"); *Chen-Oster v. Goldman, Sachs & Co*., 877 F. Supp. 2d 113, 118 (S.D.N.Y. 2012) (discretion "exercised under the rubric of a company-wide employment practice"); *Ellis*, 285 F.R.D. at 530   (""discrete companywide policies guided and supervised by a relatively small and coherent group of company executives.""); *Cronas v. Willis Group Holdings, Ltd.*, No. 06-civ-15295, 2011 U.S. Dist. LEXIS 122736, at * 9 (S.D.N.Y. Oct. 18, 2011) (all employment decisions were "subject to a single ultimate decision-maker.").

This distinction is "critical" because, "when high-level personnel exercise discretion, resulting decisions affect a much larger group, and depending on their rank . . . all [] employees. . . ." *Family Dollar*, 773 F.3d at 114.

Nor does this case present the breadth and scope problem at issue in *Dukes.* There, *1.5 million* putative class members wished to sue "about literally millions of employment decisions" in what the Court characterized as "one of the most expansive class actions ever." 131 S. Ct. at 2547.[51]  By contrast, here, the proposed class consists of approximately 272 DUSMs in just four job levels. *See, e.g.*, *DL*, 2013 U.S. Dist. LEXIS 160018 at *28 (distinguishing *Dukes* because, there, "the plaintiff class sought to challenge "literally millions of employment decisions. . . ."); *Ellis*, 285 F.R.D. at 509 ("the size of the class at issue is a mere fraction of that" proposed in *Dukes* and "covers only two closely-related, management-level positions"); *see also Chen-Oster*, 877 F. Supp. 2d at 119.  For all of these reasons, *Dukes* supports a finding of commonality here.

### 3.      Class Representative's Claims Are Typical of Those of the Class.

Typicality requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is intertwined with commonality, and the two are often addressed together.  *See Dukes*, 131 S. Ct. at 2551 n.5; *Alvarez v. Keystone Plus Constr. Corp.*, No. 13-cv-602, 2014 U.S. Dist. LEXIS 50303, at * 18 (D.D.C. Apr. 11, 2014).

The typicality requirement "has been liberally construed by courts." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C.2002). Typicality does not require an identity of

---

[51]*See also id.* at 2555 (describing what is required to establish commonality regarding decisions made "[i]n a company of Wal-Mart's size and geographical scope"); *id.* at 2252 (highlighting that plaintiffs were challenging "literally millions" of decentralized employment decisions at once); *id.* at 2557 (emphasizing that class members were challenging decisions made in "3,400 stores, sprinkled across 50 states"); *see also id.*at 2555 ("[i]n a company of Wal-Mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction.").

issues.  *See, e.g.*, *Encinas*, 265 F.R.D. at 9; *Thorpe,* 2014 U.S. Dist. LEXIS 42605 at * 90. Rather, typicality is met where the class members' claims "arise[] from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *In re Vitamins,* 209 F.R.D. at 260 (internal quotations and citation omitted); *see also DL*, 2013 U.S. Dist. LEXIS 160018 at *30.

　　　　Class Representative's claims are typical of the Class members' because they "arise from the same course of events": being denied Competitive Promotions and Directed reassignments via the same Agency-wide policies. Each makes the same legal argument to establish liability: application of this uniform policy resulted in the discriminatory denial of GS-13 through GS-15-level promotions and distribution of Headquarters positions. Accordingly, Rule 23's  typicality requirement is satisfied.  *See, e.g.*, *Moore v. Napolitano*, 926 F. Supp. 2d 8, 31 (D.D.C. 2013) (typicality found where plaintiffs sought to represent a class of employees who been denied promotions to GS-14 and 15 positions under Agency's allegedly discriminatory MPP); *DL*, 2013 U.S. Dist. LEXIS 160018 at *28-31 (typicality met where all plaintiffs challenged a common practice of denying placement in program); *see also Brewer v. Holder*, No. 08-1747, 2013 U.S. Dist. LEXIS 138777, at *34 (D.D.C. Sept. 27, 2013) (on issue of typicality, noting that defendants provided no cases wherein "courts [ ] have rejected a class claim as non-typical, where the class claim involved the same type of adverse employment action").

