# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HERMAN BREWER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-1747 (BJR) |
| | ) | |
| LORETTA E. LYNCH,[*] | ) | |
| United States Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

---

[*] Pursuant to Federal Rule of Civil Procedure 25(d), the newly appointed Attorney General's name is substituted for her predecessor who was sued only in an official capacity.

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF EXHIBITS ................................................................................................... iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................... 3

I.       Overview of the USMS. ........................................................................................ 3

II.      Plaintiff and His Claims ...................................................................................... 4

III.     Challenged Policies. ............................................................................................ 6

         A.       The Merit Promotion Process. ................................................................. 6

         B.       Non-Competitive Lateral Reassignments. ............................................... 8

         C.       "Headquarters Duty Assignments." ......................................................... 9

STANDARD OF REVIEW ............................................................................................... 9

ARGUMENT .................................................................................................................. 10

I.       The Putative Class Definition Is Ambiguous and Overbroad. ...................... 10

II.      Plaintiff Cannot Adequately Represent the Proposed Class Because He Lacks
         Standing to Pursue Declaratory and Injunctive Relief. ................................ 13

III.     Plaintiff's Proposed Class Fails To Satisfy Rule 23(a). ................................ 16

         A.       The Putative Class Does not Share Common questions of Law or Fact
                  that can be Resolved in a "Single Stroke." ........................................... 16

                  1.       Plaintiff Fails to Identify a Common Classwide Question
                           Regarding Selections Through the Merit Promotion Process ................. 18

                           a.       Plaintiff's proposed questions will not dispose of any
                                    question central to the claims of class members who have
                                    not participated in the challenged stages of the Merit
                                    Promotion Process or who applied only for lateral
                                    positions. ................................................................................ 20

                           b.       Plaintiff's Merit Promotion Process claims lack
                                    commonality because he does not establish causation for
                                    any one employment practice and because he cannot show
                                    that the decisionmakers exercised discretion in the same
                                    allegedly discriminatory way. ................................................ 22

                                    i.       Plaintiff's statistical analysis does not establish a
                                             general policy of discrimination, a class-wide
                                             disparate impact, or causation for any specific
                                             employment practice. ................................................ 22

i

    ii. Plaintiff cannot show that the discretion exercised by more than 250 individuals was used in the same way or with discriminatory results........................................ 27

  2. Plaintiff Fails to Identify a Common Classwide Question Regarding Non-Competitive Lateral Reassignments............................... 32

  3. Plaintiff Fails to Identify a Common Classwide Question Regarding Headquarters Duty Assignments............................................ 34

    a. Plaintiff's vague definition of "Headquarters duty assignments" fails to implicate a common policy because it encompasses numerous selection processes and dozens of positions. ........................................................................... 34

    b. Plaintiff proffers no evidence of agency-wide disparities for Headquarters duty assignments..................................... 35

    c. Whether denial of an assignment is a violation of Title VII turns on the individual circumstances of each putative class member. ........................................................................... 36

**B. The Putative Class Representative's Injuries are Not Typical of the Purported Class.............................................................................................. 37**

**C. Plaintiff and Class Counsel Cannot Adequately Represent the Absent Class Members. .......................................................................................... 39**

  1. A Substantial Intra-Class Conflict Exists Because Putative Class Members, including Class Representative Brewer, Have Actively Participated in the Very Decisions Challenged on Behalf of the Class......................................................................................................... 40

  2. Putative Class Counsel Faces Two Irreconcilable Conflicts of Interest.................................................................................................... 44

**IV. The Proposed Class Claims Fail to Meet the Requirements Under Rule 23(b)........ 46**

**A. Because the Putative Class Seeks Individualized Relief, the Class Cannot Be Certified Under Rule 23(b)(2)........................................................ 46**

**B. Because Individualized Inquiries Predominate Over Any Allegedly Common Issues, a Class Action is Not Superior and Cannot Be Certified Under Rule 23(b)(3). ................................................................. 47**

  1. Plaintiff Has Failed to Demonstrate Common Questions Amenable to Classwide Resolution, Let Alone Ones that Predominate Over Individual Issues. ..................................................................... 47

  2. Plaintiff's Proposed Trial Plan Demonstrates that Class Certification is Not a Superior Method of Adjudication and that No Efficiency will be Gained by Proceeding as a Class................................ 50

**CONCLUSION ................................................................................................................. 50**

# TABLE OF EXHIBITS

Declaration of David L. Harlow ..................................................................................... 1

      Ex. A  Organizational Chart (Mar. 19, 2008)
      Ex. B  Organizational Chart (Oct. 8, 2014)
      Ex. C  USMS Policy Directive 3.1, Merit Promotion Plan
      Ex. D  USMS Policy Directive 3.3, Discipline & Adverse Actions
      Ex. E  USMS Policy Directive 1.1, Delegation of Authority
      Ex. F  USMS Relocation Policy Manual (excerpts)
      Ex. G  USMS Policy Directive 3.1, Voluntary Reassignments
      Ex. H  Harlow Deposition (Feb. 7, 2014) (excerpts)
      Ex. I  USMS Policy Directive 17.13, Special Operations Group
      Ex. J  Management of Significant Incidents (July 13, 2006)
      Ex. K  Operational Management Teams (May 1, 2006)
      Ex. L  Recruitment of Incident Management Team Members (June 16, 2010)
      Ex. M Selection of Incident Management Team Members (July 19, 2010)
      Ex. N  USMS Committees and Working Groups (Oct. 18, 2011)
      Ex. O  USMS Policy Directive 3.1, Additional Duty Designation
      Ex. P  USMS Policy Directive 17.4, Peer Support and Critical Incident Response
              Team
      Ex. Q  USMS Policy Directive 17.14, Medical Support Program
      Ex. R  Collateral Duty Counter-Surveillance/Surveillance Detection Program
              (Sept. 28, 2010)
      Ex. S  USMS Policy Directive 2.4, Special Assignments
      Ex. T  United Nations General Assembly (July 13, 2007)
      Ex. U  USMS Policy Directive 10.3, Protection Details
      Ex. V  Office of Congressional Affairs TDY Opportunities for 2011 (Nov. 15,
              2010)
      Ex. W Tactical Operations Division Special Assignment (Apr. 21, 2010)
      Ex. X  Office of Internal Investigations Special Assignment (Apr. 15, 2010)
      Ex. Y  Special Assignment Request, Background Adjudication (May 5, 2009)
      Ex. Z  Summer 2007 Headquarters Extended Temporary Duty Assignment, April
              11, 2007
      Ex. AA USMS Policy Directive 1.2, Equal Employment Opportunity
      Ex. BB  USMS Policy Directive 1.2, Code of Professional Responsibility

Declaration of Molly A. Lowry ..................................................................................... 2

      Ex. A  USMS Policy Directive 3.1, Merit Promotion Plan
      Ex. B  USMS Policy Notice 95-019, Updated Merit Promotion Program for GS-
              1811 Employees (Dec. 6, 1995)

Declaration of Donna Hellberg ..................................................................................... 3

      Ex. A  Declaration of William Zichawo, ECF No. 83-7 (Nov. 16, 2011)

Declaration of Marcus Williams ............................................................................... 4

        Ex. A   USMS Policy Directive 1.10 (2003)
        Ex. B   2013 Memorandum (Hylton)
        Ex. C   2011 Memorandum (Hylton)
        Ex. D   2010 Memorandum (Clark)
        Ex. E   2008 Memorandum (Clark)
        Ex. F   2006 Memorandum (Clark)
        Ex. G   2005 Memorandum (Clark, Acting)
        Ex. H   2005 Memorandum (Reyna)
        Ex. I   2004 Memorandum (Reyna)
        Ex. J   2001 Memorandum (Reyna)
        Ex. K   2001 Memorandum (McKinney, Acting)
        Ex. L   1999 Memorandum (Marshall)
        Ex. M   1999 Memorandum (Gonzalez)
        Ex. N   1993 Memorandum (Gonzalez
        Ex. O   1992 Memorandum (Hudson)
        Ex. P   USMS Federal Agency Annual EEO Program Status Report, EEOC Form
              715-01, FY 2012 (excerpts)
        Ex. Q   Operational Diversity Management Plan (July 15, 2011)
        Ex. R   Preliminary Diversity Management Plan (June 30, 2010)
        Ex. S   Report From the Ad Hoc Committee on Personnel Matters (Aug. 1992)
        Ex. T   Task Force on Personnel Matters Status Update (Mar. 18, 1998)
        Ex. U   Report of the Task Force on Personnel Matters (Apr. 4, 1997)
        Ex. V   Review of the Ad Hoc Committee on Personnel Matters (Oct. 8, 1996)

Declaration of Paul F. White ................................................................................. 5

        Ex. A   Analysis of Selections to GS-13, GS-14, and GS-15 Positions at the
              United States Marshals Service (May 9, 2014)

Deposition of Alexander Vekker (excerpts) .......................................................... 6

Deposition of Kathleen Lundquist (excerpts) ....................................................... 7

Bickel, et al., *Sex Bias in Graduate Admissions: Data from Berkley*, 187 Science 398,
      399 (1975) ......................................................................................................... 8

*Fogg v. Holder*, EEOC Appeal No. 0120073003 (July 11, 2012) ................................ 9

EEO Complaint, June 17, 2009  **[Filed under seal]** .................................................... 10

## INTRODUCTION

The Court should deny class certification in this case because Plaintiff Herman Brewer, a retired employee of the United States Marshals Service ("USMS") and the sole putative class representative, has failed to carry his burden under Federal Rule of Civil Procedure 23. He seeks class certification under the theory that unconstrained discretion for USMS management both constitutes intentional discrimination and causes disparate impact in three different policy areas—promotions, lateral reassignments, and "Headquarters duty assignments." He seeks injunctive relief and monetary damages under both Rule 23(b)(2) and Rule 23(b)(3).

Most fundamentally, Plaintiff cannot represent the class of current and former employees because, as he concedes, he lacks standing to seek injunctive relief. Without standing to press a claim for injunctive or declaratory relief on behalf of the class, he cannot satisfy Rule 23(a)'s typicality or adequacy prongs because current employees have a substantial interest in this relief.

While this defect alone is sufficient to deny certification, there are numerous other grounds on which Plaintiff's motion should be denied. As an initial matter, Plaintiff's class definition is ambiguous, and he repeatedly conflates a host of specific and diverse policies in each of these areas into a single "practice" that he believes justifies certification. Not only is this inaccurate, it breeds confusion regarding precisely what actions he is actually challenging. As a result, he has failed to meet one of the most basic requirements for Rule 23 certification—to "begin by identifying the specific employment practice that is challenged." *Wal-Mart Stores, Inc., v. Dukes*, 131 S. Ct. 2541, 2555 (2011).

Moreover, statistical evidence of agency-wide disparities are essential to establishing Plaintiff's theories of a general policy of discrimination and disparate impact under Title VII. For the reasons stated in Defendant's *Daubert* motion, both of Plaintiff's experts should be excluded. But even if his experts' testimony were creditable, they are insufficient by their own terms to support his class claims. Plaintiff's statistician offered no opinions based on distinct analyses of lateral reassignments or "Headquarters duty assignments." Similarly, Plaintiff's

industrial psychologist only offered opinions regarding selections through the Merit Promotion Process, offering no opinions about the other policy areas identified by Plaintiff in his motion. Accordingly, class certification can be summarily denied for the two policy areas unsupported by any statistical evidence—lateral reassignments and "duty assignments."

Nor has Plaintiff carried his burden under Rule 23(a) for certification of a class regarding the last policy area—the final stages of the Merit Promotion Process—for three additional reasons. First, he has failed to demonstrate commonality under Rule 23(a)(2). Rather than identify a common policy or practice, the aspects of the Merit Promotion Process that he challenges are comprised of discretionary decisions by hundreds of different individuals—many of whom are independent, presidentially-appointed, Senate-confirmed United States Marshals— based on a number of different policies and practices. Numerous of these individuals are also class members. He cannot show that all of these individuals exercise their discretion in the same way, let alone for discriminatory purposes, as he must to establish commonality.

Second, Plaintiff has failed to demonstrate typicality under Rule 23(a)(3). In addition to his inability to pursue declaratory and injunctive relief, Plaintiff's claims are not typical of class members who have no claims at all; namely, those who never participated in the Merit Promotion Process, those who participated but did not reach the challenged stages, and those whose application were always successful.

Third, Plaintiff failed to establish that both he and his counsel can adequately represent the class, as required by Rule 23(a)(4). Numerous putative class members—including Plaintiff—served often decisive roles as recommenders in the decisions being challenged, thereby creating a conflict within the class, and thus making it impossible for Plaintiff to establish adequacy of representation. In addition, Plaintiff's counsel cannot adequately represent the class because of the irreconcilable conflict of interest in simultaneously representing a broader class, which includes many of the same class members, in an administrative class action before the Equal Employment Opportunity Commission.

Finally, Plaintiff has not carried his burden to establish the appropriateness of

certification under Rule 23(b) for any of his claims.  No class can be certified under Rule 23(b)(2) both because former employees have no standing to seek the requested injunctive relief and because, as *Wal-Mart* unanimously held, claims for individualized damages such as backpay cannot be brought under this provision.  *See* 131 S. Ct. at 2557-58.  Nor can Plaintiff's proposed class be certified under Rule 23(b)(3) because without any common class-wide issues, he cannot show that these issues predominate over individualized ones.  Nor is his proposed trial plan a superior method of adjudication.  In sum, Plaintiff's motion should be denied.

## BACKGROUND

### I.    OVERVIEW OF THE USMS.

The USMS, a component of the Department of Justice, is headed by a presidentially-appointed Director.  *See* 28 U.S.C. § 561(a).  Each of the 94 judicial districts and the District of Columbia is led by a presidentially-appointed United States Marshal, who directs the activities of personnel stationed at hundreds of locations throughout the 50 states, District of Columbia, and U.S. territories.  *See id.* § 561(c); *see also* Harlow Decl. ¶ 5 (attached as Exhibit 1).  The USMS structure is divided between these 94 districts and 13 divisions led by an Assistant Director in the Senior Executive Service.  *See* Harlow Decl. ¶ 4.  Most Assistant Directors are based in Arlington, VA, but many (and sometimes most) of the division's employees are located elsewhere throughout the country.  *See id.* ¶ 5.  The divisions, along with the leadership offices, and other offices that report to the leadership offices (such as the Office of General Counsel and the Office of Equal Employment Opportunity), are colloquially referred to as "Headquarters." *See id.* ¶ 6.  Among the USMS's more than 5,000 employees are law enforcement officers in the 1811 job series, commonly called "Deputy United States Marshals" or "deputies."  *See* Lowry Decl. ¶ 4 (attached as Exhibit 2); Williams Decl. Subex. P at 1 (attached as Exhibit 4).

The USMS has long been committed to equal opportunity for employees regardless of race.  *See* Williams Decl. ¶ 11 & Subexs. B-O (each USMS Director's agency-wide statements regarding equal opportunity).  USMS policy prohibits discrimination in personnel decisions.  *See*

3

*id.* ¶¶ 5-10.  And USMS leadership reflects substantial diversity.  Each of the USMS Directors from 1993 to 2005 was of a minority race or ethnicity.  *See id.* ¶ 19.  Numerous U.S. Marshals and Assistant Directors are African American.  *See id.* ¶¶ 20-21.  With regard to the positions at issue in this case—the four highest grades in the 1811 job series—African Americans make up a larger percentage of each higher grade than the grades below it.  *See* White Decl. Ex. A at 11-13 ("White Report") (attached as Exhibit 5) (for example, as compared to white employees in Jan. 2009, 11.86% of GS-15s, 8.23% of GS-14s, 7.42% of GS-13s, and 5.49% of GS-12s).