### 4.　　The Class Representatives Will Fairly And Adequately Represent the Claims of the Class.

　　　　The D.C. Circuit "consider[s] two principal requirements" in evaluating Rule 23's adequacy prong: (1) class representatives "must appear able to vigorously prosecute the interests of [the] class through qualified counsel," and (2) they must not have interests that conflict with

those of the class members.  *Nat'l Ass'n for Mental Health, Inc. v. Califano*, 717 F.2d 1451, 1458 (D.C. Cir. 1983).  Plaintiffs easily satisfy both requirements.

> **a.    The Named Plaintiff Will Vigorously Prosecute Class Members' Claims Through Qualified Counsel.**

Since becoming a Plaintiff, Class Representative Brewer has adequately and vigorously represented his fellow employees.[52]  He will continue to vigorously represent Class members going forward, as evidenced by his recent request that the USMS extend his ability to serve beyond the mandatory retirement date to continue to pursue the common injunctive claims. Brewer Decl.¶ 4.  Counsel for the proposed Class, Sanford Heisler, is both highly experienced in employment class actions[53] and has demonstrated its commitment to the class claims over the more than six years of the litigation so far.  Accordingly, the Court should appoint Sanford Heisler Class counsel under Fed. R. Civ. P. 23(g).

> **b.    Class Representative Brewer Has No Interests That Conflict With Those of the Class Members.**

Nor is there any conflict between Brewer and the proposed class that defeats adequacy. Like Brewer, all class members were eligible for, but denied, Competitive Promotions to GS-13 through GS-15-level positions, Directed Reassignments and HQ Duty Assignments as a result of the same Agency-wide policies.  All Class members seek to demonstrate the existence of a

---

[52] Plaintiffs also move to add  Reggie Bradshaw, Quintella Downs-Bradshaw, Antonio Gause, and Keith Harrington as named Plaintiffs and proposed class representatives.  *See* Motion For Leave to Amend, filed herewith.  As is described in the declarations submitted as part of the appendix to this motion, *see* Exs. 25, 52, 71, 62, they too will vigorously represent the interests of the class, have no conflicting interests with the class, and their claims are typical of the class. Defendant will be able to depose them on these issues before its opposition is due.
[53] *See, e.g.*, *In re Novartis Wage & Hour Litig.*, No. 09 Civ. 0437; *Stiller v. Costco*, No. 09-CV-2473-H, 2010 U.S. Dist. LEXIS 140297, at *18-19 (S.D. Cal. Dec. 13, 2010); *Velez v. Novartis Pharms. Corp.*, 2010 U.S. Dist. LEXIS 125945, at *46-47, 62-63 (S.D.N.Y. Nov. 30, 2010); *Bellifemine v. Sanofi-Aventis U.S. LLC*, 07 Civ. 2207 (JGK), 2010 U.S. Dist. LEXIS 79679, at *4, 16-17 (S.D.N.Y. Aug. 5, 2010); *Hernandez v. C&S Wholesale Grocers, Inc.*, 06 CV 2675, 2008 U.S. Dist. LEXIS 118666 (S.D.N.Y. July 30, 2008).

pattern or practice of discrimination and a disparate impact violation with respect to these selection decisions

The fact that Representative Brewer participated in making some recommendations about class members seeking promotions does not itself create a conflict of interest. *See, e.g.*, *Adair v. England*, 209 F.R.D. 5, 11 (D.D.C. 2002) (rejecting contention that the named plaintiffs could not adequately represent a class where some class members participated on promotions boards that denied promotions to other class members); *see also Staton v. Boeing Co*., 327 F.3d 938, 959 (9th Cir. 2003) (rejecting adequacy challenge to class that included supervisors and non-supervisory employees"); *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 596 (2d Cir. 1986) ("personnel role" of the named plaintiff and "many members of the class . . . in making recommendations for promotions" did not defeat adequacy).