Moreover, the USMS has taken allegations of race discrimination seriously.  For example, in 1991, at the direction of Director K. Michael Moore, the USMS put together a working group to review allegations of discrimination that had been raised by the deputies' union representative.  *See* Williams Decl. ¶ 16.  This working group did not conclude that discrimination had occurred at the USMS in any instance, but noted "a rather widely held perception . . . of favoritism and discrimination" and made a number of recommendations to improve procedures and combat that perception.  *See id.*  The substantial revision of the Merit Promotion Process for competitive selection of GS-13, GS-14, and GS-15 deputies in 1995 incorporated many of those recommendations.  *See id.* ¶ 17.  The USMS also conducted regular reviews of the implementation of the working group's recommendations for several years, ensuring that their important features were adopted.  *See id.*  In addition, the USMS has complied with all Executive Branch requirements for equal employment opportunity.  *See id.* ¶¶ 13-15.

## II.    PLAINTIFF AND HIS CLAIMS

This motion for class certification is brought by only one named Plaintiff, Herman Brewer.[1]  *See* Pls.' Mot. & Br. in Supp. of Mot. for Class Certification – Corrected ("Pl.'s Mot.")

---

[1] For that reason, this brief refers throughout to Plaintiff in the singular.  The only other remaining named Plaintiff, James Brooks, does not seek to proceed as a class representative.  *See* Order at 3, ECF No. 212.  Instead, he may press only the three individual claims for which the Court did not grant summary judgment to Defendant.  *See* Mem. Opinion at 26-30, 32-34, ECF No. 162.  These claims are not at issue in Plaintiff Brewer's class certification motion.

at 41, ECF No. 188.[2]  During the time period at issue in this case, Mr. Brewer served as the GS-14 Assistant Chief Deputy U.S. Marshal for the District of Puerto Rico, the GS-15 Chief of the Office of Inspection, and the GS-15 Acting Chief Deputy U.S. Marshal for the District of Puerto Rico.  Pursuant to the statute setting a mandatory retirement age for law enforcement officers, Mr. Brewer retired from the USMS in March 2014.  *See* Order at 5-6, ECF No. 212.

Mr. Brewer's allegations against the USMS primarily concern certain unsuccessful applications for promotion from GS-14 to GS-15 during the eighteen month period from May 2007 until he was promoted to Chief of the Office of Inspection in November 2008.  *See* Pl.'s Mot. at 24-25; Am. Compl. ¶¶ 119-122.[3]  He also raises a number of unsuccessful applications for lateral transfer at the GS-14 level during that time, and allegations regarding certain assignments.  *See id.* at 25-27; Am. Compl. ¶¶ 123-124.  On the basis of these claims, Mr. Brewer seeks to represent a class of all current and former African American law enforcement officers at grades GS-12 through GS-15.  *See* Pl.'s Mot. at 3.

Over time, the Court has substantially narrowed the Amended Complaint's expansive claims on behalf of a putative class.  *See, e.g.*, Mem. Order, ECF No. 164; Mem. Opinion at 12-17, ECF No. 162 (dismissing awards, training, and investigations claims).  And Plaintiff's motion narrows the scope still further.  Whereas the Amended Complaint raised issues with many aspects of the USMS's Merit Promotion Process, Plaintiff's motion challenges only the recommendation and selection stages of the process.  *See* Pl.'s Mot. at 3, 6-10.  Similarly, whereas the Amended Complaint raised issues regarding agency-wide "assignments," Plaintiff's motion challenges only the subcategory of "Headquarters duty assignments."  In sum, although

---

[2] The original putative class representative, David Grogan, withdrew from this action in 2013.  *See* Stipulation of Dismissal, ECF No. 133.  A putative class representative added in 2010, Fayette Reid, is no longer a party because the Court dismissed all of her claims.  *See* Order at 3, ECF No. 212; Order at 3, ECF No. 176.  The Court recently denied Plaintiffs' motion to amend the complaint to add four new class representatives.  *See* Order, ECF No. 212.

[3] The Court's April 8, 2015, order appears to have misstated that Plaintiff only has assignment claims remaining.  *See* Order at 7, ECF No. 212.  His promotion and lateral reassignment claims were simply unaddressed in prior briefing.  *See, e.g., id.* at 8 (noting Defendant's argument that "since September 27, 2013, Plaintiffs have relied on Brewer as their sole class representative with respect to promotions.").

the scope of Plaintiff's claims are ambiguous and ill-defined, *see infra* Argument § I, he appears to now challenge only three sets of policies or procedures:  (1) competitive selections for permanent positions through the final stages of the Merit Promotion Process, (2) noncompetitive selections for lateral reassignments, and (3) "Headquarters duty assignments."

## III.  CHALLENGED POLICIES.

Each of the three sets of procedures Plaintiff appears to challenge on behalf of the putative class—competitive selections through certain stages of the Merit Promotion Process, noncompetitive selections for lateral reassignments, and "Headquarters duty assignments"—is briefly summarized here.[4]

### A.  THE MERIT PROMOTION PROCESS.

The Merit Promotion Process is a set of established procedures for competitive selections for permanent positions in the 1811 job series between grades GS-13 and GS-15.  *See* Lowry Decl. ¶ 10.  It is the primary method that deputies are selected for permanent promotion to higher grades,[5] and it is also the primary method that deputies are laterally reassigned at the same grade level.  *See* Harlow Decl. ¶ 13.  While Plaintiff challenges only the final stages of the Merit Promotion Process, the whole process is summarized for context.

Merit promotion vacancy announcements are distributed electronically to all employees. *See* Lowry Decl. ¶ 32.  Those seeking a promotion or a lateral reassignment apply by submitting a current resume form.  *Id.* ¶ 34.  For each vacancy, employees seeking promotion to a higher grade are winnowed down to approximately the five highest scoring candidates under a system that weighs their education, experience, training, awards, knowledge of USMS policies, and writing ability.  *See id.* ¶¶ 36-37.  Lateral candidates are automatically included because they currently or previously held a position at that grade level.  *See id.* ¶ 36.  For each vacancy, staff

---

[4] Although Defendant disputes many of the facts asserted and characterizations made in Plaintiff's motion, few of them are relevant for purposes of the class certification motion.  Accordingly, it will be unnecessary to resolve many of the parties' disagreements for purposes of ruling upon Plaintiff's class certification motion.

[5]  Other methods of permanent promotion, such as realignment of a position due to organizational change or a reassessment of the skills used in the position, occur rarely and are not at issue in this case.  *See id.* ¶ 58.

provide the following documents to the recommenders and Director:

- A final certificate (also called a "best qualified list") that includes:
  - an alphabetical list of the final promotion candidates;
  - an alphabetical list of all eligible lateral candidates;
  - candidates' current grade level, job title, duty location, start date with USMS, and date of last promotion;
  - for GS-14 and GS-15 positions, the scores for promotion candidates' structured interviews.
- The resumes candidates submitted with their application.
- Recommendation Worksheet (provided to Career Board and Director).
- Career Board Notes (provided to Director). *See id.* ¶¶ 39, 44, 46, 48.

A recommending official ("RO")—one of the 94 U.S. Marshals (for district positions) or one of the 13 Assistant Directors (for division positions)—ranks the candidates for the vacancy in order of preference. *See id.* ¶¶ 39-42. The ROs rely on the certificate and resumes, their own experience working with a candidate, and consultation with other U.S. Marshals or supervisory employees who worked with a candidate. *See id.* ¶ 40. Some ROs also interview candidates, and they are instructed that all candidates should receive the same questions. *See id.* ¶ 41. Since 2007, more than 250 individuals have served as ROs. *See id.* ¶ 62.

At its periodic meeting, the Career Board, a diverse group of eight-to-eleven GS-14 and GS-15 law enforcement managers, reviews the ROs' recommendations for all positions under consideration, along with the certificates and resumes. *See id.* ¶¶ 44-46. The Career Board deliberates over the available candidates for every position and reaches unanimous agreement, ranking each person first no more than once. *See id.* ¶ 46. The Career Board independently considers the interests and needs of the USMS as a whole, but its rankings frequently concur with the RO's ranking. *See id.* ¶ 46; Hellberg Decl. ¶¶ 7, 10 (attached as Exhibit 3).

The USMS Director makes the final decision for each position, after meeting with the Career Board and receiving its recommendations, along with the underlying documentation. *See* Lowry Decl. ¶¶ 48-49. The USMS Director makes one of three decisions: to follow the Career Board's recommendation, to select another candidate from the certificate, or to cancel the vacancy announcement. *See id.* ¶ 49. In practice, where a selection has been made, the Director

has followed the Career Board's recommendation about 94 % of the time, followed the RO's recommendation about 89 % of the time, and chosen another candidate about 4 % of the time. *See* Hellberg Decl. ¶¶ 7-12. In addition, the Director has cancelled a position rather than making a selection only about 2.5 % of the time. *See* White Report at 23.

### B.    NON-COMPETITIVE LATERAL REASSIGNMENTS.

All federal agencies have the authority to reassign employees at the same grade level without competition. *See* 5 C.F.R. § 7.1; *id.* § 330.102. This authority to reassign employees without going through the lengthy and costly competition process is essential to the effective operation of a federal agency, including the USMS. *See* Harlow Decl. ¶ 14. While the USMS uses this authority sparingly, relying primarily on the competitive process described above, noncompetitive lateral reassignments are used (1) to fill time-sensitive positions immediately, (2) to place the most highly qualified candidate in a position of special sensitivity, (3) to remove an employee from a problematic situation (e.g., conflict with a specific judge or supervisor), and (4) to accommodate an individual employee's personal circumstances.[6] *See id.* ¶¶ 13-14.

U.S. Marshals and Assistant Directors have the authority to reassign employees within their respective districts or divisions without the need for approval from the Director. *See id.* ¶ 16. Reassignments between different districts or divisions may require additional approvals from the Associate Directors or the Deputy Director, depending on the circumstances. *See id.* ¶¶ 17-21. Such approval is frequently granted, especially when the reassignment involves no additional costs. *See id.* ¶¶ 18, 22. Reassignments to a duty station at least 50 miles from the old location and where the move is "in the interest of the Government," rather than simply sought by the employee, generally involve permanent change of station moving expenses. *See id.* ¶ 21. When such expenses are involved the Deputy Director's approval is required, and is less likely to

---

[6] The USMS has two specific procedures for employees to seek reassignment due to personal circumstances. *See* Harlow Decl. ¶¶ 23-25. Medical hardship transfer requests, which can accommodate medical needs of an employee or close relative, are reviewed by a panel of three U.S. Marshals, with appeals from the panel's decision to the Associate Director for Administration. *See id.* ¶ 24. The mutual transfer policy permits two employees to switch places at their own expense with approval from the relevant U.S. Marshals or Assistant Directors. *See id.* ¶ 25.

be granted in times of budgetary limitations.  *See id.*

### C.    "HEADQUARTERS DUTY ASSIGNMENTS."

Plaintiff's term "Headquarters duty assignment" is not a term of art at the USMS and is ambiguous.  For purposes of this brief, the USMS infers from Plaintiff's usage and examples that the term refers to assignments meeting three criteria:  (1) opportunities to perform duties for a USMS division, (2) without an official personnel action making one an employee of that division, and (3) where the selection for the opportunity is made by an employee of a USMS division.  *See* Harlow Decl. ¶ 28.  There are dozens of different processes by which an employee can have such an opportunity.  For example, many divisions maintain some sort of advisory board for senior managers to provide input to the centralized policymaking of the division.  *See id.* ¶¶ 52-56.  Several divisions have organized teams that are trained and ready to perform specific tasks anywhere in the country if needed.  *See id.* ¶¶ 59-66.  Many divisions (and districts for that matter) seek outside assistance for specific operations such as protecting diplomats at the United Nations, serving protective details for threatened judges, or providing additional security for a highly publicized trial.  *See id.* ¶¶ 67-74.  These diverse opportunities are not subject to central control or uniform selection procedures.  Rather, each division or office responsible for one of these opportunities develops the selection procedure and criteria for the opportunity.  The procedures range from multipage applications submitted by candidates in response to nationwide advertising, to successful completion of training, to selection by peers from among an existing group of skilled employees.  *See id.* ¶¶ 30, 33-74.  Even where the formal selecting official is the USMS Director, that almost always represents a concurrence with the recommendation of other managers.  *See id.*  Moreover, the duration, prestige, and effect on an employee's career of these diverse opportunities varies widely.  *See id.* ¶ 31.

### STANDARD OF REVIEW

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432

(2013) (internal quotations and citation omitted).   A party seeking class certification has the burden to "affirmatively demonstrate" compliance with Federal Rules of Civil Procedure 23 by a preponderance of the evidence.  *Wal-Mart*, 131 S. Ct. at 2551; *see also Halliburton Co. v. Erica P. John Fund*, *Inc.*, 134 S. Ct. 2398, 2403 (2014) ("requir[ing] plaintiffs to *prove*—not simply plead—that their proposed class satisfies each requirement of Federal Rule of Civil Procedure 23").  The Court must undertake a "rigorous analysis," in determining whether each of the Rule 23 requirements has been met.  *See Brewer v. Holder*, 20 F. Supp. 3d 4, 14 (D.D.C. 2013) (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 161 (1982)).  Merits issues must be addressed to the extent they overlap with the Rule 23 requirements.  *Amgen, Inc., v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  Regardless, "when a claim cannot succeed as a matter of law, the Court should not certify a class on that issue." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 39 (2d Cir. 2009).

The party seeking certification bears the burden to establish the four threshold requirements of Rule 23(a)—(1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation—as well as one of the three subsections of Rule 23(b).  *See In re Veneman*, 309 F.3d 789, 792 (D.C. Cir. 2002).  Moreover, a class representative must have standing for the claims and forms of relief he seeks to assert on behalf of the class.  *See Falcon*, 457 U.S. at 156; *Friends of the Earth, Inc., v. Laidlaw Environmental Servs.*, 528 U.S. 167, 185 (2000).

## ARGUMENT

## I.  THE PUTATIVE CLASS DEFINITION IS AMBIGUOUS AND OVERBROAD.

Plaintiff has poorly defined both the class and the claims for which he is seeking certification.  *See Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir. 2006) (requiring "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis"); Fed. R. Civ. P. 23(c)(1)(B).

Before addressing the Rule 23 requirements, as a threshold matter, a court must ascertain

that the putative class is clearly defined.  "A court . . . should deny class certification where the

class definitions are overly broad, amorphous, and vague[.]"  *In re Rail Freight Fuel Surcharge

Antitrust Litig.*, 287 F.R.D. 1, 29 (D.D.C. 2012) (quotation marks omitted), *vacated on other

grounds*, 725 F.3d 244 (D.C. Cir. 2013).  "A clearly defined class is necessary 'to ensure that the

class is neither amorphous, nor imprecise.'"  *Greenberg v. Colvin*, No. 13-1837, 2014 WL

3884181, at *4 (D.D.C. Aug. 8, 2014) (characterizing with approval and quoting *Lewis v. Nat'l

Football League*, 146 F.R.D. 5, 8 (D.D.C. 1992)).[7]

Plaintiff's class definition is both overbroad and impermissibly amorphous.  He has

defined the proposed class as follows:

> [A]ll current and former African American DUSMs, from April 22, 2007 forward,
> in job series 1811, Criminal Investigators, 1) grades 12-15 regarding promotions
> and selections for positions; and 2) a subclass of grade 13-15 regarding
> Headquarter duty assignments.