First, while Brewer may have ranked applicants in the MPP process, he certainly did not and could not have made any actual selections for Competitive Promotions, Directed Reassignments, or HQ Duty Assignments.  Brewer Decl. (Ex. 26) ¶21.  Second, there is no allegation that Brewer engaged in any discrimination against any proposed class member. *See Moore*, 926 F. Supp. 2d at 8 (adequacy satisfied "[b]ecause the record does not show specific allegations of discrimination by class members against other class members, the representation as proposed is adequate[,]" despite fact that several class members were "directly involved" in evaluation process being challenged); *Taylor* , 241 F.R.D. at 45 (same, where "there is no evidence that [the named plaintiff] nor any members of the putative class are themselves accused of discrimination"); *McReynolds v. Sodexho Marriott Servs*., 208 F.R.D. 428, 447-48 (D.D.C. 2002) (certifying a class that included employees who evaluated other class members because there was an "absence of specific allegations of discrimination by class members against other

class members"); *Hyman v. First Union Corp,* 982 F. Supp. 1, 5 (D.D.C. 1997) (same, where "[n]o plaintiffs are alleged to have discriminated against other plaintiffs,").[54]   Accordingly, adequacy is satisfied.

### C. PLAINTIFFS' CLAIMS MAY BE CERTIFIED UNDER RULE 23(b)(2).

Plaintiffs' claims should be certified under Rule 23(b)(2).  Plaintiffs have plainly shown that Defendant has "acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2). The aim of the Class members --- to put an end to the Marshal Service's discriminatory policy and practices -- "fits the prototype of the (b)(2) class, which is the most frequent[] . . . vehicle for civil rights actions and other institutional reform cases that receive class action treatment." *DL* , 2013 U.S. Dist. LEXIS 160018 at * 39  (brackets included; internal quotations and citation omitted); *Taylor*, 241 F.R.D. at 47 ("cases in the civil rights field" are "illustrative" of the types of class actions suitable for certification under (b)(2)") (quoting Fed. R. Civ. P. 23(b)(2) advis. comm. notes).  "'The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Thorpe*, 2014 U.S. Dist. LEXIS 42605 at * 104 (quoting *Dukes*, 131 S. Ct. at 2557). Such is the case here, where Plaintiffs challenge the promotion and reassignment practices of the USMS as it applies to *all* Class members.[55]

---

[54]Should such a claim arise, the class member would have the opportunity to opt-out of this law suit.  *See, e.g.*, *Matamoros v. Starbucks Corp*, 699 F.3d 129, 138 (1st Cir. 2012) (rejecting adequacy challenge to class that included employees who became supervisors during the class period as the "potential for conflict" was not "fundamental to the suit" and the ability to opt out mitigated any "hypothetical conflict on [the] class-certification decision.").

[55]Because the USMS has denied current class representative Brewer's request to continue active employment and made him retire, Plaintiffs are simultaneously moving to substitute additional current employees as Class Representatives for purposes of seeking injunctive relief. Plaintiff's Motion to File Amended Complaint to Substitute Class Representative (July 1, 2014).

**D. PLAINTIFFS' CLAIMS MAY BE CERTIFIED UNDER RULE 23(b)(3) AND 23(c)(4).**

### 1. Common Questions of Law or Fact Predominate Over Questions Affecting Only Individual Members.

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Predominance is met where "there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis...." *Moore*, 926 F. Supp. 2d at 33-34 (internal quotations and citation omitted); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 266 (D.D.C. 2002) ("At the class certification stage, plaintiffs need only demonstrate that they intend to use generalized evidence which is common to the class and will predominate over individualized issues. . . . ). Predominance "does not require [the plaintiff] . . . to prove that each 'elemen[t] of his claim [is] susceptible to classwide proof." *Amgen v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013); *see also, e.g.*, *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 307 (D.D.C. 2007) (common issues "need only be predominant, not dispositive of the litigation.").