*See* Pl.'s Mot. at 3.  Plaintiff's class definition is overbroad because it is not in any way limited

to the aspects of the processes that he is actually challenging.  For example, Plaintiff challenges

the final stages of the Merit Promotion Process and he expressly disclaims any challenge to

earlier stages such as the exam or structured interviews, but the class definition includes all

former and current African American deputies, regardless of whether they ever reached those

challenged stages.  *See* Hellberg Decl. ¶ 19.  In fact, Plaintiff's definition includes both

individuals who never applied through the process and individuals whose applications were

always successful.  *See id.*; *see also* Pl.'s Mot. at 3.  Because Plaintiff is only challenging the

final stages of the Merit Promotion Process, putative class members who did not apply through

the process, never reached those stages, or were in fact always selected have no connection to the

claims being litigated.  *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th

Cir. 2012) ("If . . . a class is defined so broadly as to include a great number of members who for

_____

[7] *See also Mathews v. Diaz*, 426 U.S. 67, 71 n.3 (1976) (noting that the "class and subclass are too broadly
defined"); *Williams v. Glickman*, No. 95-1149, 1997 WL 33772612, at *4 (D.D.C. Feb. 14, 1997) ("The proposed
class must first . . . be susceptible to precise definition.").

some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification."); 7A Wright, Miller & Kane, *Fed. Practice & Procedure* § 1760 (3d ed. 2005) ("[T]he class must not be defined so broadly that it encompasses individuals who have little connection to the claim[s] being litigated.").

The proposed class is also not clearly defined because the meaning of the three terms central to the proposed class definition are inherently vague: "promotions," "selections for positions," and "Headquarters duty assignments." *See* Pl.'s Mot. at 3. Plaintiff does not further define these terms, simply relying on allegedly illustrative examples. And each section of Plaintiff's brief groups issues differently. *Compare* Pl.'s Mot. at 3-4 (identifying four groups of "common policies and practices"); *with id.* at 4-11 (describing policies under three headings); *with id.* at 12-19 (sorting policies under five headings). As a result, even a careful reading of Plaintiff's motion as a whole is insufficient to determine the intended scope of his claims.

"Promotions." By the term "promotions," Plaintiff appears in many instances to be referencing <u>all</u> applications through the Merit Promotion Process. *See, e.g.*, Pl.'s Mot. at 4-10. Using the term this way conflates two distinct concepts—seeking a position at a higher grade level and seeking a position at the same grade level. *See, e.g.*, Pl.'s Mot. at 5-6 (discussing both concepts under the heading "Competitive Promotions"). This use of "promotions" is problematic because a transfer at the same grade level does not inherently involve a cognizable adverse action under Title VII. *See Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). Plaintiff also confusingly uses "promotions" to refer to unspecified selections outside the Merit Promotion Process. *See, e.g.*, Pl.'s Mot. at 10 (idiosyncratically defining "directed reassignment" to include "promotion . . . of a DUSM"). This breeds confusion about what claims Plaintiff seeks to certify. For example, temporary promotions to a higher grade level involve procedures that Plaintiff has nowhere addressed. *See* Lowry Decl. ¶¶ 55-57.

"Selections for positions." The term "selections for positions" is even more vague. Plaintiff may be referring to lateral selections which are part of the challenged Merit Promotion Process, *see, e.g.*, Pl.'s Mot. at 6, or he may be referring to non-competitive lateral

reassignments, *see e.g.*, *id.* at 10-11, or perhaps both or even something else.  If the definition includes lateral reassignments at the GS-12 grade level, the Court has already dismissed such claims.  *See* Mem. Order, ECF No. 169.  The only term he actually defines is "directed reassignment," by which he appears to mean all non-competitive relocations in the USMS.  *See* Pl.'s Mot. at 10 n.13.[8]  But even "directed reassignment" as he defines it does not clearly match a specific component of the class definition.

"Headquarters duty assignments."  Finally, with regard to the proposed subclass, Plaintiff has not defined the term "Headquarters duty assignment."  Logically, this term must be distinct from the "promotions" and "selections for positions," but its scope is otherwise entirely unclear. The term does not have "an objective and readily discernible meaning."  *See D.L. v. Dist. of Columbia*, 302 F.R.D. 1, 17 (D.D.C. 2013).  Plaintiff improperly leaves Defendant and the Court to guess what assignments are intended to be included.  *See infra* Argument § III(A)(3).

Because Plaintiff has failed to define the class with specificity, one cannot determine by looking at the class definition whether particular individuals and claims are within the scope of the proposed class.  Plaintiff thus fails to meet this threshold requirement and class certification should be denied.  *See Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 32 (D.D.C. 2003).

## II.    PLAINTIFF CANNOT ADEQUATELY REPRESENT THE PROPOSED CLASS BECAUSE HE LACKS STANDING TO PURSUE DECLARATORY AND INJUNCTIVE RELIEF.

Because Plaintiff, the sole putative class representative, is a retired employee who has not sought reinstatement, he lacks standing to pursue class claims for injunctive or declaratory relief, and therefore is neither an adequate class representative for such claims nor typical of the broad, amorphous class.  Indeed, Plaintiff conceded his lack of standing to seek injunctive relief in his

---

[8]  The term "directed reassignment," as used by the USMS, does not refer to placing an employee in a grade higher than they have previously held.  *See* Harlow Decl. ¶¶ 11, 27.  Plaintiff's proffered definition of "directed reassignment" is so overbroad and contrary to USMS usage of the term that it appears to include non-competitive promotions by realignment or reassessment of a position .  *See* Pl.'s Mot. at 10 n.13 ("The term 'Directed Reassignment' will be used throughout to refer to movements from one position to another within or between grades outside the [Merit Promotion Plan].");  Lowry Decl. ¶ 58 (describing several rare non-competitive promotion processes).

most recent motion to amend the complaint.  *See* Pls. Mot. to Substitute Class Reps. at 1, ECF No. 184 (stating as basis for motion that Brewer as a former employee cannot seek injunctive relief).  And there is little question that injunctive and declaratory relief are integral to this putative class action.  *See* Am. Compl. ¶ 97, ECF No. 66 ("Injunctive and declaratory relief are the predominant forms of relief sought in this action . . . ."); *id.* Prayer for Relief ¶¶ C-H.

A class representative must have standing for the claims he seeks to assert on behalf of the class.  *See Falcon*, 457 U.S. at 156 ("We have repeatedly held that a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." (quotation marks omitted)).  This includes separately demonstrating standing for each form of relief sought.  *See Friends of the Earth*, 528 U.S. at 185; *see also Hodgers–Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("Unless . . . plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief."); *Does I Through III v. Dist. of Columbia*, 216 F.R.D. 5, 9 (D.D.C. 2003).

In *Wal-Mart*, the Supreme Court adopted the Ninth Circuit's conclusion that "plaintiffs no longer employed by Wal–Mart lack standing to seek injunctive or declaratory relief against its employment practices."  131 S. Ct. at 2559-60 (discussing implications for predominance inquiry).  After *Wal-Mart*, courts have consistently held that in a class action seeking injunctive relief, a former employee who does not seek reinstatement lacks standing to represent current employees.  *See, e.g.*, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011); *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 465-66 (S.D.N.Y. 2013); *Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc.*, No. 11-2777, 2013 WL 6072702, at *18 (E.D. La. Nov. 18, 2013); *Chen-Oster v. Goldman, Sachs & Co.*, 877 F.Supp.2d 113, 121 (S.D.N.Y. 2012); *Beal v. Lifetouch, Inc.*, No. 10-8454, 2012 WL 3705171, at *3-4 (C.D. Cal. Aug. 27, 2012).  And because a named plaintiff, including a class representative, must maintain standing throughout a case, it is not sufficient for the plaintiff to have been employed when the complaint was filed.

*See Wal-Mart*, 131 S. Ct. at 2560 ("[T]hose who have left their Wal–Mart jobs *since* the complaint was filed have no more need for prospective relief than those who left beforehand.").[9]

Without standing, Plaintiff simply cannot meet Rule 23(a)'s adequacy requirement. *See* Newberg on Class Actions § 3:59 (5th ed.) ("If a court finds that standing is lacking, then adequacy will be as well, for a plaintiff cannot be an adequate representative for claims she does not have standing to pursue."); *Gutierrez v. Johnson & Johnson*, 467 F. Supp. 2d 403, 413-14 (D.N.J. 2006) (treating standing to bring prospective injunctive claims on behalf of current employees as a necessary component of Rule 23(a)(4) adequacy). That is readily apparent in a disparate impact case seeking to eliminate a policy that has an allegedly discriminatory impact, such as Plaintiff argues here, because the primary forms of relief are declaratory and injunctive. But it is also true for Plaintiff's disparate treatment claim. Under either theory of the case, "[a]s former employees, [named plaintiffs] would not share an interest with class members whose primary goal is to obtain injunctive relief. Thus, as the class currently stands, [named plaintiffs] will not adequately protect the interests of the class as a whole." *Ellis*, 657 F.3d at 986.

Nor can he meet Rule 23(a)'s typicality requirement. *See Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) ("It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class."). Courts in this district have long noted the problem of former employee representation of a class that seeks injunctive and declaratory relief. *See, e.g.*, *Batesville Casket Co. (EEO Litig.)*, Nos. 83-0534, 83-2708, 1984 WL 1142, at

---

[9] Plaintiff cannot remedy this problem by abandoning the injunctive and declaratory claims on behalf of the current employees because this would give rise to claim-splitting issues rooted in res judicata. *See Beal*, 2012 WL 3705171, at *3-4 ("Nor can the Court certify only a class for monetary damages because the claims of current employees would be impermissibly split."). "Claim preclusion prevents parties from relitigating issues they raised or could have raised in a prior action on the same claim." *NextWave Pers. Commc'ns, Inc. v. FCC*, 254 F.3d 130, 143 (D.C. Cir. 2001). Courts generally scrutinize claim splitting by a class representative, and do not permit such a plaintiff to "opt to pursue certain claims on a class-wide basis while jeopardizing the class members' ability to subsequently pursue other claims." *See In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 531 (N.D. Cal. 2010) (quotation marks omitted); *Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 224 (3d Cir. 2009) (stating that "[b]y seeking only partial relief, [plaintiff] may be engaging in claim splitting, which is generally prohibited by the doctrine of res judicata").

*6 (D.D.C. Sept. 14, 1984) ("This case, however, presents the situation of two *former* employees of the defendant endeavoring to represent *present* and *future* employees. The potential for divergent interests is too great in this case, and the Court holds that the plaintiffs cannot adequately protect the interests of the class.").[10]

For all of these reasons, Plaintiff lacks standing for the injunctive and declaratory claims he seeks to bring on behalf of the class and cannot meet the typicality and adequacy elements of Rule 23(a). On this ground alone, the Court should deny the motion for class certification and need not reach any other issue. Nevertheless, in the following sections Defendant addresses the myriad other reasons why the proposed class does not satisfy Rule 23.

## III.    PLAINTIFF'S PROPOSED CLASS FAILS TO SATISFY RULE 23(A).

### A.    THE PUTATIVE CLASS DOES NOT SHARE COMMON QUESTIONS OF LAW OR FACT THAT CAN BE RESOLVED IN A "SINGLE STROKE."

Plaintiff contends that seven "common questions" in this case establish commonality under Rule 23(a)(2). Pl.'s Mot. at 33. These include, *inter alia*, whether "uniform policies of the USMS that apply to the Class as a whole discriminate against African American DUSMs;" "whether the application of those policies have a disparate impact on the Class;" and "whether the USMS operated under a general policy of racial discrimination." *Id.* Conspicuously absent from Plaintiff's lengthy class certification motion is any identification of what specific "uniform policy" of the USMS he is challenging. For the reasons discussed below, Plaintiff has failed to meet his burden of establishing any class-wide issues that are capable of class-wide resolution and accordingly, he cannot meet the commonality requirement.

A class action may not be certified unless "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This means Plaintiff is required "to demonstrate that the

---

[10]  Decades before *Wal-Mart*, a few decisions within this Circuit permitted former employees to serve as class representatives for current employees, but those decisions did not consider the implications of constitutional standing. *See, e.g.*, *Arnett v. Am. Nat'l Red Cross*, 78 F.R.D. 73, 77 (D.D.C. 1978); *Bachman v. Collier*, 73 F.R.D. 300, 305 (D.D.C. 1976). That position is no longer tenable. *Cf. Richards v. Ernst & Young LLP*, No. 08-4988, 2010 WL 682314, at *3 (N.D. Cal. Feb. 24, 2010) (distinguishing district court decisions for failure to consider standing).

class members have suffered the same injury." *Wal-Mart*, 131 S. Ct. at 2551 (internal quotation marks omitted). The "claims must depend upon a common contention . . . . of such a nature that it is capable of classwide resolution." *Id.* at 2551; *D.L. v. Dist. of Columbia*, 713 F.3d 120, 125 (D.C. Cir. 2013). Determination of whether the contention is true or false must "resolve an issue that is central to the validity of each one of the claims in one stroke." *Walmart*, 131 S. Ct. at 2551; *see also id.* at 2552 (requiring "some glue holding the alleged *reasons* for all those decisions together" and "a common answer to the crucial question *why was I disfavored*.").

In a "pattern or practice" disparate treatment case, such "proof of commonality necessarily overlaps with [Plaintiff's] merits contention that [the defendant] engages in a *pattern or practice* of discrimination." *Wal-Mart*, 131 S. Ct. at 2552 (emphasis in original). Plaintiff must present "[s]ignificant proof that an employer operated under a general policy of discrimination." *Id.* at 2553 (quoting *Falcon*, 457 U.S. at 159 n.15). They must "begin by identifying the specific employment practice that is challenged." *Wal-Mart*, 131 S. Ct. at 2555 (quoting *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994 (1988)). And he must then show by statistics, anecdotes, or other means that this specific practice caused a common injury. *See Wal-Mart*, 131 S. Ct. at 2554-56; *Watson*, 487 U.S. at 994 ("[C]ausation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the [alleged discrimination]."); *see also Valerino v. Holder*, 283 F.R.D. 302, 314 (E.D. Va. 2012) ("[T]he Court must assess the specific thing that a plaintiff claims creates bias and understand the way in which it is common to the class.").

Plaintiff must meet similar requirements for a disparate impact claim: "begin by identifying the specific employment practice that is challenged," identify "statistical disparities in the employer's work force," and "show that the practice in question has caused [the disparity]." *Watson*, 487 U.S. at 994. Plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for promotions because of their membership in a protected group. *Id.* at 994-95. Here, as explained further below, Plaintiff has not only failed to identify a specific employment practice, but he has

also failed to demonstrate by statistics that any of the alleged practices have "caused" the alleged disparities. Thus, Plaintiff cannot show commonality.

As described in Section I, *supra*, Plaintiff's brief is ambiguous and imprecise about what specific sets of policies or practices are being challenged.  Defendant's best understanding is that Plaintiff seeks to establish commonality for three different sets of policies:  (1) competitive selections through the Merit Promotion Process (both promotions and lateral reassignments), (2) noncompetitive lateral reassignments outside the Merit Promotion Process, and (3) "Headquarters duty assignments."  *See, e.g.*, Pl.'s Mot. at 3-4.[11]  As previously described, each of these policy areas is distinct, with different decisionmakers, different policies or practices implicated, and different employees affected.  Accordingly, each of these areas will be addressed separately.  To conflate and overlap these various policies and practices, as Plaintiff does, obfuscates the reality that none of these sets of policies separately meets the Rule 23 criteria.

### 1.    Plaintiff Fails to Identify a Common Classwide Question Regarding Selections Through the Merit Promotion Process.