### a. Class Members' Claims Rely on Common Proof.

This is just the type of case courts envision when considering whether class claims predominate over individualized issues. The main issues to be determined in this action relate "solely to Defendants' conduct," and Plaintiffs' proof on these issues will be the same for all Class members. *In re Lorazepam Antitrust Litig.*, 202 F.R.D. 12, 29 (D.D.C. 2001) (internal quotations and citation omitted); *see also Hardy v. District of Columbia*, 283 F.R.D. 20, 24 (D.D.C. 2012) (predominance met where "[a]ll putative plaintiffs are advancing the same legal theory based on the same set of facts and the same course of conduct by the District."). A

common body of evidence will be used to demonstrate the class disparate impact and pattern or practice claims regarding a set of company-wide policies that place promotion and assignment decisions in the hands of a single decision-maker.

As described in the discussion of common questions, above, these common questions will be decided on a wealth of evidence common to the class regarding common policies, statistical and validation evidence, including expert evidence, and anecdotal evidence of experiences common to the class. *See* Section B2, *supra*[DISCUSSING COMMON QUESTIONS].  Through this variety of evidence, Plaintiffs will seek to prove that the challenged processes are not reliable or validated procedures that operate systematically to disadvantage African American DUSMs, and are used to continue a racially discriminatory "good old boys" network that affords whites more favorable job opportunities.  Because substantial common proof will be used to establish these core common issues, predominance is met.  *See, e.g.*, *Moore*, 926 F. Supp. 2d at 33-34 (D.D.C. 2013) ("the common issues of whether the MPP promotions process discriminates against African-American SAs and whether the [Agency] has a pattern and practice of race discrimination which the plaintiffs will try to prove through their statistical evidence predominate over individual issues."); *In re Vitamins*, 209 F.R.D. at 264-67 (predominance met where "plaintiffs have made a threshold showing that the proof they intend to offer at trial. . . will be common to the class and generalized.").

As in *Moore*, the only individual issues are the amount of damages to be awarded Class members and whether there were legitimate, non-discriminatory reasons for denial of individual promotions and reassignments.  These questions, however, "are not germane to the liability stage of a pattern and practice claim, are not relevant to the plaintiffs' disparate impact claim, and thus do not destroy predominance."  926 F. Supp. 2d at 33; *see also, e.g.*, *Taylor*, 205 F.R.D. at 51

("compensatory damages … do not automatically negate the finding that common issues predominate in a (b)(3) class action."); *Brown v. Pro Football*, 146 F.R.D. 1, 3 (D.D.C. 1992) (fact that defendant may have a right to present individualized information and defenses regarding class-members does not defeat predominance where class members "share common elements which are not only more relevant to the issues at trial, but also more significant."). Accordingly, predominance is satisfied.

> **b.** **Class-wide Adjudication of the Class Issues is More Efficient Than Individualized Trials.**

At its core, predominance is a question of efficiency. *See Amgen*, 133 S. Ct. at 1191 ("the office of a Rule 23(b)(3) certification ruling is not to  adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently'") (internal citations and quotation omitted); *see also* Advis. Comm. Notes to 1966 Amendment to Fed. R. Civ. P. 23; 2 Newberg on Class Actions § 4:49 (5th ed. 2012).  Here, it is more efficient in terms of economy of judicial resources and of the expense of litigation, to decide the common, class-wide issues on a class-wide basis than through separate trials. *See*, *e.g.*, *Butler v. Sears, Roebuck & Co*., 702 F.3d 359, 362 (7th Cir. 2013) (reversing denial of class certification on ground, *inter alia*, that the answer to this question was affirmative).