The core of Plaintiff's case is his challenge to the three final stages of the competitive Merit Promotion Process—the actions of the Recommending Officials (ROs), the Career Board, and the USMS Director in either selecting an employee for the announced position or cancelling the vacancy.  *See* Pl.'s Mot. at 4-10.  Plaintiff cannot establish class-wide commonality for his

---

[11]  Plaintiff also claims that there are "common policies and practices regarding . . . other aspects of USMS operations bearing on promotions."  Pl.'s Mot. at 4.  But the ***only*** policy he discusses is that individuals "who receive a discipline greater than a letter of reprimand are disqualified from promotional opportunities for one-two years."  Pl.'s Mot. at 18.  This is an improper attempt to resurrect class claims either previously abandoned, *compare* Compl. ¶¶ 3, 21 (alleging discipline claim on behalf of class) *with* Am. Compl. ¶¶ 34, 75-81 (dropping discipline claim and alleging investigation claim), or dismissed.  *See* Mem. Order, ECF No. 164 (dismissing investigations claim).  Accordingly, the Court should summarily dismiss this claim.  Regardless, this policy cannot support commonality because Plaintiff provides no evidence that the policy affected the class as a whole.  Indeed, only one anecdotal witness alleges that her specific application under the Merit Promotion Process was affected, and she was simply mistaken.  *See* Thompson Decl. ¶ 20; Lowry Decl. ¶ 91 (explaining that Ms. Thompson was ranked between third and eighth by the Career Board for each of these positions, and the investigation was never disclosed to the Career Board Chair or the Director).  Nor has Plaintiff—who was not subject to any discipline or investigations during the liability period, and who instead oversaw the investigative office—demonstrated typicality for this claim. *See Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 677 (7th Cir. 2001) ("[S]imilarity of claims and situations must be demonstrated rather than assumed."); *Lightfoot v. Dist. of Columbia*, 246 F.R.D. 326, 339-40 (D.D.C. 2007) (finding certain plaintiffs to lack typical claims "because they have not suffered injuries in the same general fashion as absent class members").

challenges to these three stages for two different sets of reasons.

First, resolution of Plaintiff's allegations cannot resolve claims of the entire class. On the one hand, about half of the proposed class did not participate in the three stages that Plaintiff now challenges. And on the other hand, many of those who did participate were seeking lateral positions—which require individualized consideration to determine whether the denial is a cognizable "adverse" action under Title VII. Resolution of Plaintiff's proposed common questions would thus determine nothing for much of the proposed class.

Second, Plaintiff has failed to specify what "specific employment practice[s]" he is challenging. His commonality argument—especially when considering the statistics upon which he relies—appears to depend on the notion that he is challenging the Merit Promotion Process as a single policy. *See* Pl.'s Mot. at 34 (alleging commonality due to "company-wide policies for competitive promotions to Grade GS-13-15 positions"). But this approach does not match his scattershot allegations about different aspects of each of the three final stages of the Merit Promotion Process. He simply does not show that any one alleged defect or any one stage causes racial disparities, let alone discrimination.

At the very least, he should have separately analyzed the three different stages he challenges. *Cf. Valerino*, 283 F.R.D. at 312 (separately analyzing commonality for each of these three stages where plaintiff failed to "explicitly articulate[] a theory of the case").[12] By looking only at the final result, he cannot demonstrate causation. And because most of his criticisms turn on the discretion afforded to the more than 250 Recommending Officials and dozens of Career Board members, his claims of commonality fail for the same reasons described in *Wal-Mart*. Plaintiff cannot show that all of these officials exercised their discretion in the same way.

---

[12]  These stages of the Merit Promotion Process are indisputably discrete, with separate sets of records. Accordingly, they are "capable of separation for analysis" and do not come within Title VII's "one employment policy" provision. *See Garcia v. Johanns*, 444 F.3d 625, 633 n.10 (D.C. Cir. 2006); 42 U.S.C. § 2000e–2(k)(1)(B)(i).

> a. **Plaintiff's proposed questions will not dispose of any question central to the claims of class members who have not participated in the challenged stages of the Merit Promotion Process or who applied only for lateral positions.**

For two reasons, there is a substantial mismatch between the allegedly common question presented by the final stages of the Merit Promotion Process and the proposed class of "all current and former African American DUSMs, from April 22, 2007 forward, in job series 1811 . . . Grades 12 through 15." *See* Pl.'s Mot. at 3.

First, the effect of policies regarding the challenged stages of the Merit Promotion Process can present a common question *only* if the class members participated in those stages. *See e.g.*, *Wal-Mart*, 131 S. Ct. at 2545 (requiring resolution of "an issue that is central to the validity of *each one* of the claims in one stroke." (emphasis added)); *Falcon*, 457 U.S. at 155 (stating that the class-action device is appropriate where "an issue potentially affecting *every class member* [can] be litigated in an economical fashion under Rule 23" (emphasis added)); *D.L.*, 713 F.3d at 126 (requiring "identification of a policy or practice that affects *all members* of the class in the manner *Wal-Mart* requires" (emphasis added)); *Garcia v. Johanns*, 444 F.3d 625, 633 n.10 (D.C. Cir. 2006) (requiring showing "that the putative class members have something in common—they *all* suffered an adverse effect from the same . . . policy" (emphasis added)). Here, approximately half of the putative class did not participate in those stages during the relevant period, either because they did not apply or because they did not reach the best qualified list. *See* Hellberg Decl. ¶ 19; White Report at 21.[13]

Second, unique issues for lateral applicants present a fundamental defect for the proposed

---

[13] Even if not every class member must be injured by a policy for commonality to be established, courts require an expectation that the vast majority are affected by the policy. *See Segar v. Smith*, 738 F.2d 1249, 1291 (D.C. Cir. 1984) ("Though [Title VII] generally does not allow for backpay to those whom discrimination has not injured, this section should not be read as requiring effective denial of backpay to the *large numbers* of agents whom [defendant's] discrimination has injured in order to account for *the risk that a small number of undeserving individuals* might receive backpay." (emphasis added)). *See also, e.g.*, *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266 (3d Cir. 2011) ("The evidence here is not 'common' because it is not shared by all (possibly even most) individuals in the class."); *Pagan v. Abbott Labs. Inc.*, 287 F.R.D. 139, 148-49 (E.D.N.Y. 2012) (rejecting commonality because plaintiffs did "not adequately demonstrated how the Defendant's alleged deceptive practices caused any injury, let alone the same injury, to the majority of the class members.").

class.  *See* Pl.'s Mot. at 3 (defining class to include all "promotions and selections for positions").  The competitive Merit Promotion Process includes both selections for promotion to a higher grade and selections for lateral reassignment at the same grade.  *See* Lowry Decl. ¶¶ 10-11.  But as discussed above, nonselection for a lateral reassignment (commonly called a "transfer" in court decisions) is not inherently an adverse employment action under Title VII.  *See* Mem. Opinion at 27, ECF No. 162 ("Not everything that makes an employee unhappy is an actionable adverse action."  (quoting *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013)); *Brown*, 199 F.3d at 457.  Whether denial of another position at the same grade level states a cognizable claim under Title VII depends on a detailed comparison of the two positions.  *See* Mem. Opinion at 34, ECF No. 162 ("[A] lateral transfer may constitute an adverse employment action if it significantly affects the employee's responsibilities and/or benefits."); *Brown*, 199 F.3d at 457 (requiring "some other materially adverse consequences" to demonstrate that plaintiff "suffered objectively tangible harm" not "[m]ere idiosyncrasies of personal preference").  It cannot simply be assumed, as Plaintiff's class definition purports to do, that all denials of lateral positions concern positions objectively superior to those then occupied by the putative class members—and Plaintiff has offered no such evidence.  Applicants who seek but do not receive an equivalent or inferior position have no cognizable Title VII claim, and therefore present no relevant common issue.  Here,  more than 40 percent of the non-selections specifically raised by putative class members in their declarations concern positions at the same or a lower grade.  *See* Lowry Decl. ¶¶ 84, 89  (33 of 79 announcements).  Accordingly, the inclusion of lateral applications in the class definition precludes any finding of commonality because there can be no blanket resolution of such inherently individualized claims.  *See, e.g.*, *Falcon*, 457 U.S. at 155 (stating that "[c]lass relief is peculiarly appropriate when the issues involved . . . turn on questions of law *applicable in the same manner* to each member of the class" (quotation marks omitted; emphasis added)).

For both of these reasons, ***no*** potential answer to Plaintiff's contentions regarding these stages of the Merit Promotion Process can "resolve[] in one stroke" "a question central to the

validity of each class member's claim." *D.L.*, 713 F.3d at 127.

> **b.     Plaintiff's Merit Promotion Process claims lack commonality because he does not establish causation for any one employment practice and because he cannot show that the decisionmakers exercised discretion in the same allegedly discriminatory way.**

Even if one only considers the class members who sought promotions and actually participated in the challenged stages of the Merit Promotion Process, Plaintiff's claims still fail for lack of commonality.  He is challenging different policies and practices by different decisionmakers at three different stages of the process.  *Cf. D.L.*, 713 F.3d at 127 (rejecting commonality where "the harms alleged . . . involve different policies and practices at different stages of the . . . process").  And because he has "identified no single or uniform policy or practice that bridges all their claims," *id.* at 127, nor shown "that the practice in question has caused" the alleged disparities, *Watson*, 487 U.S. at 994, he cannot establish commonality on the basis of generalities about alleged systemic failures.  Nor can he show that the hundreds of decisionmakers exercised discretion in the same allegedly discriminatory way.

> **i.     Plaintiff's statistical analysis does not establish a general policy of discrimination, a class-wide disparate impact, or causation for any specific employment practice.**

Instead of a single or uniform policy, Plaintiff criticizes at least nine different aspects of the three final stages of the Merit Promotion Process:

- Each participant's discretion to rank the candidates based on the criteria they find most relevant to the position.  *See* Am. Compl. ¶ 38 ("criteria are subjectively evaluated"); Pl.'s Mot. at 7-10; Lundquist Report at 20-21, ECF No. 185-15.

- Each participant's discretion to rank candidates differently than the prior recommendation.  *See* Am. Compl. ¶ 38 ("re-ranking by the [RO], Career Board, and the Director"); *id.* ¶ 40 ("disparate impact" from "disregard[ing] the recommendation of the Career Board and the Recommending Official").

- ROs' discretion to "reach out to other US Marshals or supervisors of potential candidates for additional information," Lundquist Report at 17, or to "conduct interviews of the candidates," *id.*; *see also* Pl.'s Mot. at 7.

22

- Variations in the ROs' documentation of reasons for recommendation. *See* Pl.'s Mot. at 7; Lundquist Report at 18.

- Career Board's practice of not ranking one candidate for selection to more than one position simultaneously. *See* Pl.'s Mot. at 8; Lundquist Report at 23.

- Director's discretion to cancel positions. Pl.'s Mot. at 9; Am. Compl. ¶ 46.

- Director's discretion to "collect[] additional input on candidates." *See* Lundquist Report at 22; Pl's Mot. at 9.

- Alleged practice of "selecting white candidates from outside the region rather than advancing internal African American candidates." Am. Compl. ¶ 48.

- Alleged lack of oversight and quality controls by human resource staff. *See* Lundquist Report at 23.

These diverse criticisms are a far cry from the unitary "teaming" and "account distribution" practices that provided commonality in one of the primary cases upon which Plaintiff relies, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012). In that case, plaintiffs identified a specific company-wide policy and explained the theory by which it had a disparate impact on the entire class. *See id.* at 488-89; *see also D.L.*, 713 F.3d at 122-23. Plaintiff cannot do that here. Instead, he claims that the USMS operates under a general policy of discrimination, which is expressed through the discretion afforded to a large number of different decisionmakers at the three distinct stages through different alleged policies or practices. *See* Pl.'s Mot. at 37-39. Alternatively, he argues that something—probably the same discretion, but he never specify exactly what—causes a disparate impact. *See* Pl.'s Mot. at 32-36, 45, 50. These arguments are indistinguishable from those rejected by *Wal-Mart*. And they should be rejected here as well.

While evidence of a general policy of discrimination can be sufficient to establish commonality, the threshold for such evidence is very high. *See Wal-Mart* at 2553. Plaintiff's evidence falls far short. USMS's written policies prohibit discrimination, and each USMS Director has regularly reinforced those policies with periodic memoranda. *See* Williams Decl. ¶¶ 5-11; Lowry Decl. ¶ 53; *cf. Wal-Mart*, 131 S. Ct. at 2554. Nor has Plaintiff or any of his anecdotal declarants identified any racist or even racially charged statements by anyone in

USMS leadership, despite the extensive discovery in this case.[14]  Instead, Plaintiff relies on a statistical analysis purporting to show a disparity in overall selection rates.  *See* Pl.'s Mot. at 35. This statistical analysis does not establish commonality by means of either a general policy of discrimination or a class-wide disparate impact for two reasons.

First, a statistical disparity, by itself, does not inherently demonstrate commonality.  *See Wal-Mart*, 131 S. Ct. at 2556 ("Merely showing that Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice.").  Instead, the statistics must show that the disparity is caused by a "specific employment practice" that ties all the individual claims together.  *See id.* at 2555 (rejecting statistically significant disparities at the regional and national level both because they did not establish a "uniform, store-by-store disparity" and because they did not link the disparities to a "specific employment practice . . . [that] ties all their . . . claims together"); *Watson*, 487 U.S. at 995.  Plaintiff has not done so here.  His statistical analysis does not show that any individual stage of the process itself causes disparities or that any of the specifically challenged aspects of those stages have negative effects.  *See* Pl.'s Mot. at 12. Instead, it simply reports a bottom line number that supposedly represents the aggregate effects of all the challenged policies—and even the effects of unchallenged policies like the structured interviews.  *See* Vekker Dep. at 20:19-22:4 (attached as Exhibit 6).  This is far more undifferentiated than the *Wal-Mart* statistics, which at least controlled for regional differences. *See Dukes v. Wal-Mart*, 222 F.R.D. 137, 158-59 (N.D. Cal. 2004) (observing that "aggregated data at the nation-wide level is highly suspect" but upholding statistical analysis aggregated to regional level); *Wal-Mart*, 131 S. Ct. at 2555 (rejecting regional statistical aggregation). Therefore, just as in *Wal-Mart*, this statistical analysis is insufficient to establish a general policy of discrimination or a class-wide disparate impact.