*International Brotherhood of Teamsters v. U.S*., 431 U.S. 324 (1977), recently reaffirmed by the Supreme Court in *Duke*s, 131 S. Ct. 2541, 2552 n.7, 2561 (2011), provides a roadmap for trying this class case in a logical and efficient manner.  Under *Teamsters*, pattern-or-practice disparate treatment cases are bifurcated into a class-wide liability phase (Phase I) and a "remedial" or damages phase (Phase II).  *Teamsters* Phase I is the quintessential class proceeding.  It returns a single answer on the single question of whether the entire class has been

subject to a pattern or practice of discriminatory treatment.[56]  If the answer is "yes," class-wide liability is established and the Court may award class-wide injunctive relief.  *See Teamsters*, 431 U.S. at 361; *Moore*, 926 F. Supp. 2d at 33 n.16.

A Phase I proceeding also would allow for a determination of liability to the class and class-wide injunctive relief under Rule 23(c)(4).  F. R. Civ. P. 23(c)(4) provides that, "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." Here, where all Class Members challenge a single practice, the issue of liability "can most efficiently be determined on a class-wide basis, consistent with [Rule 23(c)(4)].").  *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 492 (7th Cir. 2012) ("If there are genuinely common issues . . . across all the claimants . . . then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.") (internal quotation and citation omitted); *see also Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 169-70 (2d Cir. 2001); *Ellis*, 285 F.R.D. at 536-37; *Easterling v. Connecticut Dep't of Corr.*, 278 F.R.D. 41, 47 (D. Conn. 2011). Accordingly, the Court should certify a class for a determination of both class-wide liability and injunctive relief at a "Phase I" proceeding.

Phase II of the *Teamsters* proceeding handles the Class members' individual claims. At Phase II, "it is presumed that each individual plaintiff has been the victim of [ ] discrimination at the hands of the defendant." *Hyman,* 982 F. Supp. At 5. Once a plaintiff shows that he or she suffered an adverse employment action, the burden shifts to the employer to show that the action was taken for non-discriminatory reasons. *Id.* (citing *Teamsters*, 431 U.S. at 362). The finder of

---

[56] An equivalent two-step procedure applies to Plaintiffs' disparate impact claims: (i) a class-wide injunctive phase followed by (ii) an individual remedial phase. *See, e.g., Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151-52 (2d Cir. 2012); *Easterling*, 278 F.R.D. at 46 ; *Williams v. Boeing Co.*, 225 F.R.D. 626, 628 (W.D. Wash. 2005).

fact will then make a determination as to the relief to which the individual plaintiffs are entitled. *Moore*, 926 F. Supp. 2d at 33 n.16.

Here, any individualized issues regarding damages and whether there were legitimate reasons for the non-promotions and reassignments are far less significant than the broad common issues to be addressed and can be resolved through a streamlined process as part of Phase Two. Accordingly, predominance is satisfied.

### b.    A Class Action is the Far Superior Way to Resolve this Dispute.

"[T]here is no 'bright-line rule'" on how to interpret Rule 23(b)(3).  Rather, "the proper standard is a 'pragmatic' one." *McKinney v. United States Postal Serv*., 292 F.R.D. 62, 65 (D.D.C. 2013) (internal citation omitted).  Here, all four factors enumerated in subsection (b)(3) favor class certification.

First, given the common questions on liability and the class members' ability to opt-out of the monetary relief portion of the case or to pursue claims in the remedial phase, "class members have a diminished interest in individually controlling the common portions of this action." *Ellis,* 285 F.R.D. at 540; *see also Moore*, 926 F. Supp. 2d at 34; *Stinson*, 282 F.R.D. at 383.  Because the individual class members' claims may not provide the basis for recovery of significant damages, there is an inadequate incentive for them to litigate their individual claims. *See*, *e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (internal quotations and citation omitted); *see also Moore*, 926 F. Supp. 2d at 34 (same).

Second, Plaintiffs are not aware of competing litigation in any other forum.  *See Ellis*, 285 F.R.D. at 540; *Meyer v. United States Tennis Ass'n*, 11-Civ.-6268, 2013 U.S. Dist. LEXIS

60091, at *36 (S.D.N.Y. Apr. 25, 2013).  Rather, counsel's and the Court's unique familiarity

with the claims and evidence is bound to foster efficiency.  *See Easterling*, 278 F.R.D. at 50.