Second, for the reasons described in more detail in Defendant's *Daubert* motion, the

---

[14]  Defendant produced more than one million pages of discovery, along with hundreds of thousands of entries from a number of databases.  Moreover, Plaintiff conducted fifteen depositions, including two Rule 30(b)(6) depositions.

analysis performed by Plaintiff's statistician, Dr. Alexander Vekker, is significantly flawed.[15]
*See* Def.'s Mot. at 4-10, ECF No. 192; *see also In re Blood Reagents Antitrust Litig.*, 783 F.3d
183, 187 (3d Cir. Apr. 8, 2015) ("[P]laintiff cannot rely on challenged expert testimony, when
critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also
demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in
*Daubert*.").  As discussed in that motion, the data relied upon for the analysis is manifestly
inaccurate regarding the racial identity of the applicants and selectees, and is compiled in a way
that cannot accurately model the decision-making process.  *See* ECF No. 192 at 4-10; *cf. Garcia
v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 660 F.2d 1217, 1224 (7th Cir. 1981) (district court
properly rejected plaintiff's statistical evidence that relied on inaccurate "EEO-1 Reports," even
where those "reports [were] submitted by defendant . . . every year to the [EEOC]").  But most
significantly for commonality, Dr. Vekker has improperly aggregated data to the point that it
conceals relevant differences.  The detailed vacancy-by-vacancy version of the statistical
analysis conducted by Defendant's statistician, Dr. Paul White, demonstrates that the selections
for GS-13 positions—which make up seventy-five percent of all selections—show no
statistically significant disparity.[16]  *See* White Report at 19-20.  To the contrary, Dr. White's
analysis shows that there were more African American selections to GS-13 positions than
expected in four of the seven years studied and that aggregated across all years, there is one more

---

[15]  Plaintiff also supplements his expert's opinions by a number of analyses purportedly conducted by Plaintiff's
counsel's paralegal.  *See generally* Gielow Decl., ECF No.186-33.  Two of these analyses should be struck from
consideration because they involve an expert's opinion that was not disclosed in the expert report and in no way
complied with the deadlines for expert discovery.  *See id.* ¶ 7 ("Dr. Vekker supplied the standard deviation
figures."); *id.* ¶ 9 ("data provided by Dr. Vekker").  *See Iacangelo v. Georgetown Univ.*, 272 F.R.D. 233, 234
(D.D.C. 2011); *Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 28 (D.D.C. 2007).
[16]  Nor can Plaintiff justify lumping GS-13 data with the other grades based on a need to achieve results with
sufficient statistical power.  *See* Vekker Dep. at 79:19-81:9, 83:16-87:12 (arguing about power); *id.* at 172:7-174:16
(finding about 50 observations sufficiently powerful); White Report at 28 (noting that Dr. Vekker had previously
claimed a sample size of 100 was generally considered sufficient for analysis).  The sample of GS-13 employees
was more than sufficient to establish statistically significant results:  there were 953 selections at the GS-13 level,
including 113 selections of African Americans.  *See* White Report at 19 & Table 5.  Accordingly, the absence of
statistically significant findings against African Americans at this grade was not due to any lack of statistical power.

African American selection to GS-13 than expected.[17]  *See id.*  This evidence is antithetical to the notion of the existence of a policy or practice of across-the-board discrimination.  The small disparity observed in selections for GS-14 and GS-15 positions is not a sufficient basis to certify a class largely made up of applicants to GS-13 positions—as Plaintiff seeks to do here.  Because the data here is not homogenous, Plaintiff's statistical evidence should not be credited to support an illusory class-wide disparity.  *See* Federal Judicial Center, et al., *Reference Manual on Scientific Evidence*, 3d ed., at 235 ("Unless the source material is fairly homogeneous, aggregation can distort patterns in the data."); *Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro Dade Cnty.*, 122 F.3d 895, 919 n.4 (11th Cir. 1987) (discussing Simpson's Paradox, an aggregation error that leads to "illusory disparities in improperly aggregated data that disappear when the data are disaggregated.").[18]

    Plaintiff's statistical analysis falls far short of what is required to establish a general policy of discrimination or a disparate impact that can show commonality for the entire class.

----

[17]  Plaintiff seeks to evade the consequences of this data by urging the Court to ignore any analysis after the end of fiscal year 2011, and contends that the analysis should be limited to "decision-making prior to [Defendant] being on notice of evidence that its policies were discriminatory."  *See* Pl.'s Mot. at 13, n.19.  While the cases Plaintiff cites draw the "notice" line at an employer's learning about EEOC complaints or lawsuits, *see, e.g.*, *EEOC v. Ford Motor Co.*, 645 F.2d 183, 197 (4th Cir. 1981), Plaintiff proposes a highly idiosyncratic line—his filing of a disputed statistical analysis in connection with summary judgment briefing that purported to show disparities in selections.  To be consistent with the theory of his citations, he should have excluded all data post-dating the filing of David Grogan's administrative complaint in 2007, this lawsuit in 2008, or perhaps Matthew Fogg's administrative class complaint in 1994.  But instead he relies heavily on data after those points.  Plaintiff's proposed standard is legally unwarranted and would cause an absurd result because he has not alleged that any challenged employment practice or policy changed after 2011; because he seeks to represent class members regarding specific selections occurring after 2011; and because his proposed class definition runs to the present.  *See, e.g.*, Bradshaw Decl. ¶ 22 (Mar. 2014 selection); Downs-Bradshaw Decl. ¶ 46 (Jan. 2013 selections).  Regardless, even with the last two years excluded, Plaintiff has never presented a statistically significant disparity regarding GS-13 selections.  *See, e.g.*, Pl.'s Ex. 34, ECF No. 185-34 (purporting to show Dr. White's analysis without 2012 and 2013, but not computing statistical significance for the GS-13 selections separately).

[18]  *See also Lopez v. City of Lawrence*, No. 07-11693, 2014 LEXIS 124139, at *35 (D. Mass. Sept. 5, 2014) (rejecting plaintiffs' aggregation of data for lack of evidence that the relevant pools were sufficiently homogeneous and because "aggregation of pools of different sizes can produce anomalies"); *Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro Dade Cnty.*, 943 F. Supp. 1546, 1560 n.16 (S.D. Fla. 1996), *aff'd*, 122 F.3d 895 (11th Cir. 1997) ("The more heterogeneous the groups the less likely the [aggregated] disparity analysis will be reliable."); *Abram v. UPS*, 200 F.R.D. 424, 431 (E.D. Wis. 2001).  *Cf.* Bickel, et al., *Sex Bias in Graduate Admissions: Data from Berkley*, 187 Science 398, 399 (1975) (attached as Exhibit 8) (Simpson's Paradox explains how statistically significant bias in favor of male applicants appeared when aggregating admissions data for Berkley's 101 graduate departments, even though more departments had statistically significant results in favor of females than those that favored males).

*See Wal-Mart*, 131 S. Ct. at 2555.

>        ii.    **Plaintiff cannot show that the discretion exercised by more than 250 individuals was used in the same way or with discriminatory results.**

Commonality also is lacking due to the nature of his claims.  Because Plaintiff is not only challenging the actions of the two Directors who have made selections during the liability period—but also challenging both the actions taken by the ROs and the Career Board and the information provided to them—he must show commonality for these independent stages of the process.  *Cf. D.L.*, 713 F.3d at 127; *Valerino*, 283 F.R.D. at 313-16.  Plaintiff argues that these officials are granted too much subjectivity and too little guidance.  *See* Pl.'s Mot. at 6-9, 20-21.  Thus, contrary to Plaintiff's assertion that he is challenging a practice or policy of centralized decisionmaking, he is actually challenging decisions reflecting the discretion afforded to more than 250 managers.  *See* Lowry Decl. ¶¶ 62, 80.  Moreover, the ROs' recommendations were unanimously accepted by higher-level managers in more than 80% of the vacancies.  *See* Hellberg Decl. ¶¶ 7-8.  Accordingly, even his challenge to the Director's actions largely turns on the prior exercise of discretion by the ROs.  This argument places Plaintiff on a collision course with the holding in *Wal-Mart* that discretion cannot be a common policy unless all exercise their discretion the same way.  *See* 131 S. Ct. at 2554-55 (requiring "a common mode of exercising discretion that pervades the entire company").

Plaintiff has produced no evidence that each of the hundreds of ROs and dozens of Career Board members exercise their discretion in the same discriminatory way.  *Cf. Valerino*, 283 F.R.D. at 314 ("It remains 'quite unbelievable' that all Marshal[s] and Assistant Directors would exercise their discretion in a common way without some common direction." (quoting *Wal-Mart*, 131 S. Ct. at 2555)).  Indeed, given the fact that dozens of African Americans served in these roles, including Plaintiff and several putative class members, *see* Lowry Decl. ¶¶ 61-80, he simply cannot make that showing.  Nor could the putative class have the representation they do at the highest grade levels if all managers were routinely exercising their discretion in a

discriminatory fashion. *See* White Report at 11-13. Moreover, as detailed in Defendant's

*Daubert* motion, the criticisms raised by Plaintiff's industrial psychologist do not support class

certification. Her opinion that subjectivity in the system *could* allow for bias to intrude in the

decisionmaking process is a far cry from evidence that bias has *in fact* intruded. *See* Lundquist

Dep. Tr. at 35:3-36:11 (attached as Exhibit 7) (admitting she could not estimate whether 0.5 or

95 percent of selection decisions were contaminated by bias). But "whether 0.5 percent or 95

percent of the employment decisions . . . might be determined by [biased] thinking is the

essential question on which [Plaintiff's] theory of commonality depends." *See Wal-Mart*, 131 S.

Ct. at 2553 (holding that plaintiffs' sociologist failed to show "significant proof" that the

defendant "operated under a general policy of discrimination").

      Nor does Plaintiff present any other evidence from which class-wide commonality can be

inferred. His own self-serving impressions of a management culture hostile to African

Americans are not supported by *any* evidence—let alone widespread or universal—of racist

comments or racial motivations by relevant decisionmakers, and simply cannot establish that

hundreds of recommenders all exercised discretion in the same way.[19] *See Valerino*, 283 F.R.D.

at 314. As discussed above, his statistics do not address any of the final stages individually, and

---

[19] Plaintiff's brief devotes significant space to suggesting that the USMS has an unbroken chain of discrimination
from the 1970s to the present. The evidence does not support that contention. *See supra* Background § I.
Regardless, all alleged discrimination prior to the EEO Complaint that initiated this case—i.e., prior to April 22,
2007—"is the legal equivalent of a discriminatory act which occurred before the statute was passed." *United Air
Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). "[I]t is merely an unfortunate event in history which has no present
legal consequences" unless it provides "relevant background evidence" for a challenge to the "status of a current
practice." *Id.* Plaintiff's attempted use of "background evidence" fails for several reasons. First, the background
evidence must involve proven discrimination, which little of Plaintiff's evidence purports to do. *See Hazelwood
Sch. Dist. v. United States*, 433 U.S. 299, 309 n.15 (1977) ("*Proof* that an employer engaged in racial discrimination
prior to the effective date of Title VII might in some circumstances support the inference that such discrimination
continued[.]"). Second, there must be a significant causal link between the evidence and the current situation, *see id.*
(emphasizing that the inference of current discrimination is supported by prior evidence "particularly where relevant
aspects of the decisionmaking process had undergone little change"); *Valentino v. U.S. Postal Serv.*, 674 F.2d 56, 66
n.11 (D.C. Cir. 1982) (approving district court's disregard of "background evidence" where changes to selection
process had occurred), which is lacking here where many relevant policies and practices changed between 1995 and
2003. *See* Lowry Decl. ¶¶ 12-26. And third, "background evidence" occurring 20 or 30 years prior to the liability
period is simply not relevant. *Cf. Gordon v. Napolitano*, 786 F. Supp. 2d 82, 85 (D.D.C. 2011) (allowing events
occurring nine months prior to liability period); *Villines v. United Bhd. of Carpenters & Joiners of Am.*, 999 F.
Supp. 97, 103 n.26 (D.D.C. 1998) (allowing events occurring three years prior to liability period).

certainly do not support a showing of causation for any specific challenged employment practice. therefore cannot establish commonality at the level required by *Wal-Mart*. *See* 131 S. Ct. at 2555; *Watson*, 487 U.S. at 994-95.  And Plaintiff's anecdotes do little to illuminate the statistics; rather, they simply illustrate certain putative class members' assumptions that they should have been selected for every position for which they applied. *See, e.g.*, Foster Decl. ¶¶ 7-32.  These are quite unlike anecdotes that "br[ing] the cold numbers convincingly to life" by demonstrating how individual employees were mistreated by racist supervisors. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 337-38 (1977).  The anecdotes certainly do not establish that all ROs and Career Board members exercised discretion to discriminate against African Americans. *See* Lowry Decl. ¶¶ 85-86 (for example, anecdotes only challenge recommendations by 49 of more than 250 ROs and selections to 28 of 94 districts); *Wal-Mart*, 131 S. Ct. at 2556 (rejecting anecdotes that "suffer[ed] from the same defects" as statistics); *Valerino*, 283 F.R.D. at 314.

Finally, the fact that the Director ultimately signs off on the selections does not provide commonality for Plaintiff's sweeping challenges to the final three stages of the Merit Promotion Process.  Plaintiff framed his complaint around an alleged USMS policy of delegating excess discretion to managers in the Merit Promotion Process. *See* Am. Compl. ¶ 37 ("subjective selection methods, judgments, procedures, and criteria"); *id.* ¶ 38 ("[a] ranking system where criteria are subjectively evaluated").  His motion objects primarily to what he calls the "presumed selections," Pl.'s Mot. at 16, made by the ROs and the Career Board, with which the Director concurred more than 90 percent of the time.[20]  Thus, it is not enough for commonality to simply include the Director among the other challenges.  Moreover, Plaintiff's complaints about the discretion exercised by the Director are ambiguous.  It is unclear whether he challenges the Director's concurrence with the recommendations, or instead challenges the Director's authority

---

[20]  For 87 percent of the selections, the Director concurred with unanimous recommendations, and for an additional 9 percent, the Director concurred with one or the other recommendation. *See* Hellberg Decl. ¶¶ 7-11; *see also* Zichawo Decl. ¶¶ 9-10, ECF No. 83-7 (Plaintiff's paralegal analyzed 658 selections or cancellations in 2006 and 2007 and concluded that 83 percent of decisions were unanimous, and that in 98 percent of decisions, the Director followed either the Career Board's or the Recommending Official's highest recommendation).

to differ from the recommendations.  His anecdotes take different tacks.  *Compare* Foster Decl.

¶¶ 7-32 (challenging instances in which no recommendation ranked him first); Hedgepeth Decl.

¶¶ 8, 13-16) (same); *with* Bradshaw Decl. ¶ 13 (challenging departure from recommendations).

His complaint emphasizes the latter.  *See* Am. Compl. ¶ 40 (arguing that Director's authority to

"disregard the recommendation of the Career Board and the Recommending Official" causes

disparate treatment and disparate impact); *see also id.* ¶ 38 (criticizing "re-ranking by . . . the

Director").  But this divergence occurred for only a small fraction of the selections.  *See* Hellberg

Decl. ¶¶ 7, 12 (in only 54 of 1355 selections did Director select candidate not recommended

highest by either recommending body).  And, the Director's concurrence in the vast majority of

cases simply returns the focus to the discretion exercised by the recommenders.  Plaintiff failed

to address these distinctions in his motion, and he has not shown that the Director's variance

from the recommendations produced any disparity at all.[21]  Thus he has not only failed to

identify the specific practice by the Director that he is challenging, but he has also failed to

produce any evidence of causation. Therefore, he cannot establish commonality.  *See Walmart*,

131 S. Ct at 2555-57; *Watson*, 487 U.S. at_994-95.

Plaintiff's last resort is to attempt to show that *Wal-Mart*'s holding—that "delegated

discretion" is not a sufficiently "specific employment practice" to challenge—is inapplicable

here.  *See* Pl.'s Mot. at 34, 37-38.  But after *Wal-Mart*, it is clear that the variety of ways USMS

managers exercise discretion in the challenged stages of the Merit Promotion Process are not

subject to common questions that can demonstrate "why was I disfavored" in a unitary way.  *See

Wal-Mart*, 131 S. Ct. at 2552.  Among the cases Plaintiff cites is *Moore v. Napolitano*, 926 F.