Third, it is desirable to concentrate the action in this Court, the bulk of this action has

been litigated and the claims can efficiently be determined.  Finally, manageability is not a

serious concern.  There are only approximately 272 class members, each whom share common

experiences of discrimination.[57]  Class-wide adjudication is "more efficient than individual

actions because all of the cases will require the courts to determine whether the MPP promotions

process is discriminatory. Moreover, a class action will promote uniformity in decisions."

*Moore*, 926 F. Supp.2d at 34; *see also Ellis,* 285 F.R.D. at 540; *Easterling*, 278 F.R.D. at 50-51;

*City of New York*, 276 F.R.D. at 49-50.

**E.    PLAINTIFFS' PRELIMINARY TRIAL PLAN SHOWS THAT THE  CASE
        IS APPROPRIATE FOR CLASS TREATMENT**.

Plaintiffs propose that this Court adopt the trial plan tentatively adopted in Ellis, 285

F.R.D. at 545-46, and used at trial in *Velez v. Novartis*, 1:04-cv-09194-CM (S.D.N.Y.

McMahon, J.) (Dkt Nos. 279-280).[58]

**Phase I**:

The jury decides:

•      Whether Defendant engaged in a pattern or practice of discrimination (liability for class-wide disparate treatment);

•      Whether Defendant is liable to individuals who testify at trial for race discrimination and, if so, in what amount.

The Court decides:

---

[57]The *Ellis Court* certified a Title VII remedial class almost three times as large. 285 F.R.D. at 540.
[58] The plan used at trial in *Novartis* differed only in that in this pre-*Dukes* case, the jury decided back pay rather than the judge.

• Whether Defendant's employment practices have had an adverse impact on the Class (prima facie case of disparate impact).

• If yes on *prima facie* disparate impact case, Whether Defendant's employment practices were justified by business necessity (defense to the disparate impact claim), and if so, whether there was a less discriminatory alternative;

• In the event of a liability finding for either pattern-or-practice discrimination or disparate impact discrimination, appropriate class-wide injunctive relief;

**Phase II**:

• Individual hearings to determine back pay and compensatory damages and adjudicate individual defenses for class members who did not testify at trial.

## CONCLUSION

For the foregoing reasons, this Court should certify the proposed class pursuant to Rule 23(a), (b)(2), (b)(3) and (c)(4), and appoint Sanford Heisler as class counsel under 23(g).

Respectfully submitted,

Dated: July 1, 2014          By: _____

Thomas J. Henderson, D.C. Bar No. 476854
David Sanford, D.C. Bar No. 457933
Lubna A. Alam, D.C. Bar No. 982169
**SANFORD HEISLER, LLP**
1666 Connecticut Avenue, N.W., Suite 300
Washington, D.C. 20009
Telephone: (202) 499-5200
Facsimile:  (202) 499-5199

Grant Morris, D.C. Bar No. 926253
**LAW OFFICES OF GRANT E. MORRIS**
1666 Connecticut Ave., N.W., Suite 300
Washington, D.C. 20009
Telephone: (202) 499-5210
Facsimile: (202) 499-5199
*ATTORNEYS FOR PLAINTIFFS*

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing was served by electronic means on this 1st day of July, 2014 upon the following counsel of record by operation of the Court's electronic filing system:

                        **Marsha Edney**
                        **Galen Nicholas Thorp**
                        **James Schwartz**
                        U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
                        Federal Programs Branch
                        P.O. Box 883, Rm. 7330
                        Washington, D.C. 20001
                        (202) 305-0198 (phone)
                        (202) 616-8470 (fax)
                        Email: marsha.edney@usdoj.com
                        Email: galen.thorp@usdoj.gov
                        Email: james.schwartz@usdoj.gov

  /s/  D'Laney Gielow
D'Laney Gielow