---

[21]  As for Plaintiff's arguments about the cancellation of vacancies, most of these occur without the Director's
participation.  *See* Lowry Decl. ¶ 87; White Report at 22-23.  And Plaintiff performed no analysis of the even
smaller fraction of vacancies cancelled by the Director—37 out of more than 1500 positions.  *See* White Report at
23.  Without any measure of statistical significance, he argues that there is discrimination because these few
cancellations include African Americans who are ranked first by the Career Board at a slightly higher ratio than their
percentage of all applicants.  *See* Pl.'s Mot. at 15-16.  But such raw data in a very small sample size is not probative.
*See Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1453 (D.C. Cir. 1988) ("[T]he statistics must be made
meaningful to the finder of fact in order to permit the plaintiffs to carry their burden of showing that their statistics
are significant."); *Hill v. K-Mart*, 699 F.2d 776, 780-81 (5th Cir. 1983).  It certainly does not provide a common
question affecting the entire class:  only *six* putative class members were affected.  *See* White Report at 23.

Supp. 2d 8 (D.D.C. 2013) ("*Moore II*").  *Moore II* did conclude that evidence of "statistically

significant disparities for the entire class period" were sufficient to establish commonality.  *See*

926 F. Supp. 2d at 30.  But that holding cannot be reconciled with *Wal-Mart*'s clearly stated

conclusion that statistics showing a bare disparity are not sufficient.  *See* 131 S. Ct. at 2556

("Merely showing that Wal–Mart's policy of discretion has produced an overall sex-based

disparity does not suffice."); *id.* at 2555 ("Even if it established (as it does not) a pay or

promotion pattern that differs from the nationwide figures or the regional figures in *all* of Wal–

Mart's 3,400 stores, that would still not demonstrate that commonality of issue exists.").

Statistics are not enough because they cannot demonstrate that every relevant manager exercised

discretion in the same way, and because the disparity must be linked to a specific challenged

policy.  *See id.* at 2555.  With respect, the *Moore II* decision is not consistent with *Wal-Mart* and

should not be followed.[22]

Plaintiff also cites the Seventh Circuit's decision, *McReynolds*, which does not support

his position.  *McReynolds* concluded that "teaming" and "account distribution" policies differed

from the unfettered discretion at issue in *Wal-Mart* because they were specific policies.  *See* 672

F.3d at 489.  Here, Plaintiff has not focused on any specific policy and then shown how it

evidenced intentional discrimination or caused a disparate impact.  Instead, he vaguely criticizes

numerous ways that the decision-makers have discretion.  *See, e.g.*, Pl.'s Mot. at 6-10, 38-39.

Even in the Seventh Circuit, it is simply not enough to call something a "policy" when it boils

down to discretion.  *See Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 898 (7th Cir. 2012)

(rejecting plaintiffs contention that "14 policies . . . present common questions" where "all of

---

[22]   The Court of Appeals declined to review *Moore II* on interlocutory appeal, finding the deferential "manifest
error" standard unmet.  *See In re Johnson*, 760 F.3d 66, 72 (D.C. Cir. 2014) (noting that it is a "difficult standard to
meet" and that the D.C. Circuit has "never . . . granted Rule 23(f) review on the basis of a manifest error").  The
Court of Appeals did not adopt *Moore II*'s reasoning on commonality, and did not even address its finding of
commonality based on the statistical disparity, but instead observed that the policy at issue was not "the complete
delegation involved in *Wal-Mart.*"  *Id.* at 73.  It did note that "different decision makers no doubt injected some
subjectivity into the evaluations of different class members, which might be enough to cast doubt upon the
commonality of their claims were we engaged in a more searching inquiry."  *Id.*  As explained above, Plaintiff's
challenge to the subjectivity of the ROs and the Career Board is exactly why commonality is not met here.

these boil down to the policy affording discretion to each site's superintendent" because "local discretion cannot support a company-wide class no matter how cleverly lawyers may try to repackage local variability as uniformity").

For all of these reasons, Plaintiff has not established commonality for his challenge to the discretion involved in the final stages of the Merit Promotion Process.

> **2.      Plaintiff Fails to Identify a Common Classwide Question Regarding Non-Competitive Lateral Reassignments.**

Separate from his challenge to the final stages of the Merit Promotion Process, Plaintiff challenges the discretion afforded to USMS managers to make non-competitive lateral reassignments. *See* Pl.'s Mot. at 10-11, 16-17. Plaintiff cannot establish commonality for this challenge to the distinct set of policies regarding lateral reassignments for numerous reasons, including the fact that decisionmaking authority regarding such reassignments is widely distributed, the failure of his two experts to specifically analyze either the policies regarding lateral reassignments or their effects, and the individualized considerations inherent in determining whether a lateral reassignment is a cognizable adverse action under Title VII.

First, contrary to what Plaintiff alleges, the discretion to make non-competitive lateral reassignments is widely dispersed throughout the USMS. *See supra* Background § III(B); Harlow Decl. ¶ 16 (explaining that U.S. Marshals and Assistant Directors can make many reassignments without higher authorization). This geographic dispersion of decisionmaking is by itself enough to prevent certification. *See Garcia*, 444 F.3d at 632-33. Plaintiff has not limited the scope of his class to those affected by reassignment decisions made by the Director or "the three other highest-ranking officials," *see* Pl.'s Mot. at 11, nor has he provided any evidence that all of the decisionmakers for lateral reassignments exercised their discretion in the same way. *See Wal-Mart*, 131 S. Ct. at 2554-55.

Second, Plaintiff proffers no evidence of any disparity for non-competitive lateral reassignments. Plaintiff's statistician did not separately analyze selections for non-competitive lateral reassignments, even though the database containing all personnel actions (including such

reassignments) was produced in discovery.  Instead, Plaintiff relies exclusively on his statistician's comparisons of the racial balance of certain divisions.  *See* Pl.'s Mot. at 16-17; see also Vekker Dep. at 219:4-5 ("I'm not looking at a specific policy."); *see also id.* 22:6-23:9.  As Plaintiff himself admits, this data combines the effects of selections through the Merit Promotion Process, non-competitive selections, and even selections made long before the liability period. *See* Pl.'s Mot. at 16; *see also* White Report at 31.  This data is also affected by factors having nothing to do with selections, such as retirements or transfers to other agencies.  *See id.* Accordingly, Plaintiff has presented no statistical evidence that there are racial disparities in non-competitive lateral reassignments to divisions, and no statistical evidence at all regarding such reassignments to districts.  At best, all Plaintiff has shown is nothing more than an unexamined racial imbalance in some divisions.  *See Garcia*, 444 F.3d at 635 ("It does not suffice under Rule 23(a)(2) to show an ethnic imbalance . . . rather, the appellants must show that a common . . . policy caused the imbalance.").  He has not shown what factors caused the imbalance, let alone that the factors are common to the proposed class.  Nor did Plaintiff's industrial psychologist offer any opinions regarding non-competitive reassignment policies in her report.[23]  Without such evidence, Plaintiff cannot establish commonality for either a disparate impact or disparate treatment claim.  *See Wal-Mart*, 131 S. Ct. at 2555.

Finally, many of the lateral reassignments at issue may not be cognizable Title VII claims.  For the reasons discussed above, a lateral reassignment—whether an unwanted mandatory move or denial of a desired move—is frequently not even cognizable under Title VII. *See Brown*, 199 F.3d at 457.  In every instance, whether an adverse employment action has occurred will depend on the relative duties and promotion potential of the position the employee

---

[23] And Plaintiff's very limited anecdotal testimony regarding disputed non-competitive lateral reassignments—the allegations of four declarants—is an insufficient basis to establish a consistently discriminatory exercise of discretion.  *See Wal-Mart*, 131 S. Ct. at 2555.  One declarant complains about three instances where she requested but did not receive a non-competitive reassignment to a position, and three other declarants complain about receiving an unwanted reassignment to another position at the same grade level.  *See* Downs Decl. ¶¶ 16, 26, 30-32; Harrington Decl. ¶¶ 9-10; Robinson Decl. ¶ 11; Hedgepeth Decl. ¶¶ 20-22.  These few instances fall far short of any demonstration of classwide discrimination.

would be coming from and to.  *See, e.g.*, *Stewart v. Ashcroft*, 352 F.3d 422, 426-27 (D.C. Cir. 2003) (concluding denial of transfer was adverse because plaintiff was "denied his supervisor's job" and lost an "opportunity to advance within the hierarchy").  For example, one anecdotal witness complained about her request to be reassigned to a position at a lower grade level—a position for which she was ultimately selected when the position was announced through the competitive Merit Promotion Process.  *See* Downs Decl. ¶¶ 16-20.  This claim is not cognizable both because it involved seeking a lower position for personal reasons and because she was not injured by being selected through the competitive process rather than a non-competitive process.  Plaintiff has made no attempt to explain how commonality can be established when the individual circumstances of each putative class member are integral to any liability.  Nor can he.  *See Wal-Mart*, 131 S. Ct. at 2554.

### 3.    Plaintiff Fails to Identify a Common Classwide Question Regarding Headquarters Duty Assignments.

Plaintiff proposes a narrow "subclass" for "Headquarters Duty Assignments."  *See* Pl.'s Mot. at 3, 11-12, 17-18.  While the intended scope of this subclass is vague, Defendant's understanding is that it is intended to include only:

(1) opportunities to perform duties for a USMS Division (rather than District),

(2) for which no official personnel action making one an employee of that Division is required (thus distinct from selections through Merit Promotion Process or lateral reassignments), and

(3) for which the selections are not made by District management.

*See* Pl.'s Mot. at 3, 11-12.  For three reasons, Plaintiff has not shown commonality for this claim: the diversity of the assignments and selection procedures, his failure to provide any probative statistical evidence of agency-wide discrimination, and the need for individualized determinations of whether each class member's assignment is cognizable under Title VII.

#### a.    Plaintiff's vague definition of "Headquarters duty assignments" fails to implicate a common policy because it encompasses numerous selection processes and dozens of positions.

Plaintiff provides no comprehensive description of what positions are included, resting

entirely on three supposedly representative examples. *See* Pl.'s Mot. at 11-12, 17-18. But as demonstrated by the declaration of the USMS Deputy Director, Plaintiff's definition actually includes dozens of different positions involving numerous different selection processes. *See* Harlow Decl. ¶¶ 28-73. The challenged assignments are made by a wide variety of managers. Some selections are made by the USMS Director, others are made by one of the dozen Assistant Directors, and still others are made by lower level managers or appointed boards. *See id.*

Plaintiff may not rest at the "abstract level of generalization" at which "almost any set of claims can be said to display commonality." *See Love v. Johanns*, 439 F.3d 723, 729-30 (D.C. Cir. 2006) (quotation marks omitted). It is not enough to simply claim without any support—as Plaintiff does here—that dozens of different practices operating under a variety of specific procedures have a common purpose and effect. *See Wal-Mart*, 131 S. Ct. at 2555 (requiring identification of a "specific employment practice"); *Lightfoot v. Dist. of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2010) (rejecting plaintiffs' effort to "conflate a wide variety of practices and impute them to the class as a whole by collecting them under a single, unilluminating umbrella of 'systemic' failures"); *Yapp v. Union Pac. R.R. Co.*, 229 F.R.D. 608, 620-622 (E.D. Mo. 2005). But only nondiscrimination policies unite these procedures. *See* Harlow Decl. ¶ 74.

### b.    *Plaintiff proffers no evidence of agency-wide disparities for Headquarters duty assignments.*

Plaintiff has performed no agency-wide statistical analysis of assignments that meet his definition. Instead, he relies exclusively on three allegedly representative examples: the selection of the Operation FALCON commander and deputy commander, the Special Operations Group collateral duty, and the Incident Management Team. He has misunderstood and inaccurately characterized the facts for each of these selection processes. *See* Harlow Decl. ¶¶ 33-50. These examples actually demonstrate the diversity of decision-makers and selection procedures. The Operation FALCON leaders were Chief Deputies drawn from the Chiefs' Investigative Advisory Board, generally on the basis of the prior leader's recommendation. *See id.* ¶¶ 35-37. The Special Operations Group ("SOG") collateral duty is available to all who

complete the SOG course, but can be continued once one is promoted to GS-13 in only limited circumstances.  *See id.* ¶¶ 40-42.  And the Incident Management Team members are selected on the basis of an agency-wide application process.  *See id.* ¶¶ 45-50.

Plaintiff's only evidence of racial disparities in these three assignments are various pieces of raw data compiled by Plaintiff's paralegal.  *See* Pl.'s Mot. at 17-18.  This data is frequently erroneous due to its patchwork collection and reliance on limited information never discussed with agency officials or at depositions.  *See, e.g.*, Harlow Decl. ¶ 43.  But even if the data were accurate, it is still insufficient for two reasons.  First, Plaintiff did not submit it to be analyzed or weighed for statistical significance by any expert.  *See, e.g.*, *Hill v. K-Mart*, 699 F.2d 776, 780-81 (5th Cir. 1983) ("Hill has the burden to give her raw statistics relevance and meaning by accounting for basic factors likely to affect the evidence's probative value."); *Hillis v. Marsh*, No. 79-82, 1986 WL 10617, at *5 (E.D. Tex. Feb. 20, 1986); *Taylor v. Sec'y of the Army*, 583 F. Supp. 1503, 1515 (D. Md. 1984).  Second, Plaintiff provides no evidence that these three isolated examples are representative of the dozens of other assignments.  *See Lightfoot*, 273 F.R.D. at 326 ("Plaintiffs never actually attempt to tie any specific practices to the class as a whole.").

### c.     *Whether denial of an assignment is a violation of Title VII turns on the individual circumstances of each putative class member.*

Finally, many of these assignment selections are not cognizable under Title VII.  As this Court observed, "[t]he D.C. Circuit has explained that 'denial of a temporary designation is not one of the terms, conditions, or privileges of employment contemplated by Title VII.'"  Mem. Opinion at 31, ECF No. 162 (quoting *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. Cir. 2002)).  Many of the assignments within the scope of Plaintiff's class definition present exactly this problem.  *See, e.g.*, Foster Decl. ¶ 33 (alleging removal from recruitment interview panel).  They involve no changes to the "terms or conditions of employment" and provide only the most speculative connection to future promotability.  *See* Harlow Decl. ¶ 31.  *Cf.* Mem. Opinion at 21, ECF No. 162 ("Plaintiffs fail to show or even allege how these assignments adversely affected Reid's ability to advance within USMS hierarchy.").  Because any determination regarding the

assignment claims as a whole would not resolve whether liability under Title VII was possible for many putative class members, this claim cannot be certified.  *Cf. Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 671 (N.D. Ga. 2003) ("Plaintiffs cannot disguise this fact [that their claim requires examination of  many individual, fact-specific issues] simply by calling their claim a 'Teamsters-type' pattern or practice action.").[24]

### B.    THE PUTATIVE CLASS REPRESENTATIVE'S INJURIES ARE NOT TYPICAL OF THE PURPORTED CLASS.

Plaintiff contends that his claims are typical of class members' claims because they all "arise from the same course of events;" namely, being denied competitive promotions and direct reassignments from the "same Agency-wide policies."  Pl.'s Mot. at 40.  For many of the same reasons why Plaintiff cannot establish commonality, he has not shown typicality.

"Typicality requires that the claims of the representative be typical of those of the class." *Encinas v. J.J. Drywall Corp.,* 265 F.R.D. 3, 9 (D.D.C. 2010) (internal quotation marks omitted). "The commonality and typicality requirements of Rule 23(a) tend to merge."  *Wal-Mart*, 131 S. Ct. at 2551 n.5 (quotation marks omitted).  Both serve as guideposts for determining whether Plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.  *Id*.  This requirement is satisfied when a class representative "possess[es] the same interest and suffer[s] the same injury as the class members."  *See id*. at 2550 (quotation marks omitted); *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) ("The purpose of this requirement is to ensure that the class representatives have suffered injuries in the same general fashion as absent class members." (quotation marks omitted)).  It is Plaintiff's burden to show the similarity of the claims.  *See Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 677 (7th Cir. 2001).

---

[24] Given Plaintiff's failure to identify any common policy or practice as discussed in detail above, his commonality arguments about whether the various disparate USMS policies and practices are job-related and justified by business necessity, and whether there are less discriminatory alternatives to the challenged policies or practices are irrelevant. *See* Pl.'s Mot. at 33, 36-37.  Plaintiff has not shown that such arguments can provide an independent basis for finding commonality where he has failed to identify any common policy or practice in the first instance.

As an initial matter, as discussed in Section II, *supra*, Plaintiff is retired and lacks standing to press claims for injunctive and declaratory relief.  Therefore, his claims are not typical of the current employees whom he seeks to represent, who remain subject to USMS policies and who seek systemic changes to USMS's policies and practices.  *See, e.g.*, *Prado– Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

Second, Plaintiff's claims regarding the Merit Promotion Process cannot be typical of the many class members who have no claim to the relief requested, including:  (1) those who have never participated in the Merit Promotion Process; (2) those who participated, but did not reach the challenged stages; and (3) those whose applications were always successful.  *See supra* Argument § III(A)(1)(a) (detailing these facts as a commonality defect).  "Where a class definition encompasses many individuals who have no claim at all to the relief requested . . . the typicality premise is lacking, for—under those circumstances—it cannot be said that a class member who proves his own claim would necessarily prove the claims of other class members." *Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009).  *See also Bacon v. Honda of Am. Mfg., Inc.*, 205 F.R.D. 466, 481 (S.D. Ohio 2001) (rejecting typicality where "other class members claim[ed] discrimination in promotion if the class representative never applied for a similar promotion"); *Moore v. Napolitano*, 269 F.R.D. 21, 33 (D.D.C. 2010) ("*Moore I*") (successful applicants "may not have suffered an injury at all, much less an injury typical of the injuries alleged by the class representatives.").

Finally, Plaintiff's claims are not typical of the proposed subclass for "Headquarters duty assignments" because there are simply too many different policies and too many different ways class members may have been affected.  Plaintiff complains about nonselection to lead Operation FALCON, where selections were made by prior occupants of the position from the small pool of Chief Deputies who served on a division advisory board.  *See* Harlow Decl. ¶¶ 35-37.  His alleged injury from that selection process does not establish that all other nonselections for "Headquarters duty assignments" involve "suffer[ing] injuries in the same general fashion."  *See In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260.  Plaintiff has not demonstrated a common

policy threaded through the numerous other selection methods and different decisionmakers.  *See supra* Background § III(C); Harlow Decl. ¶¶ 28-73.  *See, e.g.*, *Oakley v. Verizon Commc'ns, Inc.*, No. 09-9175, 2012 WL 335657, at *14-15 (S.D.N.Y. Feb. 1, 2012) (notwithstanding that challenged policies were uniformly applied across employer's various locations, no typicality present where class representatives were injured by different policies in different ways).  Nor has he established that denials of each opportunity rose to the level of an adverse employment action. *See Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 469 (N.D. Ill. 2009) ("Where, as here, a court would have to examine numerous individualized factors to determine the parameters of individual claims, the typicality requirement is not met.").[25]

### C.    PLAINTIFF AND CLASS COUNSEL CANNOT ADEQUATELY REPRESENT THE ABSENT CLASS MEMBERS.

Plaintiff contends that he and the law firm of Sanford, Heisler & Kimpel can adequately represent the class, and that there are no conflicting interests that would defeat adequacy under Rule 23.  Pl.'s Mot. at 40-41.  Because he cannot adequately represent the interests of current African American deputies who seek injunctive and declaratory relief, and due to the substantial intra-class conflicts and to the conflict posed by his counsel's simultaneous representation of overlapping lawsuits, Plaintiff cannot meet his burden under Rule 23(a)(4).

Under Rule 23(a)(4), Plaintiff must show that he "will fairly and adequately protect the interests of the class."  Where, as here, money damages are sought, this requirement has constitutional due process implications.  *See Cobell v. Salazar*, 679 F.3d 909, 922 (D.C. Cir. 2012).  Because absent class members will be bound by a final judgment when a class action is certified, courts are required to "undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation."

---

[25]  While Plaintiff quotes the Court's observation that in a prior brief Defendant had not cited cases "reject[ing] a class claim as non-typical where the class claim involved the same type of adverse employment action," *see* Mem. Opinion at 23, ECF No. 162, here Defendant has cited several such cases, and further demonstrated by specific evidence that the "Headquarters duty assignments" claim for which Plaintiff seeks certification involves numerous selection methods and different decisionmakers.  *See* Harlow Decl. ¶¶ 28-73.  Moreover, Plaintiff has not established that all such claims involve an "adverse employment action."

*Nat'l Ass'n of Reg'l Med. Programs v. Matthews,* 551 F.2d 340, 344 (D.C. Cir. 1976). The adequacy of representation inquiry concerns both the behavior of the class representatives and class counsel. *See, e.g.*, *Twelve John Does v. Dist. of Columbia,* 117 F.3d 571, 575 (D.C. Cir 1997). It is meant to uncover conflicts of interest between the named plaintiffs and the class they seek to represent, as well as conflicts within the class or conflicts that implicate class counsel's ability to vigorously prosecute the case on behalf of the whole class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 & n.20 (1997); *Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 331 (1980). In addition to the fatal defect presented by Plaintiff's lack of standing for injunctive relief, *see* Argument § I *supra*, both Plaintiff and his counsel are inadequate for other reasons.

    **1.    A Substantial Intra-Class Conflict Exists Because Putative Class Members, including Class Representative Brewer, Have Actively Participated in the Very Decisions Challenged on Behalf of the Class.**

        For class representative Brewer to satisfy the adequacy requirement, he "must not have antagonistic or conflicting interests with the unnamed members of the class." *Twelve John Does,* 117 F.3d at 575 (quoting *Nat'l Ass'n of Reg'l Med. Program,* 551 F.2d at 345). This includes conflicts among the unnamed class members. *See also Barnes v. Dist. of Columbia*, 242 F.R.D. 113, 122 (D.D.C. 2007). The D.C. Circuit has stressed that "[c]lass members whose interests are antagonistic in fact to, or even 'potentially conflicting' with, the interests of the ostensibly representative parties cannot be bound, consistent with the requirements of due process to an adjudication taken in their name." *Phillips v. Klassen*, 502 F.2d 362, 366 (D.C. Cir. 1974).

        Here, dozens of putative class members actively—and often decisively—participated in the Merit Promotion Process as Recommending Officials or Career Board members, or served in other selection or recommendation groups that Plaintiff alleges discriminated against putative class members. At least thirteen class members—including class representative Brewer—have

served as Recommending Officials.  *See* Lowry Decl. ¶ 63.[26]  And seven class members have served on the Career Board, where all decisions require the unanimous consent of its members, and whose recommendations were accepted by the Director in the vast majority of cases.  *See id.* ¶¶ 46, 81-82.  This substantial participation by putative class members in the challenged decisions is far beyond the "negligible impact" ceiling that courts have allowed for class member participation in challenged decisionmaking.  *See, e.g.*, *Krueger v. New York Tel. Co.,* 163 F.R.D. 433, 443 (S.D.N.Y. 1995) ("[A] conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." (quotation marks omitted)).[27]

In a case similar to this one, the D.C. Circuit reversed a decision certifying a class of African-American employees alleging systemic race discrimination under Title VII, holding that the inclusion of class members who "have been responsible for evaluating the performances of other members of the class" fatally undermines the adequacy of representation.  *Wagner v. Taylor*, 836 F.2d 578, 595 (D.C. Cir. 1987); *see also In re PEPCO Emp't Litig.*, 1992 WL 442759, at *22 (D.D.C. Dec. 4, 1992) (rejecting certification where supervisors were included in class challenging supervisory practices because "[t]he court will not certify a class whose

---

[26] These 13 individuals have served in the following relevant capacities (sometimes more than one):  three U.S. Marshals, three Acting Marshals, six Chief Deputies, three senior Division employees.  *See* Lowry Decl. ¶¶ 66, 68, 70, 75.  In one instance, Plaintiff's anecdotal witness specifically challenges the recommendation made by a fellow class member with which the USMS Director concurred.  *See* Foster Decl. ¶ 32 (challenging MPA 11-169, in which Neil DeSousa, a fellow class member, recommended him seventh, and in which the Director selected Mr. DeSousa's first recommendation, a Hispanic); Lowry Decl. ¶ 90.  In many other instances, the USMS Director followed the Plaintiff's or another class member's recommendation, and in doing so did not select other class members who were ranked lower than the selectee(s).  *See* Lowry Decl. ¶¶ 76-79.

[27]  The cases Plaintiff cites are factually distinguishable and not to the contrary.  *See* Pl.'s Mot. at 42.  In *Staton v. Boeing Co.*, the Ninth Circuit recognized the "valid concern" in having a class comprised of supervisors and non-management employees and noted  that the existence of an inter-class conflict is necessarily "context-specific and depends upon the particular claims alleged in the case."  327 F.3d 938, 959 (9th Cir. 2003).  The Ninth Circuit concluded that there was no conflict where the defendant failed to identify a substantive issue for which there was a conflict of interest and that the named plaintiffs included representatives of each major sub-group.  *Id.*  The class that was originally certified in *Adair v. England*, 209 F.R.D. 5 (2002), was later decertified, and in the second round of class certification briefing, the Court held that under the current factual circumstances plaintiffs were not adequate representatives because "their paramount interest in this litigation" was not necessarily aligned with the individual interests of each class member.  *See In re Navy Chaplaincy,* 2014 WL 4378781, *17 (D.D.C. 2014).  Finally, in *Rossini v. Ogilvy & Mather, Inc.*, although the Second Circuit rejected the district court's finding of an inter-class conflict because "vice-president" was an honorary title without additional authority, the Court also recognized that it would have been reasonable to exclude officers that had the actual powers that concerned the district court.  798 F.2d 590, 596 (2d Cir. 1986).

members are in potentially antagonistic relationships . . . . The existence of any conflicts is enough.").  In *Hyman v. First Union Corp.*, 982 F. Supp. 1 (D.D.C. 1997), the Court again held that the proposed class cannot include those supervisory class members plaintiffs claim discriminated against them through their active and direct participation in the promotions process.  Only when supervisory involvement plays a "negligible" role in the promotions process are impermissible conflicts avoided.  *See id.*  at 5-6.

By bringing a pattern and practice claim, Plaintiff is necessarily alleging that *every* decision under the challenged stages of the Merit Promotion Process (even if made by a class member) is tainted by the "common policy" of discrimination.  *See Wal-Mart*, 131 S. Ct. at 2552 n.7.  Similarly, Plaintiff purports to challenge every noncompetitive lateral reassignment and Headquarters duty assignment, regardless of whether a class member was the decisionmaker.  Accordingly, Plaintiff cannot establish adequacy of representation because the interests of class members "are antagonistic in fact to, or even '*potentially conflicting*' with, the interests of the ostensibly representative parties."  *Phillips*, 502 F.2d at 366 (emphasis added).

*Moore II*  is distinguishable here and does not permit Plaintiff to evade *Phillips* and *Wagner*.  Unlike *Moore II*, Plaintiff here has not proposed a class free from relevant conflicts.  Certification was granted in *Moore II* only after the plaintiffs narrowed their class to remedy the intra-class conflicts the Court had previously identified—excluding all class members specifically accused by other class members of racial discrimination, and excluding the class members who had served as Assistant Directors and participated in the challenged decisionmaking at the highest levels.  *See Moore II*, 926 F. Supp. 2d at 16, 24; *Moore I*, 269 F.R.D. at 34-35  (denying class certification).  Here, there are specific allegations of discrimination among class members,[28] and certain Assistant Directors and comparable senior

---

[28] *See, e.g.*, EEO Complaint at 2-3, June 17, 2009 (attached as Exhibit 10) (absent class member alleging that Plaintiff James Brooks and another class member retaliated "because I refused to cooperate" in class action, preventing him from being considered for four promotion opportunities in December 2008 and initiating an unwanted lateral reassignment); Foster Decl. ¶ 32 (challenging MPA 11-169, in which Neil DeSousa, a fellow class member, recommended him seventh, and in which the Director picked Mr. DeSousa's first recommendation, a Hispanic); Lowry Decl. ¶ 87 (some of declarants' allegations challenge recommendations by fellow class members).

managers, such as U.S. Marshals, are included among the class. *See* Lowry Decl. ¶¶ 66, 72, 87,

90.  Moreover, *Moore II*'s requirement of "specific allegations of discrimination by class

members against other class members," 926 F. Supp. 2d at 32, is too narrow an interpretation of

the relevant conflicts.[29]  The D.C. Circuit's affirmance of *Moore II* under the deferential

"manifest error" standard of interlocutory review does not adopt the district court's narrow

reading of Rule 23(a)(4), but instead upholds it only on the basis of assumptions that are

inapplicable here:

> If class members *neutrally applied* a flawed rating system and thereby reached a
> discriminatory result, then they were not themselves discriminating and therefore
> have no apparent interest that is in conflict with the attempt to prove other agents
> were denied promotions because of their race.

*In re Johnson,* 760 F.3d 66, 74 (D.C. Cir. 2014) (emphasis added).  Here, Plaintiff's claim is that

the relevant decisionmaker's discretion was abused by, among other reasons, consideration of

improper factors, by opportunities for bias, and by favoritism.  *See* Pl.'s Mot. at 6-12.  In this

context, Plaintiff is not claiming—and in fact cannot claim—that the dozens of class members

who took often dispositive actions in the challenged processes had only a negligible impact on

those decisions.  Rather, these class members' participation was often dispositive.

    As a result, Plaintiff seeks to advance his case on behalf of some class members by

challenging the specific recommendations of other class members.  This raises the specter that

Defendant may be obliged to call some class members to testify in defense of their decisions

being challenged by other class members.  This is a serious conflict of interest.  Plaintiff cannot

claim to adequately represent the interests of the very individuals who actively caused the

---

[29] *Phillips* and *Wagner* looked to the antagonistic nature of the class members' competing interests rather than simply whether a class member had stated specific allegations against another.  *See, e.g.*, *Wagner*, 836 F.2d at 595. *Moore II* erred by misreading *McReynolds*, which concluded that there was no evidence other class members "perpetuated or contributed to any of Sodexho's alleged discriminatory policies."  *McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428, 447 (D.D.C. 2002); *see also id.* at 447-48 (explaining that—in a case challenging promotion policy—class members completing supervisory evaluations of subordinate class members did not create a conflict because "even if the evaluations . . . had an impact . . . it was a negligible impact" (quotation marks omitted)).  While *McReynolds* bolstered its conclusion by the absence of specific allegations, *see id.* 208 F.R.D. at 448, it did not assert that such allegations were required for a class conflict.

alleged injury of other class members.  To be clear, Defendant is not assuming that the mere presence of supervisors in the putative class precludes adequacy from being met.  Rather, where supervisory putative class members are direct participants in an allegedly discriminatory promotion process, whose decisions have more than a "negligible impact" on the challenged outcomes, conflicts are created that prevent adequacy from being met.  These substantive examples of actual conflict among putative class members are sufficient to illustrate that adequate representation cannot be achieved.

### 2.    Putative Class Counsel Faces Two Irreconcilable Conflicts of Interest.

A putative class counsel's conflicts of interest are also fatal to class certification.  *See, e.g., Lewis*, 146 F.R.D. at 11-12.  Here, putative class counsel has a conflict of interest stemming both from their effort to represent senior managers whose decisionmaking they claim has had a discriminatory effect on the class, and by their decision to simultaneously prosecute an overlapping class action before the EEOC.

A conflict of interest arises for a lawyer, "when, in behalf of one client, it is his duty to contend that for which duty to another client requires him to oppose."  *Cuyler* v. *Sullivan*, 446 U.S. 335, 356 n.3 (1980) (Brennan, J., concurring) (quoting with favor Canon 6 of the 1937 Canons of Professional Ethics).  Here, for example, when defenses to individual promotion decisions are presented, Defendant is likely to present class members who served as recommending officials and Career Board members to testify about the legitimate reasons that they ranked other class members lower than the selectees.  *See* Lowry Decl. ¶¶ 63-82; *see Baas v. Dollar Tree Stores, Inc.*, No. 07–3108, 2008 WL 906496, at *2 (N.D. Cal. Apr. 1, 2008) ("The spectacle of an attorney skewering her own client on the witness stand in the interest of defending another client demeans the integrity of the legal profession and undermines confidence in the attorney-client relationship." (quotation marks omitted)).  Forcing absent class members to accept such conflicted representation implicates not only Rule 23(a)(4), but also the denial of constitutional due process.  *See National Ass'n of Reg'l Med. Progs.*, 551 F.2d at 345-46.

Nor has putative class counsel made any attempt to resolve the conflict of interest presented by their continued prosecution of an overlapping class action before the EEOC.[30]  To the contrary, they erroneously claim to be "not aware of competing litigation in any other forum."  Pl.'s Mot. at 48.  "Courts have consistently held that counsel cannot simultaneously represent a class and prosecute either individual or class claims against the same defendants in a different proceeding."  1 *McLaughlin on Class Actions* § 4:39 (5th ed. 2009).  *See also* 5 *Moore's Federal Practice* § 23.120[5][e] (2007) ("An attorney who represents another class in an unrelated suit against the same defendant may not serve as class counsel."); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (citing *Moore's Federal Practice* with approval and finding conflict of interest where attorneys represented settlement class as well as individual clients with more favorable settlement); *In re Lorazepam & Chlorazepate Antitrust Litig.*, 205 F.R.D. 24, 28 (D.D.C. 2001) (noting possibility of "conflict stemming from Class Counsel's dual representation" that "could help the Court in evaluating the adequacy of representation of the class").  The mere appearance of conflict is a sufficient basis to deny certification.  *See Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (responsibility to class members "does not permit even the appearance of divided loyalties of counsel").

This parallel litigation against the same defendant challenging some of the same policies and practices creates a conflict of interest because the interests of the separate classes may not be aligned.  *See Lou v. Ma Labs., Inc.*, No. 12-05409, 2014 WL 68605, at *1-2 (N.D. Cal. Jan. 8, 2014) (refusing to certify class where Sanford Heisler LLP represented another group of

---

[30]  Since at least 2004, proposed class counsel in this case has represented Matthew Fogg in his EEOC class complaint against the USMS alleging discrimination in promotions and other personnel decisions from 1994 onward.  *See, e.g.*, Letter dated Oct. 28, 2004, ECF No. 40-15 (indicating representation by Sanford, Wittels & Heisler LLP); Def.'s Opp'n to Pl.'s Mot. to Amend at 4-7, ECF No. 40 (describing history of *Fogg* complaint).  In 2012, the EEOC certified an expansive class action, and the USMS's motion for reconsideration remains pending.  *See* EEOC Decision, July 11, 2012 (attached as Exhibit 9).  The EEOC class is substantially broader than the instant case—arguably including administrative as well as operational employees, including all grade levels, challenging additional policies, and encompassing a period of more than 20 years.  *See id.* at 1-2.  Nevertheless, there is substantial overlap, as demonstrated by Plaintiff's repeated reference to the EEOC case in its filings in this matter.  *See, e.g.*, Pl.'s Reply in Supp. of Mot. to Amend Compl.at 14-22, ECF No. 41; Pl.'s Mem. in Supp. of Mot. for Recons. at 3-4, ECF No. 69-1; Pl.'s Mot. Re. Issues Affecting the Liability Period, ECF No. 108.

plaintiffs in parallel litigation against the same defendants).  "The interests need not conflict directly, but the mere fact of adjusting or compromising legal tactics or arguments to accommodate both classes of plaintiffs obviously impairs counsel's use of independent professional judgment as to each class." *Moore v. Margiotta*, 581 F. Supp. 649, 653 (E.D.N.Y. 1984).  Here, for example, proposed class counsel may seek to simultaneously settle both cases, but settlement might not be in one or the other class's interest.  *See Krim v. pcOrder.com, Inc.*, 210 F.R.D. 581, 589-90 (W.D. Tex. 2002).  Or tactical decisions in one case could harm the interests of clients in the other case.  *See Moreno v. Autozone, Inc.*, 2007 WL 4287517, *15 (N.D. Cal. 2007) ("[P]lacing a class at risk that its interests will be compromised for the benefit of parties in another action."); *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 679 (N.D. Ohio 1995) ("Every decision to hasten or delay the litigation on behalf of one set of plaintiffs could alternately harm or benefit the other set of plaintiffs.").  Such considerations are relevant even if counsel has not yet taken a position contrary to the interests of the class.  *See Sullivan v. Chase Inv. Serv., Inc.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978).

## IV.     THE PROPOSED CLASS CLAIMS FAIL TO MEET THE REQUIREMENTS UNDER RULE 23(B)

In order to obtain class certification, Plaintiff must not only meet the requirements of Rule 23(a), but also must meet the requirements of one of the subsections of Rule 23(b). *Amchem,* 521 U.S. at 613-14.  For all of the reasons given above, Plaintiff has failed to meet the requirements of Rule 23(a), and thus, the Court can deny class certification without even addressing Rule 23(b).  However, Defendant briefly explains why Plaintiff also does not meet either subsection of Rule 23(b) asserted in his motion.

### A.     BECAUSE THE PUTATIVE CLASS SEEKS INDIVIDUALIZED RELIEF, THE CLASS CANNOT BE CERTIFIED UNDER RULE 23(B)(2).

Rule 23(b)(2) allows class treatment where "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  By definition, this proposed class cannot proceed under this subsection because—as even Plaintiff

admits—he does not have standing to seek the requested injunctive relief.  *See* Pls.' Mot. to

Substitute Class Reps. at 1, ECF No. 184 (acknowledging that Brewer "is no longer a current

employee who can seek [injunctive] relief.").  Moreover, controlling Supreme Court precedent

does not permit claims for individualized relief, such as backpay, under this subsection.  *Wal-

Mart*, 131 S. Ct. at 2557 ("[A]t a minimum, claims for *individualized* relief (like the backpay at

issue here) do not satisfy the Rule."); *see also id.* at 2558 ("Permitting the combination of

individualized and classwide relief in a (b)(2) class is also inconsistent with the structure of Rule

23(b)."  "[W]e think it clear that individualized monetary claims belong in Rule 23(b)(3).").

Plaintiff entirely fails to address this unanimous holding of the *Wal-Mart* decision and its

implications for his motion.[31]  *See* Pl.'s Mot. at 43.

### B.  BECAUSE INDIVIDUALIZED INQUIRIES PREDOMINATE OVER ANY ALLEGEDLY COMMON ISSUES, A CLASS ACTION IS NOT SUPERIOR AND CANNOT BE CERTIFIED UNDER RULE 23(B)(3).

Plaintiff alternatively seeks certification under Rule 23(b)(3), which provides that a class

may be certified if "the court finds that the questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy. . . ."

Fed. R. Civ. P. 23(b)(3).  Plaintiff argues, in effect, that assuming he has met the commonality

requirement of Rule 23(a), he has also demonstrated that common questions of law and fact

predominate over individual questions and thus, a class action is a superior way to resolve the

dispute.  *See* Pl.'s Mot. at 45-49.  For the reasons explained below, Plaintiff is wrong.

### 1.  Plaintiff Has Failed to Demonstrate Common Questions Amenable to Classwide Resolution, Let Alone Ones that Predominate Over Individual Issues.

In *Amchem*, the Supreme Court noted that "[e]ven if Rule 23(a)'s commonality

---

[31] Plaintiff here seeks far more individualized relief than the comparatively narrow claims for backpay that were rejected in *Wal-Mart*.  *See, e.g.*, Am. Compl., Prayer for Relief ¶¶ G, H, I, K (seeking orders placing "class members into those jobs they now would be occupying but for USMS's discriminatory policies"; adjusting "wage rates and benefits . . . to levels to which they would have been entitled"; "award of back pay, front pay, lost benefits and equitable monetary relief for lost compensation and job benefits"; and "compensatory damages.").

requirement may be satisfied by [a] [] shared experience, the predominance criterion is ***far more demanding***." 521 U.S. at 623-24 (emphasis added); *see also Love v. Veneman*, 224 F.R.D. 240, 246 (D.D.C. 2004). The *Amchem* Court held that predominance was not met by a class of individuals exposed to asbestos, because "[c]lass members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods." 521 U.S. at 624 (citation omitted). The same is true here. As explained *supra,* although the putative class members allege they all have been affected by policies regarding the Merit Promotion Process, lateral reassignments, and "Headquarters duty assignments," common issues do not predominate because the individual African-American deputies were subject to different rating officials, at different times, for different positions, implicating different policies and practices, and they all had different experiences and career histories. Moreover, even assuming Plaintiff could establish a prima facie case for a "pattern or practice of discrimination" applicable to all class members, a host of individual issues would still need to be resolved before any class member could actually prevail on a failure to promote or other selection claim. Specifically, each class member would need to establish that the denial was a cognizable adverse action and overcome any individual defenses raised, such as denial for legitimate, non-discriminatory reasons. *See Wal-Mart* at 2552 n.7 (quoting *Teamsters*, 431 U.S. at 358). In other words, even a class-wide finding that one or more of the challenged selection procedures was discriminatory would not resolve whether any class members would prevail on their claims.

Plaintiff also argues that predominance is met because substantial common proof will be used to establish core common issues. *See* Pl.'s Mot. at 45. However, because the "common proof" that Plaintiff intends to offer—specifically, his experts' testimony—is deficient for the host of reasons fully explained in Defendant's previously filed Daubert motion, *see* Def.'s Mot. to Exclude Expert Opinions, ECF No. 192; Def.'s Reply in Supp. of Mot., ECF No. 208, Plaintiff cannot satisfy his evidentiary burden of proving that common issues predominate. *See Comcast*, 133 S. Ct. at 1432 (party must satisfy through evidentiary proof that the questions of law or fact common to class members predominate over any questions affecting individual members). The

Supreme Court has repeatedly emphasized that it is appropriate and necessary for courts to probe beyond the pleadings to determine class certification. *Id.* (citing cases).

Finally, even Plaintiff admits that there will be individual issues regarding damages. Pl.'s Mot. at 45, 47-48. The Supreme Court has made clear that a court must consider the entire cause of action, including damages, in assessing predominance. *Comcast*, 133 S. Ct. at 1433. Here, there is little question that the individual damages issues could dwarf any common issues. In his Amended Complaint, Plaintiff has requested "back pay, front pay, lost benefits and equitable monetary relief for lost compensation and job benefits" in addition to compensatory damages on behalf of the putative class. Am. Compl., Prayer for Relief I-L. ECF No. 66. Plaintiff proposes no common method of calculating these awards, and they would be substantially different for each class member since each has different employment histories and applications. Because the "individual damage calculations will inevitably overwhelm questions common to the class" predominance cannot be established. *Comcast*, 133 S. Ct. at 1433.

Recognizing that there are numerous individual questions, Plaintiff also suggests that this Court certify only the liability issues under Rule 23(c)(4). *See* Pl.'s Mot. at 47. This would not resolve Plaintiff's failure to establish predominance because the most persuasive authority holds that Rule 23(c)(4) does not allow evasion of the predominance requirement. *See, e.g.*, *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 422 (5th Cir. 1998).[32] At a minimum, an issue class under Rule 23(c)(4) should be certified only upon a showing of predominance for the cause of action as

---

[32] The D.C. Circuit has made clear that Rule 23(c)(4) raises complicated issues. *See In re Veneman*, 309 F.3d 789, 795-96 (D.C. Cir. 2002). The fact that a panel of the D.C. Circuit recently indicated a willingness to *consider* an issue class in an employment case, *see In re Johnson*, 760 F.3d at 75, does not dispose of any of those concerns. *See id.* ("recogniz[ing] there is a controversy over the proper use of issue classes"). The most persuasive authority rejects narrowing the predominance consideration to a single "issue." *See, e.g.*, *Allison*, 151 F.3d at 422 ("[R]eading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended." (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n. 21 (5th Cir. 1996)); *Roach v. T.L. Cannon Corp.*, 2013 WL 1316452 (N.D.N.Y. Mar. 29, 2013) (refusing to certify a class on common liability issues when individualized damages determinations would otherwise predominate); *Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc.*, 2013 WL 6072702 (E.D. La. Nov. 18, 2013) (holding that using Rule 23(c)(4) and "phase two" damages proceedings would improperly permit "end run around the predominance and superiority requirements of 23(b)(3)"); *cf.* Laura J. Hines, Challenging the Issue Class End-Run, 52 Emory L.J. 709 (2003).

a whole.  *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439-45 (4th Cir. 2003) (surveying cases and applying predominance to cause of action as a whole).  Plaintiff cannot establish predominance and superiority for any cause of action in this case.

>    **2.    Plaintiff's Proposed Trial Plan Demonstrates that Class Certification is Not a Superior Method of Adjudication and that No Efficiency will be Gained by Proceeding as a Class.**

Finally, Plaintiff's proposed trial plan confirms that there is no efficiency gained by proceeding as a class action and, thus, that a class action would not be superior.  Plaintiff proposes a jury trial not only to establish liability for class-wide disparate treatment, but also to have the initial jury determine damages for every putative class member who "testif[ies] at trial." *See* Pl.'s Mot. at 49 ("Whether Defendant is liable to individuals who testify at trial for race discrimination and, if so, in what amount.").  He then proposes subsequent individual hearings to determine damages and to adjudicate individual defenses for those class members who did not testify at trial.  Plaintiff thus seeks a division not between liability and damages, but instead between merits decisions for individuals called to testify at trial and those not called to testify. This proposal does not result in a superior vehicle for resolving claims.  For example, if all of Plaintiff's declarants testified at trial, the USMS would need to rebut their testimony with highly individualized explanations of the decisionmaking for about 79 competitive selection decisions. *See* Lowry Decl. ¶ 84 (explaining that the declarants identified 79 vacancies), not to mention the need to address the other idiosyncratic evidence the declarants may put forward to suggest that the agency's actions toward them were discriminatory.  A trial plan that requires so much individualized testimony is not efficient or consistent with the purpose of class certification, and further highlights the fact that individualized issues predominate over any common questions. Certification should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for class certification with prejudice.

Dated:  May 15, 2015                    Respectfully submitted,

                                        BENJAMIN C. MIZER
                                        Principal Deputy Assistant Attorney General

                                        VINCENT H. COHEN, JR.
                                        United States Attorney

                                        JOSHUA E. GARDNER
                                        Assistant Director
                                        Civil Division

                                        _ s/ Galen N. Thorp_____
                                        MARSHA STELSON  EDNEY
                                        (DC Bar # 414271)
                                        Senior Trial Counsel
                                        JAMES SCHWARTZ (DC Bar # 468625)
                                        Senior Counsel
                                        GALEN N. THORP (VA Bar # 75517)
                                        Trial Attorney
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave. NW, Room 6140
                                        Washington, D.C. 20530
                                        Tel: (202) 514-4781
                                        Fax: (202) 616-8460
                                        E-mail: galen.thorp@usdoj.gov

                                        *Attorneys for Defendant*